**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| |
|---|
| FIVE RIVERS CATTLE FEEDING, LLC, |
| *Petitioner*, |
| v. |
| HOWARD B. SAMUELS, SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF CENTRAL GROCERS, INC., R & D MARKETING, LLC, AND REDNER'S MARKETS, INC., |
| *Respondents*. |

Case No.   1:22-mc-00216

## <u>FIVE RIVERS CATTLE FEEDING, LLC'S MOTION TO QUASH NON-PARTY SUBPOENA</u>

Non-Party Five Rivers Cattle Feeding, LLC ("Five Rivers") respectfully moves to quash a subpoena served on October 11, 2022 by Howard B. Samuels, solely in his capacity as Chapter 7 trustee for the bankruptcy estate of Central Grocers, Inc., R & D Marketing, LLC, and Redner's Markets, Inc. (the "Direct Purchaser Plaintiffs" or "DPPs"), in connection with *In re DPP Beef Litigation*, Case No. 0:20-cv-1319 (JRT/HB), a civil antitrust lawsuit pending in the U.S. District Court for the District of Minnesota (the "DPP Action").  Five Rivers is a resident of Colorado and the subpoena commanded compliance in Greenwood Village, Colorado, so this Court is therefore the appropriate venue for this Motion pursuant to Federal Rule of Civil Procedure 45(d)(3).

Even though discovery in the underlying litigation is in its very early stages, and the defendants to that action apparently have not even begun their document productions, the Direct Purchaser Plaintiffs have served an absurdly overbroad subpoena on non-party Five Rivers.  The subpoena seeks documents that are irrelevant or of tenuous connection to the underlying suit at best.  Worse yet, the subpoena demands information largely available from public sources or within the possession of the defendants.

Five Rivers made extensive efforts to reasonably focus the subpoena, but its common-sense proposals were largely rejected. Instead, the Direct Purchaser Plaintiffs have continued to insist on overbroad, irrelevant, and burdensome document productions from Five Rivers before the parties have made their own discovery. As outlined below, the subpoena should be quashed in its entirety or, at the very least, if any discovery is ordered by the Court, the scope of the subpoena should be narrowed and Five Rivers should be awarded its costs and expenses in responding to the subpoena. Five Rivers also requests its reasonable attorney's fees in bringing this Motion.

## I.      BACKGROUND

### A.      Underlying Litigation and Industry Background

The subpoena at issue was served in connection with multidistrict litigation (the "MDL") pending in the District of Minnesota in which multiple groups of plaintiffs claim that certain meat processing and packing companies violated Section 1 of the Sherman Act by conspiring to constrain beef supplies. *See In re DPP Beef Litigation*, Case No. 0:20-cv-1319 (JRT/HB) (D. Minn.) at ECF-304 ("DPP 3d. Am. Compl.") attached as Ex. A; *see generally In re Cattle and Beef Antitrust Litigation*, Case No. 0:22-md-303 (D. Minn.). Specifically, the Direct Purchaser Plaintiffs allege that, beginning around 2015, the defendant meat processing and packing companies[1] agreed to reduce their fed cattle purchases and slaughter volumes. According to the plaintiffs, this limited the supply of beef and thereby raised beef prices.[2] *See id*. Five Rivers,

---

[1] Defendant meat processing and packing companies named in the DPP Action include Cargill, Inc., Cargill Meat Solutions Corporations (a/k/a Cargill Protein) ("CMS"), JBS S.A., JBS USA Food Company ("JBS USA"), Swift Beef Company ("Swift"), JBS Packerland, Inc. ("Packerland"), National Beef Packing Company ("National Beef"), Tyson Foods, Inc. ("Tyson Foods"), and Tyson Fresh Meats, Inc. ("Tyson Fresh"). *See* DPP 3d. Am. Compl.

[2] As used in the DPP's complaint, "'beef' means boxed and case-ready meat that has been processed from fed cattle by Defendants and other smaller, nondefendant producers. It excludes ground beef made from culled cows. 'Cattle' means fed cattle before they are processed into beef

which operates cattle feedlots, is not a party to the DPP Action or any other action in the MDL. *See id.*

Some industry background, as alleged in the DPPs' complaint, provides context for the present Motion to Quash.[3] Fed cattle progress through multiple stages prior to slaughter. DPP 3d. Am. Compl. ¶ 92. "First, calves are raised by their mothers for six to ten months. When they weigh about 500 pounds, the calves are weaned and sold to the stocker-yearling sector where they eat a diet of forage, wheat pasture, and sileage. When a steer or heifer reaches 600–800 pounds, it is sold to a feedlot where it eats corn and protein supplements in addition to roughage." *Id.* ¶ 93. "Once cattle reach 950–1,300 pounds [more accurately 1,200–1,500 pounds], they are sold as fed cattle to the beef packing stage." *Id.* ¶ 94. Cattle are sold to meat processing and packing companies through two channels: (1) supply contracts [known as alternative marketing agreements "AMA's"] with feedlots or ranching operations, and (2) the cash cattle trade market (i.e. the spot market). *Id.* ¶¶ 95, 181. Some meat processing and packing companies rely on their own cattle instead of purchasing cattle for slaughter. *Id.* ¶ 181. Meat processing and packing companies "slaughter and process the cattle into edible boxed beef and smaller case-ready consumer cuts" and "sell the beef in the wholesale market to businesses like [DPPs] who distribute the beef to retailers or directly to grocery chains, restaurants, and other large retailers." *Id.* ¶¶ 94, 96. This process is illustrated in the figure below:

---

and excludes culled cows. 'Fed' cattle means steers and heifers raised in feedlots on a concentrated diet for the production and sale of beef." DPP 3d. Am. Compl. ¶ 1 n.1.

[3] Five Rivers does not necessarily agree with the industry background as alleged by DPPs but will accept it solely for purposes of this Motion.



Source: GAO analysis of U.S. Department of Agriculture and industry information. | GAO-18-296

*Id.* at Figure 6.

The crux of the Direct Purchaser Plaintiffs' conspiracy claim is that defendant meat processing and packing companies "agreed to periodically reduce their respective purchase [of fed cattle] and slaughter volumes, resulting in wholesale prices above competitive levels." *Id.* ¶ 104. In turn, the Direct Purchaser Plaintiffs allege that, as direct purchasers of wholesale beef, they were damaged by paying artificially inflated prices. *Id.* ¶¶ 260–61. The Direct Purchaser Plaintiffs do not allege that feedlots, like Five Rivers, conspired with the defendant meat processing and packing companies. In fact, the Direct Purchaser Plaintiffs claim the opposite—that defendants'

purported conspiracy *harmed* entities like Five Rivers because "when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded." *See id.* ¶ 98.

**B.    Discovery in the Underlying Litigation**

Discovery in the underlying litigation is in its very early stages. It appears that the parties have yet to begin producing documents. According to the November 9, 2022 Order to Modify Scheduling Order, over the past few months the parties have been negotiating search terms for document review and production. *See In re Cattle and Beef Antitrust Litigation*, 0:22-md-03031 (D. Minn.) at ECF-69 attached as Ex. B. And the MDL Court has not even set the discovery deadlines in the case. *See In re Cattle and Beef Antitrust Litigation*, 0:22-md-03031 (D. Minn.) at ECF-104 attached as Ex. C (directing the parties to submit a joint stipulation and proposed pretrial scheduling order after they meet and confer to finalize some remaining details). Accordingly, the scope of party productions in the DPP Action is far from established.

Moreover, the Direct Purchaser Plaintiffs reached a settlement with Defendants JBS S.A., JBS USA Food Company, Swift Beef Company, and JBS Packerland, Inc. ("JBS Defendants"). The Direct Purchaser Plaintiffs have also touted the continued discovery obligations of those defendants. In their Motion for Preliminary Approval of Settlement, the Direct Purchaser Plaintiffs told the MDL Court that the settlement requires the JBS Defendants to provide "*extensive*" discovery. *See In re DPP Beef Litigation*, Case No. 0:20-cv-1319 (JRT/HB) (D. Minn.) at ECF-331 attached as Ex. D (emphasis added). In particular, the Direct Purchaser Plaintiffs described seven categories of discovery cooperation from the JBS Defendants:

(a) [A]n eight (8) hour attorney proffer where JBS's counsel is required to summarize the principal facts known to it that are relevant to the alleged conduct, market, and industry participants at issue in the Actions, including any facts previously provided to the DOJ or any other U.S. government investigative

authority in response to subpoenas or otherwise related to the allegations in the Complaint;
(b) production of JBS's structured data;
(c) data, documents, and contact information necessary for facilitating class notice and settlement administration;
(d) witness interviews with up to six (6) JBS employees;
(e) depositions of up to six (6) JBS employees;
(f) the production of up to three (3) current employee witnesses at trial; and
(g) assistance with authentication and laying a foundation for admissibility at trial of JBS documents, among other cooperation provisions.

*See id* at pp. 5–6.  Accordingly, the Direct Purchaser Plaintiffs have ample ability and time to seek discovery from the parties to the DPP Action and to seek relief from the MDL Court to the extent defendants do not comply with their discovery obligations.

### C.      Non-Party Subpoena at Issue

On October 11, 2022, the Direct Purchaser Plaintiffs served a subpoena in the DPP Action directed to Five Rivers in Johnstown, Colorado.  *See* September 28, 2022, Subpoena attached as Ex. E.  The subpoena directed Five Rivers to produce certain documents to counsel in Greenwood Village, Colorado by November 4, 2022.  *Id.*  The subpoena broadly seeks "Documents and Unstructured Data" spanning the time period of January 1, 2012, to June 30, 2020 (eight and a half years) and "Structured Data" spanning the time period of January 1, 2009, to June 30, 2020 (eleven and a half years).  *See id.*

The six document requests (including multiple subparts) in the subpoena seek:

1. "All Documents" regarding a 2018 acquisition by Pinnacle Asset Management, L.P., of Five Rivers from JBS USA, including contracts, draft contracts, communications with government agencies, communications with suppliers and customers, and studies or analyses;

2. "All Documents" regarding a 2008 acquisition by JBS USA of Five Rivers from Smithfield Foods and Continental Grain Company, including contracts, draft contracts,

communications with government agencies, communications with suppliers and customers, and studies or analyses;

3. "All Structured Data" showing the individual transactions (including nine subparts specifying categories of data) that Five Rivers made acquiring and selling cattle domestically, as well as the shipments or movements of cattle into or out of Five Rivers' possession;

4. "All Documents" reflecting communications between Five Rivers and two or more Defendants;

5. "All Documents" relating to any studies, reports, analyses, or presentations regarding competitive conditions in the cattle feedlot industry or the Beef industry, generally; and

6. "All Documents" related to the effect of drought on any competitive conditions for cattle, including the quality or quantity of cattle.

**D.    Five Rivers has Conferred Extensively Over the Subpoena with DPPs.**

On October 14, 2022, counsel for Five Rivers conferred with counsel for the Direct Purchaser Plaintiffs by telephone regarding the subpoena.  Five Rivers expressed its concerns about the considerable burden of the requests, as well as the lack of relevancy of the demanded documents, along with their competitive sensitivity.  Five Rivers also explained that the documents were more appropriately sought from the parties to the litigation.  Five Rivers further proposed holding the subpoena in abeyance while the parties make further progress in discovery.

On October 25, 2022, Five Rivers served its formal objections to the subpoena. *See* October 25, 2022, Objections to Non-Party Subpoena attached as Ex. F.  Five Rivers objected to each of the six document requests on multiple grounds, including those addressed in this Motion.

On November 10, 2022, counsel for the Direct Purchaser Plaintiffs sent a letter to counsel for Five Rivers inadequately addressing Five Rivers' objections to the subpoena.  *See* November 10, 2022, Letter attached as Ex. G.  Counsel for the Direct Purchaser Plaintiffs only withdrew one

of the six document requests (Request 2) and continued to insist on production of documents in response to the remaining five requests. *See id*.

Counsel for Five Rivers and counsel for the Direct Purchaser Plaintiffs conferred by telephone again on November 22, 2022. Counsel for Five Rivers memorialized that conversation in a letter dated November 23, 2022. *See* November 23, 2022, Letter at Ex. H. On December 28, 2022, counsel for the Direct Purchaser Plaintiffs and counsel for Five Rivers conferred further by letter and email correspondence, confirming certain agreements and the areas on which the parties have reached an impasse, as detailed below. *See* December 28, 2022, Letter at Ex. I and December 29, 2022, Email at Ex. J.

Five Rivers and the Direct Purchaser Plaintiffs have reached agreement as to certain portions of the document requests. In exchange for the Direct Purchaser Plaintiffs otherwise holding Request 3 in abeyance,[4] Five Rivers agreed to produce monthly data for downstream sales for the time period of 2009 through 2020. In response to Request 5, Five Rivers agreed to provide a list of third-party studies, reports, and analyses related to Competitive Conditions in the feedlot industry and to which Five Rivers subscribes, and the Direct Purchaser Plaintiffs have agreed that the production of such a list satisfies Request 5 as to third-party material. The Direct Purchaser Plaintiffs have refused to hold any of the other requests in abeyance, and instead they demand the immediate production of irrelevant and disproportionate discovery in response to Requests 1, 4, 5, and 6. For this reason, Five Rivers has filed the instant Motion seeking relief from this Court.

---

[4] As stated in the November 23rd correspondence, for any request held in abeyance, Five Rivers and DPPs agreed to discuss in good faith renewed requests following DPPs' further efforts to obtain responsive information from other discovery sources. Five Rivers does not waive its objections to the subpoena and reserves the right to reassert the objections if DPPs subsequently renew the requests held in abeyance.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 45 requires a party serving a subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(d)(1).  Further, pursuant to Rule 45(c)(3)(A)(iv), the Court must quash or modify a subpoena that subjects a person to undue burden.  *Gebremedhin v. Am. Family Mut. Ins. Co.*, No. 1:13-cv-02813-CMA-NYW, 2015 WL 4272716, at *4 (D. Colo. 2015).

"The proper scope of discovery is further bounded by the principles of proportionality." *Id.*  Indeed, Rule 26(b)(2)(C) provides that a court must "limit discovery on motion or on its own if it determines that: (1) the discovery sought is unreasonably cumulative or duplicative, or may be obtained from some other source that is more convenient, less burdensome, or less expensive; (2) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (3) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." *Id.* (internal citations omitted) (citing Fed. R. Civ. P. 26(a)(2)(C)).  In this regard, the party serving the non-party subpoena must "be able to explain why it cannot obtain the same information, or comparable information that would satisfy its needs, from one of the parties to the litigation[.]"  *In re Novartis & Par Antitrust Litig.*, No. 19-00149, 2019 WL 5722055, at *7 (E.D. Pa. 2019) (quoting *Va. Dept. of Corrections v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019)); *see also Rossman v. EN Eng'g, LLC*, 467 F. Supp. 3d 586, 590–91 (N.D. Ill. 2020) ("A non-party subpoena seeking information that is readily available from a party through discovery may be quashed as duplicative or cumulative."); *Baumer v. Schmidt*, 423 F. Supp. 3d 393, 408–09 (E.D. Mich. 2019) ("[C]ourts in this circuit have repeatedly denied motions to compel discovery and quashed subpoenas directed to non-parties where the discovery sought was obtainable from a party to the litigation");

*Castleberry v. Camden Co.*, 331 F.R.D. 559, 565 (S.D. Ga. 2019) ("Court will not allow Defendant to seek non-party discovery through its Motion to Compel, particularly where Defendant could have obtained the same materials during the discovery period from Plaintiff"); *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D. 406, 409–10 (C.D. Cal. 2014) ("Courts are particularly reluctant to require a non-party to provide discovery that can be produced by a party.").[5]

A party "must satisfy a burden of proof heavier than the ordinary burden imposed by Rule 26" when dealing with a subpoena on a non-party. *Masters v. Gilmore*, No. 08-cv-02278, 2009 WL 4016003, at *2 (D. Colo. 2009). "The fact that discovery is sought from a non-party is one factor the Court may weigh in determining whether . . .to enforce[] . . . the subpoena. Courts are required to balance the need for discovery against the burden imposed when parties are ordered to produce information or materials, and the status of a person or entity as a non-party is a factor which weighs against disclosure." *Id.*; *see also Bosier v. Am. Family Mut. Ins. Co., S.I.*, No. 17-cv-02664, 2019 WL 981349, at *3 (D. Colo. 2019) ("Discovery from third-parties must, under most circumstances, be closely regulated.").

"A trial court may find that discovery into matters not relevant to the case imposes a per se undue burden." *Gebremedhin*, 2015 WL 4272716, at *4 (citing Fed. R. Civ. P. 26(c)(1)(D)). Further, "parties are not allowed to engage in exploratory discovery or a 'fishing expedition' in an

---

[5] *See also Seven Z Enters., Inc. v. Giant Eagle, Inc.*, No. 17-740, 2020 WL 7240365, at *3 (W.D. Pa. 2020) (in antitrust litigation, granting a motion to quash plaintiffs' non-party subpoenas because the information was available and could be requested from the defendant); *Zabresky v. von Schmeling*, No. 12-20, 2013 WL 1402324, at *3–4 (M.D. Pa. 2013) (quashing non-party subpoena because the information was available from other sources); *Am. Trucking Ass'ns v. Alviti*, 496 F. Supp.3d 699, 717 (D.R.I. 2020) (declining to require non-party deponents to produce documents that were available from a party to the litigation).

attempt to obtain evidence to support their claims or defenses." *Breen v. Black*, 2016 WL 4257437, at *2 (D. Wyo. 2016).

III.   <u>ARGUMENT</u>

    A.   **Request 1 is Overbroad and Seeks Documents About a Corporate Transaction That Has No Relevance to the Underlying Case.**

Request 1 seeks "all" documents related to a 2018 corporate transaction in which Five Rivers was sold by JBS to Pinnacle Asset Management, L.P. ("the 2018 Transaction"). The request is overbroad, and the demanded highly confidential information and documents are irrelevant.

It is entirely unclear how transaction documents are relevant to an alleged conspiracy between meat processing and packing companies to curtail beef supply. The Direct Purchaser Plaintiffs do not claim that the transaction itself was unlawful under the antitrust laws (i.e., this is not a case under Section 7 of the Clayton Act). There are no other allegations in the underlying complaint establishing the relevance of the requested information.[6] But it is not the Court's nor Five Rivers' obligation to puzzle through the request to find a connection to the case. *See Frappied v. Affinity Gaming Black Hawk, LLC*, No. 17-cv-01294, 2018 WL 1899369, at *4 (D. Colo. 2018) ("When the relevance of a particular topic is not apparent from its face, the party seeking the information bears the burden of first establishing the relevance of the information."); *Church Mut. Ins. Co. v. Phillip Marshall Coutu*, No. 17-cv-00209, 2017 WL 4236318, at *6 (D. Colo. 2017) (granting motion to quash where subpoenaing party failed to establish the necessary nexus under

---

[6] Indeed, the subpoena originally demanded documents about another corporate transaction in 2008 (Request 2), but the Direct Purchaser Plaintiffs withdrew that request upon Five Rivers' objections.

Rule 26(b)(1) to persuade the court that the requested documents are relevant to its claims).  The Court should grant Five Rivers' motion to quash as to Request 1 on this basis alone.

In addition to being irrelevant, Request 1 is massively overbroad in that it seeks "[a]ll Documents regarding" the 2018 Transaction without limitation.  Specifically, Request 1 calls for materials "including, but not limited to" contracts ***and draft contacts***; communications with government agencies; communications with cattle suppliers and customers; and Five Rivers' studies and analyses regarding the transaction, "the business rationale behind it, and its anticipated effect on Your business or the industry."  *See* Ex. E at Request 1.  It is difficult to see how *any* documents, let alone *all* documents, related to the 2018 Transaction are proportional to the needs of the case.  Request 1 should thus be quashed as overbroad on its face.  *See GSL Group Inc. v. Travelers Indemnity Co.*, No. 1:18-cv-00746, 2020 WL 12813087, at *2 (D. Colo. 2020) (finding subpoena overbroad on its face where "given [the requests' and definitions'] extraordinarily broad language, it is hard to imagine what documents, information, or individuals would not be swept up in these expansive definitions, including privileged and irrelevant materials.").

**B.    Request 4 Seeks Correspondence That Can Be Obtained From Multiple Parties to the DPP Action.**

Request 4 is facially cumulative and duplicative in that seeks "[c]ommunications between [Five Rivers] and two or more Defendants."  By definition, ***two different defendants in the underlying case*** possess the requested communications, and the Direct Purchasers Plaintiffs have ample opportunity to obtain the materials from them.  During the meet-and-confer negotiations, the Direct Purchaser Plaintiffs asserted their right to confirm the completeness of the defendants' productions, but this does not make sense where the parties have not even begun producing documents.  In any case, the Direct Purchaser Plaintiffs' desire to triple-check the completeness of the defendant's productions is not proportional to the burden on non-party Five Rivers to search

for and produce the same communications. The Court should grant Five Rivers' motion to quash as to Request 4. *See* Fed. R. Civ. P. 26(b)(2)(C); *ACI Worldwide Corp. v. Mastercard Technologies, LLC*, No. 14-cv-31, 2016 WL 3647850, at *5 (D. Neb. 2016) (holding that "serving a document subpoena on a nonparty to confirm what was already produced by a party is not reasonable to avoid undue burden or expense, or proportional to the needs of the case" where the subpoenaing party claimed it wanted to use a non-party to "audit" the productions of a party since the party may have intentionally or inadvertently failed to produce certain documents).

### C. Requests 5 and 6 Seek Five Rivers' Proprietary and Highly Sensitive Views of Competitive Conditions.

Request 5 demands "[a]ll Documents relating to any studies, reports, analyses, or presentations regarding Competitive Conditions in the cattle feedlot industry or the Beef industry, generally." In an attempt to reasonably narrow the request, Five Rivers offered to provide a list of third-party studies, reports, and analyses to which Five Rivers subscribes. While the Direct Purchaser Plaintiffs agreed that the production of such a list would satisfy this request as to third-party materials, the Direct Purchaser Plaintiffs continue to demand all *internal* analyses prepared by Five Rivers.

Similarly, Request 6 demands "[a]ll Documents related to the effect of drought on any Competitive Conditions for cattle, including the quality or quantity of cattle." Five Rivers explained to the Direct Purchaser Plaintiffs that the requested information is publicly available and proposed that this request be held in abeyance while the Direct Purchaser Plaintiffs examine the third-party materials that Five Rivers identifies in response to Request 5. But the Direct Purchaser Plaintiffs have refused that reasonable narrowing and instead continue to seek all internal materials prepared by Five Rivers as the effect of drought on any Competitive Conditions.

In light of the ample third-party and public sources covering the Cattle and Beef industries, there is no valid reason for demanding Five Rivers' internal reports, studies, and analyses. Further, it is unclear how non-party Five Rivers' internal analyses of general competitive conditions is relevant to an alleged conspiracy between meat processing and packing companies to curtail beef supply. And Five Rivers' documents about "competitive conditions" necessarily involve the business's internal deliberations about competitors, sales prospects, and the like—all highly sensitive. And the production of "all documents" for such a broadly worded request would capture information not pertinent to the underlying case as well. Especially in light of Five Rivers' offer to provide a list of third-party materials to which it subscribes, the Direct Purchaser Plaintiffs' requests for internal documents are not proportional to the needs of the case.

### D. To the Extent the Court Orders Five Rivers to Produce Any Documents in Response to the Subpoena, Five Rivers Seeks Cost Shifting.

"It is the Court's obligation to protect any person who is not a party to the underlying lawsuit from significant expense resulting from the inspection and copying which was commanded pursuant to Rule 45." *In re Application of Michael Wilson & Partners, Ltd., for Judicial Assistance Pursuant to 28 U.S.C. Section 1782*, No. 06-cv-02575, 2012 WL 1901218, at *4 (D. Colo. 2012) (citing *R.J. Reynolds Tobacco v. Philip Morris, Inc*., 29 F. App'x 880, 882–83 (3rd Cir. 2002) (holding that compensation for significant expenses incurred by a nonparty is mandatory under Rule 45) and *Linder v. Calero–Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001) (The "court must protect the non-party by requiring the party seeking discovery to bear at least enough of the expense to render the remainder 'non-significant.'")).

Under Rule 45(d)(1), a court must impose sanctions against a party and its attorneys where they failed to take reasonable steps to avoid imposing undue burden or expense on a party subject to a subpoena. Further, under Rule 45(d)(2)(B)(ii), where a non-party has objected to a subpoena

and a court orders compliance with the subpoena, the court's "order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." "The court, in determining to what extent costs should be shifted, shall consider (1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear its costs than the requesting party; and (3) whether the litigation is of public importance. Cost shifting is not limited to costs of inspection and production, but those 'significant expenses resulting from the inspection and copying.'" *In re Application of Michael Wilson*, at *5 (internal citation omitted).

Here, Five Rivers is not a party to the underlying case, and if Five Rivers is required to produce additional discovery, the Direct Purchaser Plaintiffs should be ordered to reimburse Five Rivers for its costs and expenses in responding to the subpoena. *See In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 669 F.2d 620 (10th Cir. 1982) (holding that district court properly conditioned non-party discovery upon payment of discovery costs incurred by the non-party).

### E.    Request for an Award of Attorneys' Fees

Five Rivers should also receive an award of attorney's fees incurred in bringing this Motion.   Under Rule 45(d)(1), a district court must impose sanctions—which may include reasonable attorney's fees—against a party and its attorneys where they failed to take reasonable steps to avoid imposing undue burden or expense on a non-party.   As set forth herein, the subpoena imposes undue burden and expense on Five Rivers because it seeks irrelevant information and is unreasonably duplicative since the information sought can be obtained from other sources, including public sources and defendants in the underlying litigation.   Five Rivers' good faith efforts to narrow the subpoena have been largely rejected by the Direct Purchaser Plaintiffs, thereby necessitating the present Motion.   After the Court's resolution of this Motion, Five Rivers will submit a declaration itemizing the fees incurred for the Court's review.

**IV.**   <u>**CONCLUSION**</u>

For the reasons set forth above, the Court should grant Five Rivers' Motion to Quash Non-Party Subpoena and quash in its entirety the subpoena served on Five Rivers by the Direct Purchaser Plaintiffs.  If any discovery is ordered by the Court, the scope of the subpoena should be narrowed, and Five Rivers should be awarded its costs and expenses in responding to the subpoena.  Five Rivers also should be awarded its attorneys' fees in bringing this Motion.

Dated:  December 29, 2022                     Respectfully submitted,

*/s/ Christopher C. Yook*
Christopher C. Yook
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
cyook@kslaw.com

John F. Massouh
**SPROUSE SHRADER SMITH PLLC**
701 S. Taylor Street
Suite 500
Amarillo, TX 79101
Telephone: (806) 468-3300
john.massouh@sprouselaw.com

*Counsel for Five Rivers Cattle Feeding,*
*LLC*

16

## D.C.COLO.LCivR 7.1 CERTIFICATE

Pursuant to Fed. R. Civ. P. 26(c)(1) and D.C.COLO.LCivR 7.1, I hereby certify that I conferred in good faith with opposing counsel on multiple occasions in an attempt to resolve the issues presented in this motion, but the issues were unable to be resolved.

*/s/ Christopher Yook*
Christopher C. Yook

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of December, 2022, I served the foregoing FIVE RIVERS CATTLE FEEDING, LLC'S MOTION TO QUASH NON-PARTY SUBPOENA by mailing a copy via e-mail to the following counsel of record:

| | |
|---|---|
| Jason S. Hartley | Daniel E. Gustafson |
| Hartley LLP | Daniel C. Hedlund |
| 101 West Broadway, Suite 820 | Michelle J. Looby |
| San Diego, CA 92101 | Joshua J. Rissman |
| Phone: (619) 400-5822 | Brittany Resch |
| Fax: (619) 400-5832 | GUSTAFSON GLUEK PLLC |
| hartley@hartleyllp.com | Canadian Pacific Plaza |
| | 120 So. Sixth Street, Suite 2600 |
| | Minneapolis, MN 55402 |
| | Telephone: (612) 333-8844 |
| | Facsimile: (612) 339-6622 |
| | dgustafson@gustafsongluek.com |
| | dhedlund@gustafsongluek.com |
| | mlooby@gustafsongluek.com |
| | jrissman@gustafsongluek.com |
| | bresch@gustafsongluek.com |
| | |
| Adam J. Zapala | Dennis J. Stewart |
| Elizabeth T. Castillo | GUSTAFSON GLUEK PLLC |
| James G. Dallal | 600 B Street |
| COTCHETT, PITRE & MCCARTHY, LLP | 17th Floor |
| 840 Malcolm Road, Suite 200 | San Diego, CA 92101 |
| Burlingame, CA 94010 | Telephone: (612) 333-8844 |
| Telephone: (650) 697-6000 | Facsimile: (612) 339-6622 |

Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com

dstewart@gustafsongluek.com

Alexander E. Barnett
COTCHETT, PITRE & MCCARTHY, LLP
40 Worth Street, Suite 602
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

Megan E. Jones
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
mjones@hausfeld.com

Dianne M. Nast
Daniel N. Gallucci
Michele Burkholder
Joanne E. Matusko
Michael S. Tarringer
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
dnast@nastlaw.com
dgallucci@nastlaw.com
mburkholder@nastlaw.com
jmatusko@nastlaw.com
mtarringer@nastlaw.com

Doulas A. Millen
Steven A. Kanner
Brian M. Hogan
FREED KANNER LONDON &
MILLEN
LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
dmillen@fklmlaw.com
skanner@fklmlaw.com
bhogan@fklmlaw.com

Kenneth A. Wexler
Melinda J. Morales
WEXLER BOLEY & ELGERSMA LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel:(312) 346-2222
kaw@wbe-llp.com
mjm@wbe-llp.com

Daniel R. Karon
KARON LLC
700 W. St. Clair Ave., Ste. 200
Cleveland, OH 44113
Tel: (216) 622-1851
dkaron@karonllc.com

Arthur N. Bailey
RUPP, BAASE, PFALZGRAF
CUNNINGHAM LLC
111 West 2nd Street #1100
Jamestown, New York 14701
T: (716) 664-2967
bailey@ruppbaase.com

Marco Cercone, Esq.
RUPP, BAASE, PFALZGRAF
CUNNINGHAM LLC
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
Tel: (716) 854-3400
cercone@ruppbaase.com

Kevin Landau
Evan Rosin
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Tel: (646) 873-7654
Fax: (212) 931-0703
klandau@tcllaw.com
erosin@tcllaw.com

R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813
rick@saveri.com
cadio@saveri.com

Simon B. Paris
Patrick Howard
SALTZ, MONGELUZZI,
& BENDESKY, P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: (215) 496-8282
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com

Brian D. Penny
GOLDMAN SCARLATO & PENNY,
P.C.
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Tel.: (484) 342-0700
Fax: (484) 580-8747
penny@lawgsp.com

J. Gordon Rudd, Jr.
David M. Cialkowski
ZIMMERMAN REED LLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 341-0400
gordon.rudd@zimmreed.com
david.cialkowski@zimmreed.com

Joseph Goldberg
Vince Ward
FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
Tel : 1.505.244.7520
jg@fbdlaw.com
vjw@fbdlaw.com

Richard M. Hagstrom
Michael R. Cashman
Nathan D. Prosser
Anne T. Regan
HELLMUTH & JOHNSON, PLLC
8050 West 78th Street
Edina MN 55439
Telephone: (952) 941-4005
rhagstrom@hjlawfirm.com
mcashman@hjlawfirm.com
nprosser@hjlawfirm.com
aregan@hjlawfirm.com

Warren T. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel: (469) 904-4550
wburns@burnscharest.com

Christopher J. Cormier
BURNS CHAREST LLP
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Tel: (202) 577-3977
ccormier@burnscharest.com

Bryan L. Bleichner
Jeffrey D. Bores
Christopher P. Renz
CHESTNUT CAMBRONNE PA
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Tel: (612) 339-7300
bbleichner@chestnutcambronne.com
jbores@chestnutcambronne.com
crenz@chestnutcambronne.com

Daniel J. Mogin
Jennifer M. Oliver
Timothy Z. LaComb
MOGIN RUBIN LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 687-6611
dmogin@moginrubin.com
joliver@moginrubin.com
tlacomb@moginrubin.com

Erica C. Lai
Melissa H. Maxman
COHEN & GRESSER LLP
2001 Pennsylvania Ave. NW, Suite 300
Washington, DC 20006
Tel: (202) 851-2073
elai@cohengresser.com
mmaxman@cohengresser.com

Ariana J. Tadler
Brian Morrison
TADLER LAW LLP
One Penn Plaza, 36th Floor
New York, NY 10119
Tel: (212) 946-9300
atadler@tadlerlaw.com
bmorrison@tadlerlaw.com

Daniel Walker
BERGER MONTAGUE
2001 Pennsylvania Avenue NW, Suite 300
Washington, DC 20006
Tel: (202) 559-9745
dwalker@bm.net

Katrina Carroll
CARLSON LYNCH
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Tel: (312) 750-1265
kcarroll@carlsonlynch.com

Kelly Iverson
CARLSON LYNCH
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
kiverson@carlsonlynch.com

Andrew J. McGuinness
ANDREW J. MCGUINNESS, ESQ.
111 S. Main St., 3rd Floor
Ann Arbor, MI 48107
Tel: (734) 274-9374
drewmcg@topclasslaw.com

Michael Gratz
GRATZ & GRATZ, P.A.
312 North Green St.
Tupelo, MS 38804
Tel (662) 844-5531
Fax (662) 844-8747
michael@gratzandgratz.com

Joshua H. Grabar, Esq.
GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 267-507-6085
Fax: 267-507-6048
Email: jgrabar@grabarlaw.com

Marc H. Edelson
EDELSON LECHTZIN LLP
3 Terry Drive
Suite 205
Newtown, PA 18940
215-867-2399 (work)
215-272-0517 (cell)
Medelson@edelson-law.com

**_Counsel for Respondents_**

_/s/ Christopher Yook_
Christopher C. Yook

# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE CATTLE AND BEEF ANTITRUST LITIGATION | Case No. 0:20-cv-1319 (JRT/HB) |
| This Document Relates To:<br><br>IN RE DPP BEEF LITIGATION | <u>**DIRECT PURCHASER PLAINTIFFS'**</u><br><u>**THIRD CONSOLIDATED AMENDED**</u><br><u>**CLASS ACTION COMPLAINT**</u><br>**REDACTED PUBLIC VERSION** |

Plaintiffs, Howard B. Samuels solely in his capacity as Chapter 7 trustee for the bankruptcy estate of Central Grocers, Inc. ("Central Grocers"), R& D Marketing, LLC ("R & D"), and Redner's Markets, Inc. ("Redner's"), bring this antitrust class action lawsuit on behalf of themselves and all persons and entities similarly situated against Defendants Cargill, Inc., Cargill Meat Solutions Corporations (a/k/a Cargill Protein) ("CMS"), JBS S.A., JBS USA Food Company ("JBS USA"), Swift Beef Company ("Swift"), JBS Packerland, Inc. ("Packerland"), National Beef Packing Company ("National Beef"), Tyson Foods, Inc. ("Tyson Foods"), Tyson Fresh Meats, Inc. ("Tyson Fresh") (collectively "Defendants"), and unnamed co-conspirators. Based upon personal knowledge and investigation by counsel, Plaintiffs allege as follows:

## I. NATURE OF THIS ACTION

1.     This class action is brought on behalf of Plaintiffs and all persons and entities who purchased beef[1] in the United States directly from one or more of the Defendants from at least January 1, 2015, until present (the "Class Period"). Plaintiffs allege that Defendants violated Section 1 of the Sherman Act by conspiring to constrain beef supplies in the United States, thereby artificially inflating domestic beef prices paid by direct purchasers. As a direct result of Defendants' unlawful conduct, Plaintiffs and the other class members suffered antitrust injury for which Plaintiffs seeks treble damages and injunctive relief. Plaintiffs also demand a jury trial.

2.     Defendants are the world's largest meat processing and packing companies, known in the industry as meatpackers or packers. In 2018, the operating company Defendants (Tyson Fresh, CMS, Swift/Packerland, and National Beef) (collectively "Operating Defendants") — sold approximately 80 percent of the more than 25 million pounds of fresh and frozen beef supplied to the U.S. market. Collectively, they controlled approximately 81–85 percent of the domestic cattle processed (or slaughtered) in the market throughout the Class Period. The next largest meatpacker had only a 2–3 percent market share.

3.     Since at least the start of 2015, Defendants have exploited their market power in this highly concentrated market by conspiring to limit the supply, and fix the prices, of

---

[1]     In this Complaint, "beef" means boxed and case-ready meat that has been processed from fed cattle by Defendants and other smaller, nondefendant producers. It excludes ground beef made from culled cows. "Cattle" means fed cattle before they are processed into beef and excludes culled cows. "Fed" cattle means steers and heifers raised in feedlots on a concentrated diet for the production and sale of beef.

beef sold to Plaintiffs and class members in the U.S. wholesale market. The principal, but not exclusive, means Defendants have used to effectuate their conspiracy is a scheme to artificially constrain the supply of beef entering the domestic supply chain. Defendants' collusive restriction of the beef supply has had the intended effect of artificially inflating beef prices. As a result, Plaintiffs and class members paid higher prices than they would have paid in a competitive market.

4.     Recently, the U.S. Department of Justice ("DOJ") and U.S. Department of Agriculture ("USDA") launched investigations into whether Defendants fixed beef prices in the United States. On June 4, 2020, news sources reported, and Plaintiffs confirmed, that DOJ's Antitrust Division sent civil investigative demands to Defendants Tyson Foods, JBS SA, and Cargill, Inc., and to National Beef Inc. (a company related to Defendant National Beef) seeking information about their pricing practices dating back to January 2015.

5.     On March 12, 2020, testimony before the Senate Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies, Secretary of Agriculture Sonny Perdue announced that the USDA had begun an investigation into suspiciously high beef prices. Secretary Perdue expressed serious concern that meatpackers were paying lower prices for live cattle without passing the cost savings on to Plaintiffs and other beef purchasers. As he explained, the difference between prices for live cattle and prices for wholesale beef was "historically high."

6.     A confidential witness previously employed by Swift at its Cactus, TX slaughter plant has confirmed the existence of a conspiracy among the Operating

Defendants. The witness has confirmed that all the Defendants agreed to reduce their cattle purchases and slaughter volumes for the purpose and effect of increasing their margins (i.e., the spread between what Defendants pay cattle ranchers for fed cattle and the price they charge Plaintiffs and the proposed class for beef). Defendants' transactional data and slaughter volume records, information published by the USDA, and Defendants' public calls for industrywide slaughter and capacity reductions corroborate Witness 1's account.

7.     In addition to the high concentration in the wholesale beef industry, other structural characteristics of the domestic beef market facilitate Defendants' conspiracy. Operating Defendants sit atop the supply and distribution chain that ultimately delivers beef to the market. Their vital role is to purchase cattle from the nation's farmers and ranchers, slaughter and pack cattle into beef, and sell beef to Plaintiffs and class members. Operating Defendants' gatekeeping role has enabled them to collusively control upstream and downstream beef pricing throughout the Class Period.

8.     Other market characteristics serve as plus factors and support the inference of collusion among Defendants during the Class Period. These characteristics include producer concentration, high barriers to entry, inelastic demand, the commodity nature of beef, frequent opportunities to conspire, surging demand, market share stability, and decreased imports. These economic factors encouraged and fomented the formation of Defendants' conspiracy and continue to foster its successful operation.

9.     Capitalizing on the fundamental mechanism of supply and demand operating in a beef market vulnerable to successful cartel formation and operation, Operating

4

Defendants illegally collaborated to restrain and manage production of beef in the United States.

10.     These practices created surpluses in the cattle market and shortages in the wholesale beef market. These artificial conditions, in turn, drove down the prices Operating Defendants paid for cattle and boosted the prices Operating Defendants commanded for beef. The result intended and achieved by Operating Defendants has been higher profit margins (e.g., meat margins) than would have existed in a competitive market.

11.     This growth of Operating Defendants' margins was aided by the way supply and demand operate in the beef industry. The supply of cattle is insensitive to short-term price changes because of the long lifecycle of livestock, livestock's perishable nature, and the lack of any alternative use for livestock. Beef demand is also relatively insensitive to price fluctuations. As a result, Operating Defendants' margins are very responsive to changes in the aggregate volume of slaughtered cattle.

12.     Another form of interaction conducive to Defendants' collusion was frequent meetings between each other's executives and key employees. Trade association conferences and other industry events offered convenient opportunities to exchange information, plans and strategies, and to build relationships. As described throughout this complaint, Operating Defendants seized these opportunities to advance their collusive supply restrictions.

13.     By the beginning of 2015, Defendants had begun exploiting favorable market conditions to launch their conspiracy. At that time, they undertook a campaign of throttling

the beef supply, which campaign persists today. Publicly available industry data demonstrates Operating Defendants' abrupt transition from competition to collusion. Joint management of their respective slaughter volumes during the Class Period is immediately apparent from Figure 1 below, which tracks their quarterly slaughter volumes and shows them moving in tandem.

**Figure 1**



14.     The results of Defendants' agreement to coordinate slaughter reductions and volume are illustrated in Figures 2 and 3 below.  Figure 2 compares the average annual beef cattle slaughter by Operating Defendant and the smaller, non-defendant beef producers in the market before the Class Period (2007–2014) to the same average during the first five years of the Class Period (2015–2019), the years for which data is available.

6

**Figure 2. Average Annual Commercial Slaughter of Cattle**



15.     Figure 3 also compares the Operating Defendants' and the Independent

Packers' annual slaughter volumes during the Class Period and the pre-Class Period, but

breaks out the slaughter volume for each year of the Class Period for which data is

available.  The graph confirms that Tyson Fresh, Swift/Packerland, CMS, and National

Beef each slaughtered less fed cattle in every year in the Class Period compared to their

pre-Class Period averages. It also shows that while Tyson Fresh, Swift/Packerland, CMS,

and National Beef each gradually increased their slaughter volume from 2016 after their

dramatic 2015 reductions, as the supply of fed cattle increased, their rate of increase was

vastly outpaced by the slaughter volume increases of Independent Packers during the same

7

period.  Operating Defendants thus used periodic slaughter reductions and underutilized plant capacity to ensure their supply of beef never outstripped demand.

**Figure 3.**
**Average Pre- & Post-Class Period Fed Cattle Slaughter–**
**Operating Defendant vs Others**[2]



16.    These figures demonstrate that each Operating Defendant family curtailed its annual slaughter volumes during the Class Period, while the smaller beef processors collectively increased their slaughter volumes during the same period without making up the shortfall of beef created by the conspiracy.

---

[2]    As National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume.  Absent that acquisition, its year-on-year slaughter volume was flat against 2018, while Independent Packers collective slaughter volume rose by approximately 100,000 head (netting out National Beef's acquisition of Iowa Premium).

17.     As an immediate consequence of Operating Defendants' reduced supply, the beef market experienced a dramatic change of price behavior. Before 2015, prices of cattle and beef predictably moved in tandem. That correlation was the natural economic relationship in a competitive market because beef is simply processed cattle.

18.     But, at the start of the Class Period, when Operating Defendants began to cut production, this fundamental economic relationship between cattle and beef prices abruptly changed. The degree of correlation of cattle and beef prices diverged (to Operating Defendants' benefit) without any credible, non-collusive explanation. The relevant supply and demand factors in the industry no longer explained the prices charged to direct purchasers.

19.     Starting in 2015, wholesale beef prices began to show unusual trends. The per-pound price of cattle had historically stayed within 20 to 40 cents of the per-pound average wholesale price of beef. But in 2015, the spread between those prices increased dramatically as Figures 4 and 5 demonstrate.

Figure 4.



**The Spread Between the Farm Value of Beef and Wholesale Prices 2012 - 2020**

Source: USDA

Figure 5.

| Years | Farm to Wholesale Price Spread | Proportional Increase |
|---|---|---|
| 2010 through 2014 | $34.07 | |
| 2015 through 2018 | $54.24 | 59% |
| 2019 | $84.15 | 55% |
| 2020 | $125.05 | 49% |
| | | |
| 2010 through 2014 | $34.07 | |
| 2015 through 2020 | $71.03 | 109% |

10

20.     According to USDA Economic Research Service data, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to present than during the preceding five years. From 2010 to 2014, the average farm-to-wholesale spread was about $34. But from 2015 to 2018, the average spread was about $54—a 59% increase.  The spread continued to balloon, by 2020 reaching about $71, a 109% increase from the pre-class period average.

21.     Operating Defendants' ability to cut beef production while maintaining inflated beef prices during the Class Period provides compelling circumstantial evidence of their conspiracy. In a beef market free from collusion, if a competitor reduces its purchase of cattle, other competitors quickly pick up the slack to boost their sales and increase their market shares.

22.     In that environment, a competitor would not cut its purchases and suffer lost sales thereby compromising any hope of increasing its profit margin. Only colluding meatpackers would expect to benefit by reducing their purchases and slaughter of cattle – because they knew their would-be competitors would not be increasing their purchasing volumes as one would expect in a competitive market. By concertedly slashing their supply output, Operating Defendants have been able to expand their profit margins, confident that none of them would grab volume from another.

23.     United by their conspiracy, Operating Defendants were confident that none of them would break ranks and disproportionately expand their beef production to satisfy

11

unmet demand. Armed with this assurance, Operating Defendants improved their meat margins by achieving and sustaining an unprecedented gap between cattle and beef prices.

24.     Aided by their collective market power in the upstream (cattle) and downstream (beef) markets, Operating Defendants' conspiracy allowed them to steadily enlarge their operating margins throughout the Class Period. By the end of 2020, the two largest Defendants, Tyson Foods and JBS USA, were reporting record margins in their beef business. Tyson Foods reported that its beef business' operating margin was nearly 10.7% percent—nearly triple its 2014 operating margin. JBS USA reported a higher beef business margin of 11.5% percent for the first three quarters of 2020.

25.     Given these swollen margins, it is little wonder that a leading industry reporter remarked that Defendants "no longer compete against each other," which has enabled them to reap "gangbuster profits."[3]

26.     In summary, Defendants colluded during the Class Period to reduce supplies of beef in tandem thereby raising and fixing beef prices at levels higher than prices that would have prevailed had the beef market been competitive. As a direct result, Plaintiffs and class members suffered antitrust injury by paying illegally inflated prices for beef they purchased from Defendants.

---

[3]     Cassandra Fish, "Whatever Happened to a Fair Fight," The Beef (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/

## II.     JURISDICTION AND VENUE

27.      Plaintiffs bring this action on behalf of themselves and all similarly situated persons and entities under Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to secure damages injunctive relief for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

28.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

29.      Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants reside in, are found in, transacted business in, or have an agent who transacted business in this District and because a substantial portion of the affected interstate commerce was carried out here.

30.      This Court has personal jurisdiction over each of the Defendants because, among other reasons, each Defendant (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and delivered or directed the manufacture, sale, shipment, and delivery of substantial quantities of beef throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

13

31.    Defendants' and co-conspirators' activities were within the intended flow of commerce within the United States and had direct, substantial, and reasonably foreseeable effects on foreign and interstate commerce.

## III.    PARTIES

### A.    Plaintiffs

32.    Plaintiff the Trustee, Howard B. Samuels, acting solely in his capacity as Chapter 7 trustee for the bankruptcy estate of Central Grocers, brings this action on behalf of Central Grocers. Central Grocers is a privately owned Illinois corporation with its principal place of business at 2600 Haven Avenue, Joliet, Illinois 60453. Central Grocers directly purchased beef processed and sold at prices artificially inflated by one or more of the Defendants, their co-conspirators during the Class Period. Central Grocers suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

33.    Plaintiff R & D Marketing, LLC is a Mississippi limited liability company with its principal place of business at 4110 Westside Drive, Suite C Tupelo, Mississippi 38801. R & D directly purchased beef processed and sold at artificially inflated prices by one or more Defendants or their co-conspirators during the Class Period. R& D suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

34.    Plaintiff Redner's Markets, Inc. is a Pennsylvania corporation with its principal place of business at 3 Quarry Road, Reading, Pennsylvania 19605. Redner's directly purchased beef processed and sold at artificially inflated prices by one or more

Defendants or their co-conspirators during the Class Period. Redner's suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### B.   Defendants

#### 1.   The Cargill Defendants

35.   Cargill, Inc. is a privately held Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391. During the Class Period, Cargill, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through Cargill, Inc.'s wholly owned or controlled affiliates, to purchasers in the United States. Cargill, Inc. is the parent company.

36.   Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) ("CMS") is a Cargill, Inc. subsidiary. CMS is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202. CMS is the principal operating entity within Cargill, Inc.'s U.S. cattle and beef business and is a wholly owned subsidiary of Cargill, Inc. On information and belief, CMS owns directly, or indirectly through its subsidiaries, Cargill, Inc.'s U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

37.   Throughout the Class Period, Cargill, Inc. wholly owned, as a direct or indirect subsidiary, CMS and sold, along with CMS, beef in interstate commerce, directly or through this wholly owned or controlled affiliate, to purchasers in the United States.

38.   During the Class Period, Cargill, Inc. and CMS shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that

15

purposefully directed conduct causing injury to and derived direct benefit from class members in the United States and this District.

### 2.      The JBS Defendants

39.      Defendant JBS S.A. is a Brazilian corporation with its principal place of business at Av. Marginal Direta do Tiete, 500 Bloco 3-30 andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil. During the Class Period, JBS S.A. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through JBS S.A.'s wholly owned or controlled affiliates, to purchasers in the United States. JBS S.A. is the parent company.

40.      JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. JBS USA is the principal operating entity of JBS S.A.'s U.S. cattle-and-beef business. On information and belief, it is the principal operating entity within JBS S.A.'s U.S. cattle and beef business and the contracting entity for certain of JBS S.A.'s purchases of fed cattle in the United States.

41.      Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. Swift owns directly, or indirectly through its subsidiaries, certain of JBS S.A.'s U.S. fed cattle slaughter plants including the Cactus, Texas; Greeley, Colorado; Grand Island, Nebraska; and Hyrum, Utah plants.  On information and belief, Swift contracts for the majority of fed cattle to be slaughtered at these plants.

16

42.     Defendant JBS Packerland, Inc. ("Packerland") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. On information and belief, Packerland owns directly, or indirectly through its subsidiaries, certain of JBS S.A.'s U.S. fed and dairy cattle slaughter plants, including the Packerland packing plants in Green Bay, Wisconsin and Plainwell, Michigan, the Sun Land beef plant in Tolleson, Arizona, and the Moyer Packing plant in Souderton, Pennsylvania.   On information and belief, Packerland contracts for the majority of fed cattle to be slaughtered at these plants.

43.     Various senior staff and executives responsible for the operation of JBS's US fed cattle and beef business during the Class Period were employed by each of JBS USA, Swift, and Packerland.[4]

44.     Throughout the Class Period, JBS S.A. wholly owned as direct or indirect subsidiaries, JBS USA, Swift, and Packerland and sold, along with JBS USA, Swift, and Packerland, beef in interstate commerce, directly or through these wholly owned or controlled affiliates, to purchasers in the United States.

45.     During the Class Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from class members in the United States and in this District.

---

[4]     *See* JBS USA's, Swift's, and Packerland's September 25, 2020 Updated Disclosures Pursuant to Attachment 1 of ECF No. 187 in *Peterson, et al. v. JBS USA Food Company Holdings, et al.*, Case No. 19-cv-1129, at 3-7, 12-13.

17

### 3.     The Tyson Defendants

46.     Tyson Foods, Inc. ("Tyson Foods") is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

47.     Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh") is a wholly owned subsidiary of Tyson Foods. Tyson Fresh is a Delaware corporation with its principal place of business at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049. Tyson Fresh is the principal operating entity within Tyson Foods' U.S. cattle and beef business.

48.     On information and belief, Tyson Fresh owns directly, or indirectly through its subsidiaries, Tyson Foods' U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

49.     Throughout the Class Period, Tyson Foods wholly owned as a direct or indirect subsidiary, Tyson Fresh and sold, along with Tyson Fresh, beef in interstate commerce, directly or through this wholly owned or controlled affiliate, to purchasers in the United States.

50.     On June 10, 2020, Tyson Foods announced it was fully cooperating with DOJ's price-fixing investigation into the broiler chicken industry under the antitrust division's Corporate Leniency Program.

51.     During the Class Period, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from class members in the United States and in this District.

### 4.     National Beef Packing Company

52.     National Beef Packing Company ("National Beef") is a privately owned Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163. National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

53.     On information and belief, National Beef owns directly, or indirectly through its subsidiaries, National Beef's U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

54.     "Defendants" includes all Defendants' predecessors, including beef meatpackers merged with or acquired by any Defendant and each Defendant's wholly owned or controlled subsidiaries or affiliates that sold beef in interstate commerce directly to purchasers in the United States during the Class Period.

55.     Each of the Defendants sold or distributed beef to direct purchasers or played a material role in the coordinated and collusive behavior alleged. All Defendants were active, knowing participants in the conspiracy alleged, and their conduct, to the extent

19

committed by the Operating Defendants was known to and approved by their parent Defendants.

## C.     Defendants' co-conspirators

56.     Unknown persons, firms, and corporations not named as Defendants participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, whether Plaintiffs have named these co-conspirators as Defendants.

## D.     Reciprocal agency of Defendants and co-conspirators

57.     Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

58.     Each Defendant and co-conspirator acted as the agent or joint-venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct Plaintiffs allege.

## E.     Defendant parent and subsidiary companies share a unity of interest

59.     The coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise for purposes of Section 1 of the Sherman Act.

60.     A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate, and their general corporate actions are guided

or determined not by two, separate corporate consciousnesses but by one. Accordingly, the coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise.

61.     A parent and its wholly owned subsidiary always have a unity of purpose and thus act as a single enterprise whenever they engage in coordinated activity.

62.     By controlling, dictating, or encouraging their subsidiaries' anticompetitive conduct in advancement of a common scheme for an illegal and anticompetitive purpose, the parent Defendants independently participated in the illegal enterprise that they entered with their subsidiaries. In doing so, the parent Defendants engaged in sufficient independent conduct and had sufficient knowledge, intent, and involvement in Operating Defendants' conspiracy to be liable under the Sherman Act as a single enterprise with their subsidiaries.

63.     During the Class Period, the parent Defendants shared a unity of corporate interest and operated as part of a single enterprise with their subsidiaries, the Operating Defendants, to advance their conspiracy.

### 1.     The Cargill Defendants

64.     Rather than owning and operating subsidiaries to diversify risk and earn profits by investing in them, Cargill, Inc. formed subsidiaries to conduct business that it otherwise would have conducted itself. To this end, Cargill, Inc. created CMS to conduct its business in the meat industry that Cargill, Inc. previously operated itself.

65.     Cargill, Inc. presents itself and its subsidiaries to the public as a single unified enterprise. For example, on its website, Cargill, Inc. reports that it employs 155,000 workers in 70 countries. Plaintiff is informed and therefore believes and alleges that these numbers include CMS employees. Cargill, Inc. has also publicly announced consolidated revenues, earnings, and cash flow that Plaintiff believes include performance results from CMS's beef operations.

66.     In the Letter to Stakeholders included in Cargill, Inc.'s 2019 Annual Report, Cargill, Inc. reported that it "delivered $2.82 billion in adjusted operating earnings in fiscal 2019 . . . . Revenues dipped 1% to $113.5 billion. Cash flow from operations totaled $5.19 billion." On information and belief, those statistics include earnings, revenues, and cash flows from all Cargill, Inc. subsidiaries as well as Cargill, Inc. itself. In the same document, Cargill, Inc. reported that its "[e]arnings were led by our North American protein businesses. With steady domestic and export demand, and plentiful cattle supplies, the beef business posted its third consecutive year of strong performance."

67.     There is one unified system that processes both companies' purchase orders, which also demonstrates the relationship between Cargill, Inc. and CMS.

68.     Further, Cargill, Inc. operates other business services, including information technology, human resources, finance, transportation and logistics, and procurement, with and for CMS.

69.     Cargill, Inc. plays an active role in managing CMS's business operations. As one example, Cargill, Inc.'s website reported that its chairman and CEO, David MacLennan, "supervised several businesses in Cargill Protein," which subsumes CMS.

70.     As another example, Cargill, Inc. describes the responsibilities of executive team member, Brian Sikes, as including "leading Cargill's global protein and salt businesses," overseeing "Cargill's protein business in North America and Europe," and leading "the transformation of the North American protein business." Mr. Sikes lives in Wichita, Kansas, the principal place of business of CMS.

71.     Finally, Cargill, Inc.'s slaughter plants in Fresno, California, Wyalusing, Pennsylvania, and Friona, Texas all list either "Cargill" or "Cargill Beef" as DBAs with the USDA Food Safety Inspection Service.

72.     Cargill, Inc.'s extensive involvement in CMS's management and operations demonstrates these entities' unity of purpose (e.g., to profit from their price fixing) and common objectives. Cargill, Inc.'s extensive involvement in CMS's management and operations demonstrates that Cargill, Inc. does far more than provide long-term strategy or guidance to CMS. Cargill, Inc. created CMS as its instrumentality to execute Cargill, Inc.'s directives. Throughout the Class Period, Cargill, Inc. exerted, and had the right to exert, control over CMS. In this manner, Cargill, Inc. independently participated in the illegal enterprise with CMS and, as a result, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with CMS as a single enterprise.

23

### 2. The JBS Defendants

73.     JBS S.A. is not merely a holding company whose business is restricted to investments in operating subsidiaries. JBS S.A. established subsidiaries, including JBS USA, Swift, and Packerland, to conduct its business, including the purchase and processing of cattle and the sale of beef. Had JBS S.A. not created or acquired these subsidiaries, it would have performed these functions itself.

74.     JBS S.A. presents itself as a unified enterprise and conducts consolidated earnings calls on which its corporate representatives discuss the operations and profits of JBS S.A., including JBS USA, Swift, and Packerland. On these calls, JBS S.A. executives have described the beef business it conducts through JBS USA, which it refers to as "JBS beef," as a "division" or "business unit."  JBS S.A. commonly refers to JBS USA as its "JBS USA beef business[.]" As reported on JBS USA's financial statements, JBS USA "conducts its United States beef and pork processing businesses through its wholly-owned subsidiaries Swift Beef Company ('Swift Beef'), Swift Pork Company ('Swift Pork') and JBS Packerland, Inc."

75.     JBS S.A. appointed JBS USA's CEO Andre Nogueira. He "report[s] directly" to JBS Global Operations' CEO. In Mr. Nogueira's online "Welcome" message, he explains that JBS USA operates "[i]n partnership with JBS S.A."

76.     Operating Defendants Swift and Packerland are fully integrated into the JBS USA enterprise. They rest under the complete control of JBS USA, and in turn, JBS S.A. JBS USA directs and oversees all JBS's U.S. cattle procurement, beef processing, and sales

24

operations, with ultimate direction from JBS S.A. JBS USA's financial statements are replete with references to notes, loans, and credit facilities that "are guaranteed by our Parent, JBS S.A."

77.     The career progression of Wesley Batista Filho clearly demonstrates the level of control JBS S.A. maintains over its subsidiaries, as JBS S.A. installed Wesley Batista Filho into whatever subsidiary they wished, at whatever level they wished, whenever they wished.  Wesley Batista Filho is the son of former JBS S.A. CEO Wesley Batista, and the grandson of founder Jose Batista Sabrinho.  His grooming to become the next Batista to lead JBS S.A. began with a position as a trainee in the JBS USA beef plant in Greeley, Colorado.  He then returned to Brazil, where he worked for JBS S.A. in a variety of roles.  Soon after, he became Head of JBS Uruguay, and then Head of JBS Paraguay.  He was next installed as Head of JBS Canada.  After that, he was made Head of Fed Beef for JBS USA and President of JBS USA and Swift Beef.  Now, he is president of all JBS operations in South America.

78.     Swift and JBS Packerland's packing operations are presented as those of JBS USA.  For example, they appear on USDA's list of Bonded Packers as "JBS USA Food Company, Swift Beef Company" and "JBS USA Food Company, JBS Packerland, Inc.," respectively.  The USDA's Food Safety and Inspection Service's Inspection Directory lists "JBS," "JBS USA," and "JBS USA Food Company" amongst other DBAs for Swift.

79.     JBS S.A.'s extensive involvement in JBS USA's, Swift's, and Packerland's management and operations demonstrates these entities' unity of purpose (e.g., to profit

from their price fixing) and common objectives. JBS S.A.'s extensive involvement in JBS USA's, Swift's, and Packerland's management and operations also reveals that these entities' general corporate actions are guided and determined by one corporate consciousness. JBS S.A. does more than provide long-term strategy and guidance to JBS USA, Swift, and Packerland. The entire purpose of these subsidiaries is to serve as instrumentalities by executing JBS S.A.'s directives within the greater JBS enterprise. Throughout the Class Period, JBS S.A. exerted, and had the right to exert, total control over JBS USA, Swift, and Packerland. In this manner, JBS S.A. independently participated in the illegal enterprise with JBS USA's, Swift's, and Packerland's and, as a result, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with JBS USA's, Swift's, and Packerland's as a single enterprise.

### 3.    The Tyson Defendants

80.    Tyson Foods is not a mere holding company whose business is restricted to investments in operating subsidiaries. Rather, Tyson Foods formed subsidiaries to act as its agents and representatives to conduct business activities that Tyson Foods would have otherwise conducted. With respect to Tyson Foods' subsidiary Tyson Fresh, those activities include purchasing and processing cattle and selling beef.

81.    Tyson Foods holds itself out to the public as a single unified enterprise, describing the beef business it conducts through Tyson Fresh as a mere "business unit." Indeed, before Noel White became Tyson Foods' CEO (now former CEO), he was "group president of Tyson's Fresh Meats business unit."

26

82.     On its quarterly earnings calls, Tyson Foods' corporate representatives include Tyson Fresh when discussing the company's financial performance. On these calls, Tyson Foods announces operating income and returns on sales from its beef segment business that Tyson Fresh operates. More specifically, on these calls Tyson Foods attributes improved returns to actions taken at plants that Tyson Fresh owns and operates.

83.     During a January 31, 2014, earnings call, Tyson Foods management employees explained to investors that Tyson Foods had generated $58 million in operating income and a 1.6% return on sales from its beef segment business, despite that business being operated directly by Tyson Fresh Meats.  On the same call, Tyson Foods' managers stated that "as the calf crop declines . . . we'll probably have to curtail production." Production of the beef from the calf crop is an activity which is undertaken by Tyson Fresh.

84.     On other earning calls, Tyson Foods has described actions taken by Tyson Fresh to advance Defendants' conspiracy. For example, on its August 3, 2015, earnings call, Tyson Foods explained its strategy for cattle purchasing implemented by Tyson Fresh as "we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs."

85.     Similarly, on Tyson Foods' May 7, 2018, earnings call, with respect to beef production plants owned and operated by Tyson Fresh, Tyson Foods explained that "we have to stop production, we have closed plants, several times in the quarter, not every plant, but several plants in the quarter."

86.     Tyson Foods and Tyson Fresh also guarantee each other's debts. Tyson Fresh has issued multiple debt securities guaranteed by Tyson Foods. In a registration statement filed with the SEC in 2009, Tyson Foods notified investors that Tyson Fresh pledged not only its own assets to guarantee debt instruments but also those of Tyson Foods and certain "other domestic operation subsidiaries of Tyson [Foods]."

87.     Similarly, in a 2014 prospectus filed with the SEC, Tyson Foods stated that Tyson Fresh would act as a guarantor to Tyson Foods' debt securities, including debentures, notes, and all other types of debt. Tyson Foods has issued multiple senior notes under this arrangement, many of which do not mature until 2034 and some of which do not mature until 2044. Some of these debt instruments have been called before their maturity date.

88.     Finally, in registrations with the USDA's Food Safety Inspection Service, Tyson Fresh slaughter plants in Dakota City, Nebraska, Lexington, Nebraska, Amarillo, Texas, and identify Tyson Foods as a business name of Tyson Fresh.

89.     Tyson Foods' extensive involvement in Tyson Fresh's management and operations demonstrates these entities' unity of purpose (e.g., to profit from their price fixing) and common objectives. Tyson Foods' extensive involvement in Tyson Fresh's management and operations also reveals that these entities' general corporate actions are guided and determined by one corporate consciousness. Tyson Foods does not merely provide long-term strategy and guidance to Tyson Fresh. Tyson Fresh's entire purpose is to execute Tyson Foods' directives within the greater Tyson enterprise and to serve as an

instrumentality of Tyson Foods. Throughout the Class Period, Tyson Foods exerted, and had the right to exert, control over Tyson Fresh. In this manner, Tyson Foods independently participated in the illegal enterprise with Tyson Fresh and, as a result, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with Tyson Fresh as a single enterprise.

## IV.   INDUSTRY BACKGROUND

90.   The market for fed cattle in the United States is enormous.  For example, in 2017 alone, 25.8 million fed cattle were slaughtered and processed into beef products. This amount accounted for 80% of the 32.2 million commercial cattle slaughtered across the United States.[5]

91.   The cattle production cycle, running from birth to slaughter, typically ranges between 15 to 24 months, and is the longest of all animals typically raised for meat.

92.   Fed cattle progress through three interrelated sectors prior to slaughter: cow/calf; stocking and background; and feedlots, as detailed in Figure 6 below.

---

[5]   The remaining volume is comprised of slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products such as hamburger patties.

**Figure 6.**



93.     Production of cattle raised for beef takes considerable time and investment. The life cycle of cattle raised for beef is longer than that of any other animal commonly raised for meat. As Figure 6 illustrates, the beef value chain comprises several stages. First, calves are raised by their mothers for six to ten months. When they weigh about 500 pounds, the calves are weaned and sold to the stocker-yearling sector where they eat a diet of forage, wheat pasture, and sileage. When a steer or heifer reaches 600–800 pounds, it is sold to a feedlot where it eats corn and protein supplements in addition to roughage.

30

94.     Once cattle reach 950–1,300 pounds, they are sold as fed cattle to the beef-packing stage. Defendants and other beef producers then slaughter and process the cattle into edible boxed beef and smaller case-ready consumer cuts. A steer weighing 1,000 pounds typically yields about 450 pounds of edible beef.

95.     Cattle are sold to beef processors through two channels. About 70 percent of cattle are sold through supply contracts (known as captive-cattle agreements) with feedlots or, to a lesser extent, ranching operations. The rest of the cattle are sold on the spot market, which is typically the benchmark for prices under the captive-cattle agreements. Because Defendants and other beef producers ordinarily have a steady supply of cattle through captive-cattle agreements, they are not forced to buy in the spot market. This affords Defendants the power to suppress the price of captive cattle and cattle purchased in the spot market.

96.     Finally, Defendants and other meatpackers sell the beef in the wholesale market to businesses like Plaintiffs who distribute the beef to retailers or directly to grocery chains, restaurants, and other large retailers.

97.     Tyson Fresh, JBS USA/Swift/Packerland, CMS, and National Beef each conduct daily meetings, typically from their head office, attended by representatives of their respective cattle procurement, plant operations, scheduling, beef sales, and risk management teams, among others, to make decisions regarding their respective cattle and beef operations. Among other matters, the attendees of these meetings will discuss the number of cattle their fed cattle business will procure, the terms on which they will be

31

bought, plant scheduling (including slaughter rates) across each of their slaughter facilities, and beef sales strategy.

98.     As the cost of fed cattle constitutes the majority of their costs of production, Operating Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef.  The meat margin is very sensitive to changes in industry aggregate slaughter levels, and Tyson Fresh, Swift/Packerland, CMS, and National Beef can, through cooperation, increase it.  As noted by the U.S. Department of Justice ("DOJ"), "all else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase.  Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits."[6]  As a result of these sensitivities, Tyson Fresh, Swift, Packerland, CMS, and National Beef on behalf of their parent companies, Tyson Foods, JBS S.A., JBS USA, and Cargill Inc., can improve their profitability by coordinating their respective slaughter levels at or below the prevailing supply of slaughter-weight fed cattle.

---

[6]     *U.S. v. JBS*, Case No. 08-cv-5992 (N.D. Ill.), ECF No. 48 ("Amended Complaint"), ¶¶ 26-27.  *See also* Section VII(B) below regarding the elasticities of fed cattle and beef.

## V.   OPERATING DEFENDANTS' ANTITRUST VIOLATIONS

99.   By the beginning of 2015, Operating Defendants were forced to confront shrinking profit margins for their beef sales. The earnings calls of the two largest Defendants, Tyson Foods and JBS S.A., reported the slumping profitability of their beef operations.

100.   On a November 7, 2014, earnings call, Tyson Foods reported a quarterly operating margin that was less than half the margin enjoyed by its poultry division.

101.   On a November 13, 2014, earnings call, JBS S.A. announced a badly underperforming beef segment at JBS USA. Its quarterly margin reached only about a third of its pork segment's margin.

102.   But rather than act independently in their individual business interests to restore profitability, Operating Defendants agreed to collectively reduce and manage their respective slaughter volumes that are made available to the downstream market, including to direct purchasers.

103.   The consequent beef shortage ushered in a new era of supracompetitive prices paid by Plaintiffs and other direct purchasers in the wholesale beef market.

### A.   Direct evidence of Defendants' conspiracy

104.   As confirmed by Jason F. ("Witness 1"), based on conversations with James Hooker, head of fabrication at Swift's Cactus plant, each of the Operating Defendants expressly agreed to periodically reduce their respective purchase and slaughter volumes, resulting in wholesale prices above competitive levels.

105.    Witness 1 is a former employee of Swift. He worked for Swift as quality assurance officer ("QA") at Swift's Cactus, Texas slaughter plant, located in the Texas Panhandle.  He worked there for over ten years until his employment ceased in early 2018.

106.    During the period of his employment coinciding with the Class Period, Witness 1 was a head QA and had primary responsibility for the plant's kill floor, hotboxes, and coolers.  The kill floor is where cattle are slaughtered and dressed, i.e., head, hide, and internal organs removed.  The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

107.    Witness 1 learned of Operating Defendants' collusive purchase and slaughter reduction agreement from Mr. Hooker.  Mr. Hooker was the head of fabrication at Swift's Cactus plant and, as explained below, was thus in a position to know about the unlawful agreement.

108.    Witness 1 regularly stopped by Mr. Hooker's office before starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days.  These numbers affected how Witness 1 and his team would execute their responsibilities, including the placement of his team, arrangement of hotbox and cooler space, the number of carcasses they would need to process through the hotbox and coolers that day, and his interactions with USDA inspectors.

109.    In addition to the fabrication plan, Mr. Hooker, like Witness 1, also needed to understand the number of cattle scheduled to be slaughtered each day.  Amongst other

matters, if the kill volume was lower but the price of beef remained favorable, the fabrication floor would continue to process carcasses at typical rates. However, when kill volumes were reduced and the price of beef was unfavorable, Mr. Hooker may order the carcasses to spend longer in the hot boxes and coolers before being fabricated into beef cuts so as to improve grading performance. In this circumstance, Witness 1 and his team would allow more space between each carcass in the hotboxes. If the kill volume was higher, Mr. Hooker may need to increase the number of carcasses fabricated to ensure there was sufficient space in the hotboxes and coolers, and Witness 1 would need to space the carcasses closer together when filling the hotboxes. Further, the number of carcasses expected to be put into the hotboxes would dictate the amount of air and water Witness 1 and his team used to ensure proper cooling speeds. In sum, it was essential to both Mr. Hooker and Witness 1 that they know the plant's planned slaughter figures in order to perform their core job duties.

110.    Witness 1 reports having had a "decent" working relationship with Mr. Hooker.

### 1.    Mr. Hooker Was Well Positioned to Know About Operating Defendants' Agreement

111.    Plaintiffs understand that Mr. Hooker continues to work at Swift's Cactus plant, where he has worked for over 15 years in that role, including a short stint as head of slaughter operations. Witness 1 reports that before working for Swift in the early 2000s,

Mr. Hooker worked at Tyson Fresh's Amarillo, Texas slaughter plant, where he was also responsible for fabrication.

112.    As a fabrication manager for Swift, Mr. Hooker reported directly both to Cactus's General Manager, Manny Guerrero,[7] and directly to the beef production department of JBS USA/Swift/Packerland's head office in Greeley, Colorado.

113.    As head of fabrication, Mr. Hooker needed to be informed as to cattle buying/scheduling, cattle slaughter, and beef selling aspects of JBS USA/Swift/Packerland's fed cattle business. He thus interacted with personnel across JBS USA/Swift/Packerland. In particular, in addition to his direct reports, Mr. Hooker would also speak directly to other managers within the JBS corporate office about plant operations, including scheduled slaughter and fabrication volumes, and fabrication priorities.

114.    For example, Mr. Hooker would speak directly to Mr. Sergio Sampaio Nogueira, Head of Operations and Executive Vice President of Plant Operations for JBS's Fed Beef Business during the Class Period, when Mr. Nogueira visited the Cactus plant, which occurred regularly. Witness 1 understands that Mr. Hooker would also speak to Mr. Sergio Nogueira at other times. Mr. Hooker's contact with senior management reflects that JBS USA/Swift/Packerland senior executives maintained direct connections with plant-level managers, like Mr. Hooker, during the Class Period. Mr. Sergio Nogueira was

---

[7]    Mr. Guerrero worked for CMS for approximately 17 years prior to his move to JBS's Cactus Plant. He was Plant Manager for CMS's Fresno, CA plant prior to his departure in early 2012.

installed by Wesley Batista, JBS S.A.'s CEO,[8] and was regarded as Mr. Batista's "right hand man" in regards to JBS's U.S. beef operations.  Mr. Sergio Nogueria had primary responsibility for Swift's fed cattle plant scheduling and/or operations during the Class Period.

115.  In addition, Mr. Hooker was responsible for the Cactus plant in the absence of Mr. Guerrero and the Plant Engineer, along with Ryan Wagnon, Head of Slaughter Operations at Cactus.  When acting as the Cactus plant's General Manager, Mr. Hooker would liaise closely with fed beef executives from across JBS's head office.

116.  Therefore, Mr. Hooker spoke regularly to individuals very highly placed at JBS.  Indeed, the following recent photo shows the close working relationship he had with such management:[9]

---

[8]    Wesley Batista is one of the sons of JBS S.A. founder Jose Batista Sobrinho. Wesley Batista and his brother Joesley Batista took control of JBS S.A. in the early 2000s, prior to JBS' acquisition of Swift and Pilgrim's Pride.  Wesley was CEO of JBS S.A., and directed JBS' takeover of Swift.  He remained in that role, and as a director and senior executive of JBS USA, Swift and Packerland, until he was implicated in a 2017 bribery and corruption scandal in Brazil, for which he was ousted as CEO and spent time in prison.

[9]    From right to left: James Hooker - Cactus Fabrication Operations Manager; Donna Estrada - Cactus Technical Services Manager; Al Almanza - JBS Global Food Safety Director; Sergio Sampaio - JBS Corporate Director of Operations; Paul Kieker - FSIS Undersecretary USDA Operations; Dr Hafeez - Texas USDA FLS; Dr Mindy Brashears - FSIS Undersecretary USDA FS; Brian McFarlane - JBS Corporate Director of Technical Services; Mark DeRaad - Cactus Value Added Manager; Ryan Wagnon - JBS Slaughter Operations Manager.



117. Mr. Hooker, Mr. Sergio Nogueria, and Mr. Wagnon, are respectively pictured on the far left, fourth from the left, and far right.

118. In addition to having corporate information for JBS, Mr. Hooker had information regarding the other Operating Defendants. Mr. Hooker regularly told Witness 1 that he was in contact with his former colleagues at Tyson Fresh's Amarillo plant, including his replacement there. Mr. Hooker also told Witness 1 that he had friends and former colleagues with whom he stayed in touch at other Operating Defendants' plants. Mr. Hooker would often provide Witness 1 with detailed information as to the current and future operations of Tyson Fresh, CMS, and National Beef's nearby packing plants.

## 2. Witness 1 Learns of an Agreement Among Defendants

119.   Witness 1 reports having multiple discussions with Mr. Hooker during which Mr. Hooker explained that all of the Operating Defendants reduced their purchase and slaughter volume in order to reduce fed cattle prices when Operating Defendants viewed fed cattle prices as being or becoming "too high" for their liking. During one such conversation, Mr. Hooker specifically admitted that the Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

120.   That conversation occurred in 2015.   Witness 1 reports that he was in Mr. Hooker's office when Mr. Hooker received an angry phone call from his immediate supervisor, who worked out of JBS USA/Swift/Packerland's central office in Greeley, Colorado.

121.   After the call concluded, Witness 1 reports that he asked Mr. Hooker how "many are we [Swift, Cactus] cutting [i.e., fabricating]?" Witness 1 reports that Mr. Hooker replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).[10]

122.   Witness 1 recalls asking Mr. Hooker whether Swift Cactus's competitor plants were also cutting back their kill. Witness 1 reports he recalls that Mr. Hooker

---

[10]   Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities. Among other reasons, this reflected the fact that Slaughter Plant 1's fabrication team had to continue to process the carcasses that were already hanging in the coolers.

answered Witness 1's question as follows: "Yes, they are. We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

123.   Witness 1 is certain that Mr. Hooker intended to convey that all Operating Defendants were reducing their slaughter volumes by agreement in response to high prices, and was not simply commenting on the fact that one or some of the Operating Defendants had independently decided to do so.

124.   Witness 1 stated that Swift's Cactus plant had a 5,500–6,000 head per day slaughtering capacity and might drop its kill level back to around 4,800–5,200 head per day when implementing Defendants' agreement. When Swift implemented the Defendants' agreement by buying and slaughtering fewer cattle, consequences included running its slaughter plants at reduced hours, operating those plants at lower "chain speeds," and/or scheduling maintenance shutdowns. Witness 1 recalls management at Swift's Cactus plant, including Mr. Guerrero and Mr. Wagnon, telling staff during these periods of reduced slaughter during the Class Period that kill levels were being reduced in response to fed cattle prices.

125.   Witness 1 reports that Swift's Cactus Plant would also reduce its slaughter around November and then regularly maintain lower kill volumes through April the following year.

126.   Meanwhile, Defendants coordinated and agreed to refrain from expanding their slaughtering and processing capacity, thereby further restricting supply, as further described below.

**B.    The Available Data Corroborates Witness 1's Account**

127.    Public reports, Defendants' slaughter data, and the cattle sales data in Plaintiffs' possession, indicate that all Operating Defendants reduced and rationed their slaughter volumes during the Class Period resulting in supracompetitive beef prices. Operating Defendants also managed their respective slaughter volumes throughout the Class Period in relative lockstep in order to ensure the supply of beef remained lower than the skyrocketing demand. Operating Defendants did so despite cattle being readily available and as Operating Defendants' margins ballooned.

128.    The slaughter reductions, while most obvious at the beginning of each year, occurred at various points throughout the Class Period. In particular, Operating Defendants moderated their slaughter volume across the second and third quarters of most years in a successful attempt to expand their margins, across a number of months, thereby also forestalling both the onset, and minimizing the effect of, the increase in slaughter volume that historically occurs in the fall. Operating Defendants also reacted to short one-to-two week rallies in cattle prices, and one-off opportunities presented by market shocks, such as the fire at Tyson Fresh's Holcomb plant in August 2019.

129.    Operating Defendants' joint slaughter management was not a reaction to changes in beef demand, which, as admitted by Tyson Fresh's head of procurement in 2018, had been "off the charts."[11] See also Figure 17 below, demonstrating rising beef

---

[11]    Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the

demand throughout Class Period. Nor did any Operating Defendant break from the agreement and buy more cattle in an attempt to capture greater market share, despite all posting profit margins clearly demonstrating that no Operating Defendant was running at or near their marginal cost of production. From the end of the first quarter of 2015 through the end of the class period, Operating Defendants posted record per head net margins. Even excluding 2019 and 2020, which saw Operating Defendants' margins skyrocket in the aftermath of the Holcomb plant fire and COVID disruption (discussed below), Operating Defendants average per head margins across the Class Period for the first, second, third and fourth quarters vastly exceeded their pre-Class Period averages ($37 v. $0, $127 v. $21, $134 v. $25, $116 v. -$16, respectively).[12]

130.    Operating Defendant rationing of the fed cattle supply amongst themselves in parallel throughout the Class Period is demonstrated through Figure 1 below, which records each Operating Defendant's estimated quarterly slaughter volume:

---

2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, November 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

[12]    Per-head net margin estimates cited in the Complaint sourced from the Sterling Profit Tracker produced by Sterling Marketing Inc. and published weekly on www.drovers.com unless stated otherwise. Pre-class period average per head margins calculated across 1997 to 2014.

**Figure 1. Operating Defendant's Quarterly Fed Cattle Slaughter Volume**[13]



131.   Figure 1 demonstrates that Tyson Fresh, Swift/Packerland, and National Beef each dramatically reduced their slaughter across 2015, while Cargill held its slaughter volumes steady following its 2014 cuts.  These artificial reductions worked to cause the

---

[13]      To derive Tyson, JBS and National's beef slaughter volume figures produced in Figure 2, Plaintiffs used Packing Defendants' (in the case of National Beef, its shareholders') financial disclosures and Cattle Buyers Weekly's record of each Defendant's fed cattle and non-fed cattle slaughter ratio to isolate the portion of their reported quarterly revenue figures attributed to beef and by-products produced from fed cattle slaughtered within the United States. Plaintiffs then determined the volume of fed cattle (and beef) necessary to generate the disclosed revenue, taking into account prevailing beef and by-product prices (as reported by USDA AMS boxed beef cutout reports and USDA drop-credit values), carcass weights, carcass grading performance (by region), and hot carcass/dressing percentages. Having derived Tyson, JBS, and National Beef's quarterly slaughter volumes, Plaintiffs then derived Cargill's quarterly slaughter figures by reference to Cargill's market share over time, ███████████████████
███████████████████████████████████████████

dramatic decline in fed cattle prices starting in 2015 and continuing throughout the class period, while beef prices were stabilized or increased.

132.    And while the quarterly reporting period obscures certain shorter reductions described below in Section [V.C-F], it does detail the remarkable extent to which Operating Defendants' quarter-to-quarter slaughter changes move in lockstep with each other.  This parallelism is consistent with and the product of an agreement to jointly manage and reduce their slaughter levels below a competitive level.

133.    Figure 1 highlights the parallel reductions made by Operating Defendants in the winter/spring to constrain the seasonal rise in fed cattle prices historically experienced at this time, which had the effect of raising beef prices to a supra-competitive level.  Tyson Fresh, Swift/Packerland, CMS, and National Beef each cut production at a similar time and by a similar amount:

- Q1 2015 (except Cargill whose production was flat after making significant cuts in 2014)

- Q1 2016

- Q1 2017

- Q1 2018

- Q4 2019 and Q1 2020

134.    This uniform reduction during periods of seasonally lower cattle availability is not evident in the pre-Class Period.  For example, in the fourth quarter of 2012, both CMS and Swift/Packerland significantly increased their slaughter volumes (3.8% and

44

12.1%, respectively on a quarter-on-quarter basis), while Tyson's held its steady (0.2% increase), and National Beef engaged in notable cuts (-3.9% decline).   Similarly, in Q3 2013, Tyson Fresh and National Beef increased their slaughter volumes, while Swift/Packerland and CMS reduced theirs.   Across Q2 to Q4 2014, Swift/Packerland evidently sought to capture market share, first substantively increasing its slaughter volume in second quarter (16% increase against other Defendants increases of between 4.5%-10%) before holding it steady across the third and fourth quarters while each other Defendant's volumes declined in those two quarters.

135.   What is not apparent from Figure 1, is the deep nature of the cuts in 2015 and 2016 when comparing the same quarter to historic production (2012-2014).   In 2015, the production decreased in the year overall and each quarter. For 2016, the production decreased overall and for 3 of 4 quarters.   Tyson Fresh, Swift/Packerland, CMS, and National Beef's production was down comparing year-on-year changes against an average of 2012-2014 as seen in Figure 7:

Figure 7.

| Year on Year Changes Against 2012 - 2014 Averages | | | | |
|---|---|---|---|---|
| Comparison | Tyson Fresh | National | Swift/Packerland | CMS |
| 2015 v 2012-14 | -4.8% | -13.5% | -17.9% | -11.5% |
| Q1 | -5.1% | -15.3% | -20.1% | -12.7% |
| Q2 | -7.6% | -14.7% | -17.7% | -12.7% |
| Q3 | -0.7% | -15.1% | -16.9% | -9.7% |
| Q4 | -5.8% | -8.7% | -17.1% | -10.8% |
| 2016 v 2012-14 | -2.8% | -4.4% | -14.8% | -3.7% |
| Q1 | -4.5% | -14.9% | -21.7% | -9.3% |
| Q2 | -3.7% | -9.1% | -17.9% | -6.2% |
| Q3 | -5.2% | -3.9% | -10.1% | -2.7% |
| Q4 | 2.3% | 10.9% | -10.2% | 3.3% |

136.   Operating Defendants' strategy was immediately successful, with lower slaughter volumes and lower beef output resulting in artificially high beef prices, despite cash cattle prices falling.  Operating Defendants' meat margin expanded rapidly as a result.

137.   Moreover, each Operating Defendants' conduct stands apart from Independent Packers' who increased their annual slaughter volume in 2015 by 7.8% year-on-year.

138.   And, though Operating Defendants gradually increased their slaughter volumes over the rest of the Class Period, their rates of increase lagged far behind those of other producers, as evidenced by the following Figure 2:

46

**Figure 2.**
**Average Pre- and Post-Class Period Fed Cattle Slaughter –**
**Defendants vs. Smaller/Independents**



139.    Figure 3 compares the annual slaughter volumes of Operating Defendants and smaller producers before and during the Class Period and breaks out these volumes for each year of the Class Period for which data is available. In every year, Operating Defendants slaughtered fewer cattle than they did before the Class Period. Also shown is that, though Operating Defendants gradually increased their slaughter volumes year over year during the Class Period, their rates of increase lagged far behind other producers' rates.

47

**Figure 3.**
**Pre- and Post-Class Period Fed Cattle Slaughter –**
**Defendants vs. Smaller/Independents by Year[14]**



140.    As shown in Figures 2 and 3 above, each Operating Defendant slaughtered significantly less cattle in 2015 than their pre-class period average, and then maintained artificially low slaughter levels throughout the remainder of the Class Period. That Operating Defendants each slowly raised their slaughter levels as the availability of fed cattle increased during the class period only reinforces the likelihood of a collective

---

[14]    Cattle Buyers Weekly, "Top 30 Beef Packers" Annual Reports, 2008-2019, http://www.cattlebuyersweekly.com/users/rankings/index.php ("CBW Top 30 Beef Packers"); *2018 Meat & Poultry Facts*, 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 11. National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume.  Absent that acquisition its 2019 slaughter volume was flat as against 2018, while Independent Packers collective slaughter volume rose by approximately 100,000 head (net of Iowa Premium disposal).

agreement to manage slaughter levels after their initial cut – fully five years later, none of the Operating Defendants have returned to their pre-2015 levels despite record profitability, while Independent Packers slaughter is up nearly 25% against their pre-Class Period average, and 20% against their 2015 levels.   The result of such action gave Operating Defendants the ability to manage collective demand such that it never outpaced supply, and ensured the supply of beef stayed below demand.

### C.   Operating Defendants slash production in 2015

141.   The impact of the conspiracy was sudden and dramatic in 2015, evidenced by publicly available data. Each Operating Defendant cut its annual cattle slaughter volumes during the Class Period by an average of about 13 percent. In sharp contrast, other meatpackers increased their slaughter volumes during the same period by an average of 28 percent.

142.   Data breaking out slaughter volumes for each year of the Class Period highlight Operating Defendants' extreme reductions in 2015, though other beef producers maintained or increased their volumes that same year. Despite a slight uptick in the final quarter of 2015, Tyson Fresh's overall 2015 slaughter volume was down by 4 percent as compared with 2014 levels, Swift/Packerland by 17 percent, and National Beef by 6 percent. CMS's 2015 production was flat compared with the prior year but 11.3% below historical levels. All this occurred during a sustained recovery in the broader economy, as the U.S. population grew steadily, and beef demand was high.

143.   In the first quarter of 2015, Tyson Fresh, Swift/Packerland, and National Beef's year-on-year slaughter was down by approximately -1.8%, -11.2%, and -8.6%, respectively.  CMS's quarterly slaughter volume was down against a 2012-2014 average and its first quarter 2015 slaughter volume, like its co-conspirators, was still down on its fourth quarter 2014 volume.

144.   These declines were reflected in the Defendants' public reporting. Tyson's May 4, 2015 10-Q noted that its "sales volume decreased [in the quarter ending March 28, 2015, year-on-year] due to a reduction in live cattle processed."  Jefferies, National Beef's then majority shareholder, noted in its 10-Q filed May 8, 2015, that National Beef's revenues were down year-on-year for the first quarter "primarily to lower sales volume, as fewer cattle were processed."[15]  JBS S.A.'s earnings presentation for the first quarter noted a 1.1% year-on-year decline in the "number of animals processed" by its JBS USA beef unit.[16]

145.   Expanding on their cuts, Tyson Fresh, Swift/Packerland, CMS, and National Beef extended their joint slaughter reduction during the second and into the third quarters

---

[15]     Jefferies 10-Q, May 8, 2015 at 57, http://ir.jefferies.com/reports-filings/sec-filings/sec-filings-details/default.aspx?FilingId=10683755.
[16]     JBS S.A., 1Q 2015 Results, May 13, 2015 at 15, https://mz-filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-resultadoscentral-de-downloads/8bc0bd99f655d7c38a18d265a7ed397678c5e9774341f1efd1c98745f1a8a360/1q15_earnings_release.pdf.  JBS USA Beef segment also encompasses JBS S.A.'s much smaller Australian and Canadian beef businesses and Australian sheep operations. Presentation also noted a -1.1% decline in cattle processing (both fed and non-fed) across its U.S., Australian and Canadian beef businesses.  JBS USA's fed cattle to non-fed cattle slaughter ratio throughout the class period was 80% fed, 20% non-fed.

of 2015. Across the second quarter, Tyson Fresh, Swift/Packerland, and National Beef's year-on-year slaughter was down by approximately -5.4%, -12.8%, and -6.2%, respectively. CMS continued to hold to its low 2014 volume, posting an essentially flat year-on-year growth of 1.8% in the second quarter, and -12.7% against its 2012-2014 average second quarter production.

146. Again, this reduction in cattle purchases was also reflected in Tyson Foods[17], JBS S.A.[18], and Jefferies (National Beef's)[19] financial reporting.

147. Operating Defendants' determination to break cash cattle prices through their collective slaughter reductions and reduced cash cattle purchases was remarked upon by industry analysts at the time. On June 12, 2015, analyst Cassandra Fish of "The Beef" and formerly a risk manager at Tyson, speculated as to when one of the Operating Defendants might break ranks:

---

[17]   Tyson's 10-Q for its quarter ending June 27, 2015 recorded year-on-year declines in sales in its beef segment revenue due to a "reduction in live cattle processed". *See* Tyson Foods 10-Q filed August 2, 2015, p. 38. *See also*10-K filed November 23, 2015, p. 29 noting reduction in sales revenue in FY 2015 as against FY 2014 due to lower cattle processing.

[18]   JBS S.A., 2Q 2015 Results, August 13, 2015 at 15, https://mz-filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-resultadoscentral-de-downloads/02fd1b6f7f1cee632e5af617767bc7a98017ead954465d63d1e8633b2ec5a3cd/2q15_earnings_release.pdf (noting -0.9% decline in cattle processing (both fed and non-fed) across its US, Australian and Canadian beef businesses).

[19]   Jefferies 10-Q, August 5, 2015 at 52, http://d18rn0p25nwr6d.cloudfront.net/CIK-0000096223/6f776d2a-f247-4868-a18b-32f9e3b4eefe.html (noting revenues for three and six month 2015 periods decreased year-on-year "primarily due to lower sales volume, as fewer cattle were processed".); Jefferies 10-Q, November 5, 2015 at 53 (noting the same in relation to 3Q 2015 and first three quarters of 2015).

> Rarely has this industry segment [the beef packers,] been an all-for-one and
> one-for-all group. All packers need to buy cattle inventory. Most have cut
> hours. So will someone break ranks, pay up for cattle and add hours to
> capture the better realization that the next boxed beef rally will bring? Will
> one short a customer only to find that order filled by a competitor?[20]

148. Ms. Fish answered her own question a few weeks later, remarking on June 25, 2015 that the "packers refuse to reach for cattle and are currently in command. After 3 weeks of sharply curtailed kills, packers are exhibiting incredible discipline and letting the kill increase gradually," limiting the ability "of feeders to get all cattle marketed [i.e., sold] in a timely fashion."[21]

149. During the remainder of 2015, Operating Defendants continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that slaughter-ready cattle had been "backed up."[22] They did so even though under-utilizing their plants would hurt their margins.

150. Tyson's CEO, Donnie Smith, admitted as much on August 3, 2015, when discussing Tyson's decreased purchases over the preceding quarter, noting "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate and conditions are

---

[20]   Cassandra Fish, *Futures Holding Gains; Waiting on Cash*, THE BEEF (Jun. 11, 2015), https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/.

[21]   Cassandra Fish, *Another Round of the Blues*, THE BEEF (Jun. 25, 2015), https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/.

[22]   Cassandra Fish, *Kills Too Small For Too Long*, THE BEEF (Sep. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

expected to improve for the long term."[23]    In response to a question regarding the consequent impact of Tyson's underutilization of its plant capacity, Mr. Smith elaborated:

> In terms of quantifying the impact, we know when we're running 34s and 36s a week in our plants that that does cost us. It raises the cost in our plant, makes us a lot less efficient, so it does have a cost to us. I don't know that I can quantify that right off the bat, but it does impact margin.[24]

151.    Tyson Fresh, Swift/Packerland, CMS, and National Beef's concerted actions to depress cattle prices across 2015 (and their successes) are summarized by the below chart.  Figure 8 compares the price of fed cattle across 2015 against the number of fed cattle slaughtered across 2014 and 2015 at packing plants subject to AMS LMR reporting obligations.[25]  These figures are a very good proxy for Tyson Fresh, Swift/Packerland, CMS, and National Beef's cumulative slaughter volume as they operate the substantial majority of such plants and appear to provide over 90% of the reported transactions.[26] As demonstrated in Figure 8 below, the 2015 slaughter volumes are lower than 2014 in every month except February and November and lower than 2010-2014 averages in every month except October.

---

[23]    Tyson Foods, Q3 2015 Earnings Call, Seeking Alpha Transcript (Aug. 15, 2015).
[24]    *Id.*
[25]    Figure 8 were prepared using USDA Market News Service Reports: LM_CT106-National direct slaughter, committed and delivered, LM_CT151-National Weekly-Formula, Forward, Negotiated Net (Domestic), and LM_CT154-Weekly National direct slaughter, negotiated.  Fed cattle prices shown in Figure 19 is the weighted average price of all four purchase categories (formula, forward, negotiated (*i.e.*, cash), negotiated grid).
[26]    See Exhibit 1.

**Figure 8.**
**Total Fed Cattle Slaughter Volumes and Fed Cattle Prices – all purchase types**



**D.    Operating Defendants continued to artificially limit supply into
2016.**

152.    By "ration[ing] their new purchases [of cattle]" and running shorter 32-hour

weeks in early January, Operating Defendants dampened rising cattle prices and extended

the rally in beef prices.[27] Operating Defendants then further inflated beef prices by sustaining low kills across February and March.[28]

153. Tyson Fresh, Swift/Packerland, CMS, and National Beef reduced their slaughter volumes in the first quarter of 2016: Tyson Fresh (-1.1%), CMS (-3.7%), Swift/Packerland (-16.6%), National Beef (-4.7%). Moreover, all Operating Defendants slaughtered fewer cattle than their average first quarter volume across 2012-2014: Tyson Fresh (-4.5%), Swift/Packerland (-5.3%), CMS (-9.3%), and National Beef (-14.8%).

154. As a result, beef prices continued to skyrocket into March 2016, despite significantly lower than expected cattle prices. By rationing the available cattle amongst themselves, Operating Defendants posted average weekly margins of approximately $63 per head, which was, at that time, one of their "best Q1 in history" and well above their pre-Class Period first quarter average of $0 per head.[29]

155. In the second and third quarters, each Operating Defendant's kill volume remained below their 2012 to 2014 averages.

156. Despite an increase in the availability of fed cattle, except for Cargill, each Operating Defendant's annual slaughter volume in 2016 remained below their 2014 levels

---

[27] Cassandra Fish, Global Sell Off Smacks Cattle, THE BEEF (Jan. 4, 2016), https://www.thebeefread.com/2016/01/04/global-sell-off-smacks-cattle/.
[28] Cassandra Fish, Yet More Consolidation, THE BEEF (Jan. 6, 2016), https://www.thebeefread.com/2016/01/06/yet-more-consolidation/.
[29] Cassandra Fish, This Week's Cash Trade, THE BEEF (Mar. 22, 2016), https://www.thebeefread.com/2016/03/22/sell-off-accelerates/.

(Tyson Fresh (-6%) and Swift/Packerland (-6%)) or flat (National Beef).[30]  Cargill's 2016 slaughter remained significantly below the 2012-2014 average at -3.7%.

157.   Each Operating Defendant's refusal to break from their collective adherence to rationing the available cattle supply is all the more remarkable given the margins on offer to Operating Defendants across 2016.  In the third and fourth quarter alone, Operating Defendants were realizing average per head margins on their fed cattle purchases of $123 and $153 per head.  Not only were these margins significantly above pre-Class Period averages ($25 and -$16 per head), but they also exceeded the Operating Defendants' most profitable third and fourth quarters in modern times by about $30 and $100 per head, respectively.  Operating Defendants therefore had both the incentive and the ability to buy and slaughter more cattle.

**E.     After historic cuts, Operating Defendants continued to keep supply restrained, resulting in higher beef prices and unprecedented margins into 2017 and 2018**

158.   Going into 2017, Operating Defendants worked to ensure that any increase in their collective slaughter volumes did not outpace the growth in slaughter weight cattle availability and beef demand.  Tyson, Swift/Packerland, CMS, and National Beef each reduced their volumes in lockstep during the first quarter, before raising them together across the second quarter.  See Figure 1.

---

[30]     2018 Meat & Poultry Facts, 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 11.

159.    And while cattle prices did rise from $119/cwt at the beginning of February to a high of $144/cwt in first week of May (similar to pre-Class Period spring highs), Operating Defendants responded by reducing their kills.

160.    As with 2016, Operating Defendants enjoyed substantial profits across 2017, posting then record per-head margins in the second and third quarters ($128 and $147 per head, respectively).  Indeed, Operating Defendants' average per head margins for the first and fourth quarter, $42 and $88 per head, respectively, stood second only to the quarterly profits they generated in 2016.  And again, each Operating Defendant refused to add cattle to expand their market share despite the obvious profit potential.  Instead, they kept their production in lockstep with one another, rationing supply amongst themselves to ensure the continued suppression of cattle prices and resulting increase in beef prices.

161.    Their scheme continued into 2018.  Each Operating Defendant then began to tell the market that they had, as a result of the plant closures discussed, insufficient capacity to slaughter the supposed "wall of cattle" due to reach slaughter-weight in the spring and summer of 2018.[31] Operating Defendants then backed off their respective kill schedules during the first quarter of 2018.[32] See Figure 1, detailing significant decline in first quarter

---

[31]    Cassandra Fish, *Still Green*!?!, THE BEEF (Mar. 27, 2018), https://www.thebeefread.com/2018/03/27/still-green/ ("The [packers'] mechanical [slaughter] capacity exceeds needs [across Q2 2018].  The limitation perception is linked to labor.  The perception of there being a limitation has created fear and inspired some cattle feeders to "get in line" by selling [cattle] out-front [*i.e.*, on captive supply agreements].").

[32]    Cassandra Fish, *Futures Trade Both Sides; Cash Poised To Trade Lower*, THE BEEF (Apr. 2, 2018), https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-poised-to-trade-lower/

2018 slaughter as against fourth quarter 2017. As Ms. Fish reported, "Looking back at March's fed slaughter rate, it underperformed expectations. . . . Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable." The reduction in slaughter occurred despite record strong beef demand and Operating Defendants' under-utilized capacity.

162. As a result of their commitment to rationing the available cattle amongst themselves, across 2017 and 2018 Tyson Fresh, Swift/Packerland, CMS, and National Beef's annual slaughter volumes remained 5.4-7.2%, 10.2%, 9.1% and 12.0-12.8% below their pre-Class Period averages, respectively. See Figure 7. By contrast Independent Packers slaughter volume across 2017 and 2018 were up 46.5% and 56.1%, respectively, on their collective pre-Class Period averages.

### F.   Operating Defendants' 2019 and 2020 Bring Continued Parallel Slaughter, Reaction Against Independent Self-Interest

163. Going into 2019, beef demand remained "terrific", encouraging packers to run plants to meet customers' demand.[33] In ordinary times, absent a conspiracy, Operating Defendants would compete to secure as much cattle as possible to supply beef customers.

164. Instead, Operating Defendants continued to work together to constrain and limit the advance in cattle prices that market conditions warranted. In the first quarter of 2019, each Operating Defendant reduced their slaughter volumes, posting similar quarter-

---

[33]   Cassandra Fish, *How About That,* THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific. Even in February, notoriously a slow beef demand month. Packer margins are record wide for February.").

on-quarter declines: Tyson Fresh (-3.5%), National Beef (-4.0%), CMS (-3.8%), and Swift/Packerland (-4.1%). Operating Defendants each maintained comparably lighter slaughter volumes across the first three months of 2019, ensuring that their collective demand did not exceed the available supply. These supply restraints included taking downtime or reducing the number of hours the plant operates. Operating Defendants continued to constrain their weekly kill volume and decline to increase production of beef to meet rising demand, thereby artificially inflating the price of beef. [34]

165.   The resulting impact of Operating Defendants' slaughter restraint at the beginning of 2019 and their continued adherence to a common pricing strategy was that beef prices increased, despite the fact that prices for cattle continued to fall across the summer, working their way to an apparent bottom of about $109-110/cwt in the end of June.   This left producers facing an average $106 per head loss, against Operating Defendants startling estimated per head profit of $257.[35]

166.   Despite robust beef demand, Defendants' restrained production left wholesale beef prices higher on a year-on-year basis, despite the fact fed cattle prices were flat.   Ms. Fish reported beef prices were "sizzling" despite most cattle producers losing money.[36]

---

[34]   *See, e.g.*, Cassandra Fish, *And the Beat Goes On*, THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/.

[35]   *Sterling Beef Profit Tracker: week ending June 21, 2019*, STERLING MARKETING INC. (June 26, 2019), https://www.drovers.com/news/industry/profit-tracker-feeding-losses-reach-triple-digits.

[36]   Cassandra Fish, *Packers Press and Cash Softens,* THE BEEF (August 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/.

167.    A slight $2-3/cwt rise in prices allowed producers to realize a paltry per head profit of about $24 by the week ending August 9, 2020, against the Operating Defendants' profit of $192 per head.

168.    Notwithstanding the predicted cash cattle strength across August, a chance fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019 provided an opportunity for Operating Defendants to work cattle prices lower still, sending cattle producers back into the red.  Tyson closed the Holcomb plant indefinitely in the aftermath of the fire.[37]

169.    However, following the plant fire, Tyson Fresh, Swift/Packerland, CMS, and National Beef all slashed their fed cattle bids and hiked their beef prices.  These actions caused a $5/cwt drop in fed cattle prices and a $14/cwt rise in wholesale beef prices the following trading week.[38]  This saw Operating Defendants' per head margins rise from $191 to $358 in the week ending August 16.  The following week, Operating Defendants' margins continued to expand, with the spread between fed cattle prices and beef values

---

[37]    *Over 3,800 workers at Tyson Foods beef plant in Kansas out of work after fire*, REUTERS (Aug. 11, 2019, 1:30 PM), https://www.reuters.com/article/us-tyson-foods-fire/over-3800-workers-at-tyson-foods-beef-plant-in-kansas-out-of-work-after-fire-idUSKCN1V10J1?source=content_type%3Areact%7Cfirst_level_url%3Anews%7Csection%3Amain_content%7Cbutton%3Abody_link.

[38]    *Sterling Beef Profit Tracker: week ending August 16, 2019*, STERLING MARKETING INC. (August 20, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.  Live cattle futures contracts were also negatively impacted, with the market responding with two limit-down trading days on September 12 and 13, 2019.

extending to a then-record high of \$67.17/cwt., \$39.51/cwt above the average spread for the same week across 2016-2018.

170.   Defendants blamed the loss of Holcomb's 5,500-6,000 head per day slaughter capacity for these price changes.  In a competitive market and with record profits, the other Operating Defendants would have wanted to increase their purchases of cattle and increase their slaughter numbers to both taken advantage of the high prices, and to take market share from the industry leader Tyson.

171.   Instead, in the month following the Holcomb fire, each Operating Defendant decreased its production.  The parallel and coordinated decrease in production in the face of a large supply restraint cannot be explained by legitimate reasons, but instead demonstrates the commitment by the Operating Defendants to maintain high margins and keep cattle slaughter restricted. Figures 9-13 below demonstrate the parallel September cuts:

**Figure 9. Tyson Fresh Monthly Headcount – Steers and Heifers**



**Figure 10. JBS Swift Monthly Headcount – Steers and Heifers**



**Figure 11. JBS Packerland Monthly Headcount – Steers and Heifers**



**Figure 12. National Beef Monthly Headcount – Steers and Heifers**



**Figure 13. CMS Monthly Headcount – Steers and Heifers**



172.   Operating Defendants' purchase and kill reductions in the aftermath of the Holcomb fire ensured that their collective supply remained constrained, giving the Operating Defendants the power to increase beef prices, while paying less for the cattle.

173.   Tyson Fresh, Swift/Packerland, CMS, and National Beef consequently reaped record high margins in the weeks that followed the Holcomb fire by stepping down fed cattle prices and raising beef prices in parallel.   As cattle prices bottomed out in the week ending September 13, 2019, the spread between Operating Defendants and Cattle Ranchers per head margin exceeded $600, with packers making over $400 per head while producers sustained $200 per head losses.[39]

## G.   Defendants idled and closed plants, refrained from expanding processing capacity

174.   The conspiracy also entailed a longer-term strategy to restrict beef supplies. Operating Defendants agreed to permanently close processing facilities without replacing most of the lost capacity. These actions came on the heels of reduced production capacity already caused by a series of plant closures shortly before the Class Period, including these:

   a.   On January 17, 2013, Cargill Inc. announced it would shut down its Plainview, Texas, beef-processing facility, one of Cargill's larger plants, in just two weeks. This closure cut Cargills's

---

[39]   *Sterling Beef Profit Tracker: week ending September 13, 2019*, STERLING MARKETING INC. (September 18, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.

slaughter capacity by 4,650 cattle per day, which was "nearly 4% of the U.S. beef industry current capacity."[40]

b.    In April 2013, JBS USA followed by acquiring an inactive plant in Nampa, Idaho, only to keep it idle. JBS stated that it had "no immediate plans to reopen the facility," which would have been capable of processing about 1,100 cattle per day, and, upon information and belief, it remains idle today.[41]

c.    In June 2014, National Beef closed its Brawley, California, plant. This eliminated another 2,000 cattle per day of slaughter capacity.[42]

d.    The next month, Cargill Inc. announced it would also close its Milwaukee, Wisconsin, plant on August 1, 2014. This closure decreased the industry's slaughter capacity by another 1,300 to 1,400 cattle per day.

e.    Also in 2014, Tyson Foods shut down its Cherokee, Iowa, processing plant. Tyson Foods officials "told the city they would

---

[40]    Apr. 3, 2013, Votorantim Equity Research Report on JBS.

[41]    *JBS USA Acquires U.S. Operations of XL Foods*, JBS April 4, 2013 Press Release, https://jbssa.com/about/news/2013/04-04/#.X-eami2ZPow

[42]    National Beef even rejected a significant package of incentives offered by local government utilities and nearby feedlots when it decided to close its Brawley plant. "National Beef plant closing Brawley Facility," PROGRESSIVE CATTLEMEN (Mar. 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plantclosing-brawley-facility.

consider handing over the shuttered plant—but not to any firm that they believe is competition."[43] In 2018, Tyson Foods allowed another company to purchase the plant but only after inserting a requirement into the deed that "limited the amount of cattle that can be processed at the plant for the next 10 years."[44]

175.    Operating Defendants continued to shrink the beef industry's processing capacity when the Class Period began:

      a.     On September 11, 2015, Cargill Inc. announced it would sell the Plainview, Texas, plant that it idled in February 2013.

      b.     In August 2015, Tyson Food decreased the industry's slaughter capacity by another 2,000 cattle per day by shuttering its Denison, Iowa plant.

176.    By idling these plants, Operating Defendants slashed the industry's annual slaughter capacity by some two million cattle per year—excluding JBS USA's continued idling of the Nampa, Idaho plant.

177.    While overall industry slaughter capacity increased slightly between 2015 and 2018, this nominal gain was primarily not the work of any Operating Defendant. Instead, it was attributable to other beef-processing companies. For example, One World

---

[43]    Available at https://www.desmoinesregister.com/story/money/business/ 2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/.

[44]    Available at https://www.desmoinesregister.com/story/money/business/ 2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinson-pork-beef-chicken-processing/1356962002/.

Beef Packing restored about 2,000 cattle per day by reopening the Brawley, California plant closed by National Beef in 2014.

178.   In sharp contrast to the Operating Defendants' behavior, these other beef processing companies acted consistent with their competitive interests by increasing their capacity and output in response to increased demand for beef, but their increased efforts to supply the downstream market with beef had little effect on the prices due to their nominal market share. Operating Defendants' market dominance and stranglehold on the industry meant that these minor incursions by the few remaining independent processors increased availability only in isolated pockets and had negligible effect on restoring supply (and thereby reducing beef prices) in most locations.[45]

179.   In April 2015, Tyson Fresh completed upgrades to its Dakota City, Nebraska, plant. But Tyson only made them after repeated delays in a project that was originally scheduled to be completed about two years earlier. These upgrades fell substantially short of replacing the production capacity that Tyson alone had eliminated shortly before and during the Class Period, much less Operating Defendants' collective capacity elimination.

---

[45]   JBS was the only Defendant that made any capital investment to increase industry slaughter capacity during the Class Period. JBS expanded its Hyrum, Utah plant in 2015 and 2016. But, according to JBS press releases and several industry publications, the purpose of that expansion was to increase its capacity to process culled dairy cows not fed cattle. Unlike fed cattle, culled cows are not used for beef—the product at issue in this lawsuit—but rather are used for ground beef.

**H.    Operating Defendants signaled their conspiracy and encouraged each other to maintain it**

180.    One method that Operating Defendants used to coordinate, promote, and monitor their conspiracy (evident now only with the benefit of hindsight afforded by the disclosure of other now-apparent conspiratorial evidence) was to signal and discuss with each other their activities and plans during earnings calls. Examples of some communications include the following:

- During a May 2014 earnings call, JBS S.A. offered this industry forecast: "For 2015, I think beef will keep being tight. I don't see any big – an increase in beef supply in 2015."

- During a May 2014 Q4 earnings call, Tyson Foods communicated that it was striving for margin and not market share: "For FY15, we expect fed cattle supply to be down 5% to 6% from last year, and we think we've experienced the bottom of the beef supply cycle. After this year, we believe we'll see slow incremental improvement in supply. Our beef segment results should improve in the back half of the year, and while profitable for the year, FY15 results are expected to be below FY14. It is important to remember that ***we'll continue to run our beef business for margin, not market share***."

- During Tyson Food's Q4 2015 earnings call, Mr. Smith further acknowledged that "You've got relatively low cattle supply, you've got too much -- well, I should not say too much, ***that's probably not the right way to say it***, but you've got excess industry capacity and that limits our ability to drive margins above the 1.5% to 3%, we think."

- On Tyson Foods's August 3, 2015, Q3 earnings call, its CEO Donnie Smith admitted it was underutilizing its plants, despite hurting its margins. when discussing Tyson's decreased purchases over the preceding quarter, noting "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to

cut back on our hours at our plants resulting in inefficiencies and added costs.  In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term." He also admitted that "industry capacity utilization [was] probably in the low 70s."  In response to a question regarding the consequent impact of Tyson's underutilization of its plant capacity Mr. Smith elaborated: "In terms of quantifying the impact, we know when we're running 34s and 36s a week in our plants that that does cost us. It raises the cost in our plant, makes us a lot less efficient, so it does have a cost to us. I don't know that I can quantify that right off the bat, but it does impact margin."

• On its November 12, 2015, Q3 earnings call, JBS USA's CEO Andre Nogueira de Souza publicly praised Defendants' efforts to reduce industrywide slaughter capacity through plant closures, remarking that "the reduction that we saw in the cutbacks of production in U.S. . . . that was with the shutdown of nine plants the last two years reduced the cattle.  (inaudible) cost us [$3.5 million]. I think that will be a very good position balancing the industry in 2016, 2017 and 2018."

• On a May 2016 JBS S.A. Q1 earnings call, JBS USA's CEO Mr. Nogueira de Souza described the company's supply strategy: "So I don't see any imbalance in this near future, even cattle is coming back and we're going to see a little bit more production of beef this year and next year. It's still way, way below how it was few years ago and we'll be balancing at this side because a lot of plant was shut but it's too way below our historical production level."

• On its November 2016, Q4 earnings call, Tyson Foods acknowledged the widening of the meat margin: "The dynamic is that the livestock prices have not come – they've come down faster than the retail prices have, which has allowed us to make the margins that we have right now in both beef..."

I.      **Parallel Reductions in Cash Cattle Purchases and Anticompetitive Queuing Conventions**

181.    Operating Defendants procure their fed cattle in three ways: on the cash cattle trade market (the industry's version of the spot market), through formula or forward contracts, and for Swift/Packerland and CMS relying on their own cattle. Through these contracts the producer agrees to deliver its cattle once they have reached slaughter weight at a price to be determined at the time of delivery.

182.    To increase their meat margin, Operating Defendants jointly managed their purchases of domestic fed cash cattle in parallel below the available supply, including by reducing the number and volume of purchases. Operating Defendants took advantage of the supply glut and lower cash cattle prices and increased their meat margin.  Operating Defendants expanded their meat margin by refusing to pass-on the savings from the reduced cattle prices to purchasers of beef, which would normally happen in a competitive market. Instead, beef prices remained high while cattle producers, indicating a collusive agreement between Operating Defendants.

183.    In addition to Operating Defendants' reduced cash cattle purchases, each employed an antiquated "queuing convention" throughout the Class Period which served to limit producers' ability to generate price competition for their cattle.

184.    The convention, which operated predominately in relation to those cattle sold in the cash market, works as follows: once a producer receives a bid from a Packer, the producer may either accept the bid or pass on it, but may not "shop" that bid to other

packers, i.e. require competition for the bidding process.  If another Packer offers the same bid as the original bidding Packer, the producer must give the original Packer the right of first refusal.

185.   The obligation to give a right of first refusal without consideration is under threat of boycott.  Operating Defendants have adhered to and enforced the convention for decades, including across the Class Period, and treat it as a mandatory industry custom.

186.   One former feedlot manager, Matt T. ("Witness 2"), confirmed that the field buyers from Tyson Fresh (Brian Alsup), Swift (Levi Canales, and prior to him, Chad Miller), CMS (Rick Vogel, and prior to him, Steve Brown), and National Beef (Richard Duffy) who visited his feedlot enforced strict adherence to this convention with threats of retaliation.  In particular, each of these field buyers individually spoke to him about the importance of his feedlot complying with the convention, and that they would not "come by" anymore should he break with it.

187.   Witness 2 further reports that when he took over management of the feedlot in 2012, the feedlot would only receive bids from National Beef and CMS.  When he subsequently spoke to the field buyers from Tyson Fresh (Mr. Alsup) and Swift (Mr. Miller) responsible for his region in the fall of 2012, they both told him that they had stopped visiting the feedlot because Witness 2's predecessor had broken with the convention by "shopping" their bids.  Witness 2 reports that the Tyson Fresh and Swift field buyers re-commenced visiting the feedlot after he confirmed his commitment to following the convention.

188.   Witness 2 also heard from the Operating Defendants' field buyers and other industry participants about other producers being "blackballed" for breaking with the queuing convention.  In those circumstances, Witness 2 understood that the Operating Defendant who was "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted while shopping the Operating Defendant's bid, or would ex-post pressure the producer for details of its sale.

189.   As evidenced by the expanding meat margin, Operating Defendants collectively refused to pass-on any savings from the anticompetitive conduct toward the cattle producers to Plaintiffs and Class Members, instead keeping the ill-gotten gains for themselves.

## VI.   EFFECTS OF DEFENDANTS' ANTITRUST VIOLATIONS

### A.   Defendants' conspiracy increased the spread between cattle and beef prices

190.   Droughts from 2011 through 2013 caused fed cattle prices to steadily increase. Predictably, wholesale prices of beef moved in tandem, maintaining a constant relationship (or margin) between the two. As a result, Operating Defendants' profits on average were trimmed to margins of only 1 to 3 percent.

191.   The DOJ has recognized that when the beef market is functioning competitively, a strong relationship exists between the supply of cattle and the price of beef charged to direct purchasers:

> [A]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because

73

fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits.[46]

192.    Thus, in a competitive market, lower wholesale beef prices naturally follow lower cattle prices. Once the conspiracy took hold, the spread between cattle and beef prices grew significantly. Operating Defendants' restriction of the beef supply caused cattle prices to slump, while Operating Defendants charged direct purchasers for beef at elevated prices that would not have existed in the market but for Operating Defendants' artificial supply restraints.

193.    Figure 4 is a graph constructed from published USDA data. It captures the steep climb of the spread during the Class Period, which began after a period of very minimal growth from 2012 to 2015:

---

[46]    *U.S. v. JBS,* Amended Complaint, ¶¶ 26-27.

**Figure 4.**

### The Spread Between the Farm Value of Beef and Wholesale Prices 2012 - 2020



Source: USDA

**Figure 5.**

| Years | Farm to Wholesale Price Spread | Proportional Increase |
|---|---|---|
| 2010 through 2014 | $34.07 | |
| 2015 through 2018 | $54.24 | 59% |
| 2019 | $84.15 | 55% |
| 2020 | $125.05 | 49% |
| | | |
| 2010 through 2014 | $34.07 | |
| 2015 through 2020 | $71.03 | 109% |

194.    According to USDA Economic Research Service data, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to present than during the preceding five years. From 2010 to

75

2014, the average farm-to-wholesale spread was about $34. But from 2015 to 2018, the average spread was about $54—a 59% increase.  The spread continued to balloon, by 2020 reaching about $71, a 109% increase from the pre-class period average.

195.    Operating Defendants' ability to cut beef production while maintaining inflated beef prices during the Class Period provides compelling circumstantial evidence of their conspiracy. In a beef market free from collusion, if a competitor reduces its purchase of cattle, other competitors quickly pick up the slack to boost their sales and increase their market shares.

**B.      Tyson Foods and, jointly, JBS S.A. and JBS USA falsely claimed their record profits were due to market prescience, not supply constraints**

196.    Throughout 2017 and 2018, on earnings conference calls, executives from JBS S.A. and Tyson Foods frequently attributed their historically high profits to their ability to accurately foresee the volume of cattle that would enter the beef supply chain in the upcoming years. Examples of these boasts include the following:

- On a Q3 2017 earnings call on August 7, 2017, Tyson Foods reported a beef-business operating margin of 3.7 percent for the third quarter and emphasized its confidence in the beef business going forward: "With ample supplies of cattle, we see very good conditions for our beef business as far out as 2020, as we enter the early stages of a multiyear expansion cycle. Absent a shock to the system such as a drought or an import ban, our beef business is well-positioned for profitable, long-term growth." Tyson acknowledged that it was considering raising its previously forecasted 1.5–3 percent normalized operating margins. But despite ample supply of cattle and high demand for beef, Defendants did not increase cattle purchases or cattle  slaughter.

- On a Q2 2018 earnings call on May 7, 2018, Tyson Foods announced forecasted beef operating margins of 6 percent for the year—at least twice its normalized operating margin range of 1.5–3 percent. Tyson claimed the huge jump was attributable to "those cattle on feed reports and knowing that the supplies in our region are exceptionally good."

- On JBS S.A.'s Q1 2018 earnings call on May 15, 2018, JBS S.A. reported an EBITDA margin of 6.1 percent for the quarter and forecasted that the company would enjoy record beef margins for the next two quarters. JBS USA's CEO and President Andre Nogueira emphasized that its performance was not based on "taking share from anyone."

- On a Q3 2018 earnings call on August 6, 2018, Tyson Foods reported a beef operating margin of 8 percent for the quarter. Tyson Foods stated that it had an "optimistic outlook" because "we have good visibility into 2021 . . . that's good because we do see the number of animals that are out there."

- On a Q2 2018 earnings call on on August 15, 2019, JBS S.A. reported a beef EBITDA margin of 10.2 percent for the quarter. JBS USA's CEO and President Andre Nogueira stated that it was "moving the overall margin in beef [to] a different level that was in the past." JBS added that it benefitted from shutting several plants in the previous five years, and that it could not see how U.S. beef could "be less profitable in 2019 compare [sic] how it is going to perform in 2018."

- On a Q4 2018 earnings call on November 13, 2018, Tyson Foods reported record beef operating margins of 8.9 percent for the quarter and 6.7 percent for the year and stated that it expected similar results in the following years thanks to visibility into cattle supply: "As we look at 2019, 2020, even in 2021 we frankly we don't see a lot of change. The supply appears to be relatively stable. We have a good sense of what that looks like just due to the calf crop that gives us good visibility for at least a couple of years."

## VII.   ADDITIONAL PLUS FACTORS ENCOURAGING THE REASONABLE INFERENCE OF DEFENDANTS' CONSPIRACY

197.   The beef meatpacking industry bears all the characteristics of a highly cartelized market: (1) producer concentration; (2) high barriers to entry; (3) commodity product; (4) inelastic demand; (5) opportunities to collude; (6) reduction of imports; (7) market share stability; and (8) production and capacity cuts in the face of increasing demand for beef. These characteristics supported Operating Defendants' collusion to constrain the number of cattle entering the supply chain, throttle the volume of processed beef sold, raise and fix the wholesale price of beef, and maximize Operating Defendants' margins.

### A.   The beef market is highly concentrated

198.   Market concentration facilitates collusion. Conspiracies are easier to organize and sustain when only a few firms control a large share of the market. Practical matters, such as coordinating cartel meetings and exchanging information, are much simpler with a small number of players.

199.   A high degree of Operating Defendants' control simplifies coordination because little outside competitive presence exists to undermine the cartel, and Operating Defendants can more easily monitor each other's actions related to supply and pricing.

200.   In a highly concentrated market, higher, long-term profits secured by the cartel's artificially elevated prices outweigh transitory gains in profits and market share that producers might achieved by undercutting their cartel price.

78

201.    The beef industry experienced significant consolidation leading up to and during the Class Period. In 2001, Tyson Foods purchased IBP, Inc., then the nation's largest beef packer. In 2002, Cargill, Inc. purchased Taylor Packing Co. In 2007 and 2008, JBS USA acquired Swift & Co. and Smithfield Beef Group, Inc., the third- and fifth-largest U.S. beef packers.

202.    Through these purchases, Operating Defendants collectively controlled about 81–85 percent of the cattle slaughter market throughout the Class Period, while the next largest meatpacker had only a 2–3 percent market share. Operating Defendants' control of the market enabled the conspiracy to launch in 2015 and prosper ever since.

**B.    The beef market has high barriers to entry**

203.    Barriers to entry are obstacles that prevent new competitors from easily entering a market. They restrict competition in a market and make it easier for incumbents to collude.

204.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits to be reaped from supracompetitive pricing. But where significant barriers to entry exist, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

205.    Barriers to entry kept would-be competitors out of the beef-packing industry. The construction of a large packing plant requires an investment of at least $250 million. It normally takes two years or longer to obtain the necessary permits and plan, design, and

build the facility. And new entrants must also comply with numerous regulations, recruit and train a large workforce, and develop and execute a successful marketing plan.

206.    These barriers have caused new entrants to file for bankruptcy shortly after attempting to enter the market. These casualties include substantial enterprises such as Northern Beef Packers, LP, and Sam Kane Beef Processing, LLC.[47] Relative insulation from the threat of new competitors has enabled Operating Defendants to maintain their conspiracy.

### C.    Beef is a commodity product

207.    A commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods or services.

208.    Beef is a commodity. For example, beef roasts from Tyson and Cargill are virtually indistinguishable and have nearly identical nutritional content. The USDA recognizes beef as a commodity and posts daily beef prices. Options and futures for the cattle from which beef is produced are traded as commodities on the Chicago Mercantile Exchange.

---

[47]    Northern Beef Packers LP filed under Chapter 11 in July 2013 and ceased operations before selling off its assets in December of that year. "Northern Beef Packers sold to White Oak for $44.3 million," *The National Provisioner*, Dec. 9, 2013. Sam Kane Beef Processing filed under Chapter 11 in January 2019 and was acquired by STX Beef Co. in February. "Kane Beef plant sale closes, new owner pledges to restart operations," *Daily Adviser*, Mar. 1, 2019.

209.    Markets for commodity products are susceptible to collusion. Demand for a commodity depends primarily, if not exclusively, on price as opposed to other attributes such as product quality or customer service. As a result, cartel members can more easily monitor compliance and detect defectors.

210.    Any observed price discrepancies for commodities are more likely to expose cheating because they cannot as readily be attributed to other factors such as special product features, quality, reliability and durability, or other terms of a transaction.

### D.    The demand for beef is inelastic

211.    Price elasticity describes the sensitivity of suppliers or consumers to changes in the price of a good or service. Demand is inelastic if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product.

212.    Under conditions of inelastic demand, customers have nowhere to turn for alternative, cheaper products of similar quality, and they continue to purchase despite a price increase.

213.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices; otherwise, increased prices would result in declining sales, revenues, and profits as customers purchase substitute products or decline to buy altogether.

214.    Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

215.   Beef demand is relatively insensitive to price changes. According to a recent study of beef demand, "since beef has an inelastic demand, industry total revenue increases when prices rise as there comparatively is a limited reduction in volume purchased."[48]

216.   The same study concluded that the relative impact of pork and chicken prices on beef demand is economically small. Operating Defendants' supracompetitive prices to its direct purchasers do not significantly reduce beef sales or lead purchasers to seek protein from other meat sources.

### E.   Defendants took advantage of multiple opportunities to collude

217.   Operating Defendants are members of industry trade associations and forums and regularly attend industry events, including the events listed below. These events provide opportunities to exchange pricing, supply, and other competitively sensitive information.

218.   For example, the National Cattlemen's Beef Association ("NCBA") holds an annual convention, CattleCon, which includes a summer conference, legislative conference, and regional meetings.[49] The NCBA Product Council, which includes Defendants' representatives and representatives from other packers, meets quarterly for the invitation-only Beef Executive Forum. For example, two of Defendants' executives, former CMS/Cargill Vice President of Cattle Procurement Bill Thoni and former Tyson

---

[48]   Glynn Tonsor, Jason Lusk, Ted Schroeder, *Assessing Beef Demand Determinants*, (Jan. 18, 2018) at 7-9, https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-Beef-Demand-Determinants_FullReport.pdf.

[49]   *NCBA Allied Industry Membership*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), https://convention.ncba.org/.

SVP of Beef Margin Management and VP of Boxed Beef Pricing Kevin Hueser, were both officers, board members, or formally designated participants of the NCBA during the Class Periods. Defendants also participate in meetings of the Beef Checkoff program run by the Federation of State Beef Councils, held contemporaneously with the NCBA summer and winter meetings.

219.    The U.S. Meat Export Federation ("USMEF") is another example of a trade association at which Defendants regularly met. The USMEF develops export opportunities for U.S. protein producers and holds both spring and fall conferences and monthly international trade shows.[50]   USMEF leadership includes current and former employees and officers of Defendants. For example, former CMS/Cargill Vice President of International Sales Pat Binger was an officer, board member, or formally designated participant of the USMEF; former Tyson Foods SVP of International Sales Roel Andriessen served as the Chair, Vice Chair, and on the Executive Committee of the USMEF; former Tyson Foods SVP of International Sales and VP International Sales Robert Shuey was a formal participant of the USMEF; National Beef International President and former Vice President of International Sales Peter Michalski served on the Export Committee of the USMEF; and former National Beef NBP International Sales President Mark Domanski served on the Export Committee of the USMEF.   Also, in

---

50      *Events: Meetings*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/bod-meetings/; *Events: Trade Show Calendar*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/trade-shows/.

November 2017, Tyson's Roel Andriessen and CMS's Pat Binger both attended the USMEF Strategic Planning Conference in Tucson, Arizona.[51]

220.   Defendants were among the founding members of the Global and U.S. Roundtables for Sustainable Beef, and they remain members. Defendants participate in its annual meetings each spring, and JBS and Cargill have leadership positions in some of the working groups.

221.   Defendants also came together for multiple meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI") and its predecessor, the American Meat Institute. NAMI is a national trade association that represents companies that process 95% of red meat.[52] Executives and employees of Defendants also participated and held leadership positions in the NAMI. For example, CMS President of Business Operations & Supply Chain and former Cargill Beef President John Keating was an officer, board member, or formally designated participant of the NAMI; former Tyson Foods CEO, Group President of Fresh Meats & International, and COO Noel White served on the Executive Committee of the NAMI; former Tyson Foods CEO and President Thomas Hayes also served on the Executive Committee of the NAMI; National Beef President and CEO Timothy M. Klein served on the Executive Committee

---

51      *USMEF Members Examine Challenges ahead, Elect New Officer Team*, U.S. MEAT EXP. FED'N (Nov. 3, 2017), https://www.usmef.org/news-statistics/member-news-archive/usmef-members-examine-challenges-ahead-elect-new-officer-team/.

52      *See About NAMI*, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204; *Events*, NAT'L AMERICAN MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

of the NAMI; and JBS USA CEO Andre Nogueira served on the Board of Directors of the NAMI.

222.   The NAMI and the Food Industry Association host an annual Meat Conference, which various executives and employees of Defendants attend every year.[53] In 2017, National Beef's Timothy Klein, Tyson Vice President of Boxed Beef Pricing Don Kieffer, JBS USA's Andre Nogueira, and CMS Vice President of Sales John Jay, amongst other Defendant executives, were listed as attendees of the Meat Conference.[54] In 2018, National Beef's Timothy Klein, JBS USA's Andre Nogueira, Cargill Vice President of Retail Beef Business Lead Elizabeth Gutschenritter, and Tyson's Don Kieffer attended the Meat Conference.[55] In 2019, JBS USA's Andre Nogueira, Tyson's Noel White, National Beef's Timothy Klein, and Cargill's Elizabeth Gutschenritter were listed as attendees.[56] In 2020, Tyson's Noel White and National Beef's Timothy Klein again signed up to attend the Meat Conference along with various other Cargill and JBS executives and employees.[57]

---

[53]   *Meat Conference*, NORTH AM. MEAT INST. AND FOOD INDUS. ASS'N, http://meatconference.com/ (last visited Dec. 9, 2020).

[54]   *2017 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N  (Dec. 9, 2020) https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=43A35 D00000DFE&sortBy=name.

[55]   *2018 Annual Meat Conference Attendee List as of 2.9.2018*, MEAT CONFERENCE (Feb. 9, 2018), http://meatconference.com/sites/default/files/books/2018%20AMC%20Attendee%20List. pdf.

[56]   *Meat Conference 2019 Attendee List (as of 2/27)*, MEAT CONFERENCE (Feb. 27, 2019), http://meatconference.com/sites/default/files/books/2019-AMC-Attendee-List.pdf.

[57]   *2020 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N  (Dec. 9, 2020),

223.   Until April 2017, NAMI sponsored an annual Meat Industry Management Conference, which offered topics such as economics and general business. That conference was then replaced by an annual Meat Industry Summit. This summit has sponsored "networking opportunities and social events" including a golf tournament, receptions, an "Issues, Answers, Actions Breakfast," the annual NAMI board meeting, and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

224.   The beef industry's Annual Meat Conference, described on the event's website as "a complete education and networking experience," provides another opportunity for Defendants to confer. Many of Defendants' high-level executives have been attending this conference for years. The list of registered attendees in 2012, for example, included eight executives from JBS, Tyson Foods's then-CEO Donnie Smith, and twelve other Tyson executives.

225.   Defendants' executives and employees also attended "AgCon," a joint conference from the Commodity Futures Trading Commission and the Center for Risk

---

https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=571D8 1000004FF&includeUnpaid=1&sortBy=title.

Management Education and Research at Kansas State University, in 2018.[58] CMS' Bill Thoni and Tyson's Kevin Hueser were listed as attendees of the 2018 AgCon along with other Packing Defendants' executives and employees, including Tyson Fresh's VP of Sourcing & Risk Management Randall Chambers; Tyson Fresh's VP of Cattle Procurement John Gerber; National Beef Vice President of Cattle Procurement Chad Barker; National Beef Vice President of Procurement and Risk Management Phil Groetken; and JBS USA Head of Risk Management Marco Sampaio.[59]

226.   Tyson, JBS, and Cargill Defendant executives also had ample opportunities to meet privately particularly at the beginning of the conspiracy as a result of JBS's acquisition of Tyson and Cargill's Mexican and Brazilian chicken and U.S. pork operations, respectively. JBS S.A.'s purchase of Tyson's Brazilian and Mexican chicken operations was announced on July 28, 2014 and closed on December 1, 2014 and June 29, 2015, respectively,[60] while its purchase of Cargill's U.S. pork operations was announced on July 1, 2015 and closed on October 30, 2015.  Cargill, Tyson, and JBS executives with responsibilities relating to beef and cattle such as then-Tyson CEO and President Donnie

---

[58]    *Inaugural AgCon brings business, government together to discuss ag futures markets*, KANSAS STATE UNIV. (Mar. 8, 2018), https://www.ksre.k-state.edu/news/stories/2018/03/AgCon2018.html.

[59]    *2018 AgCon Attendees*, KANSAS STATE UNIV. (Mar. 28, 2018), https://www.k-state.edu/riskmanagement/documents/Ag_Con_2018_Attendees_Mar30.pdf.

[60]    JBS Foods Int'l B.V., Registration Statement (Form F-1) at 112 (Dec. 5, 2016), https://www.sec.gov/Archives/edgar/data/1691004/000119312516785274/d304020df1.htm.

Smith,[61] JBS USA CEO Andre Nogueira,[62] and then-Cargill Senior Vice President Todd

Hall[63] were all involved in the acquisition discussions. JBS S.A.'s CEO Wesley Batista

stated in July 2015 that its "courtship" with Cargill in relation to its U.S. pork operations

"started years ago," with discussions intensifying at the beginning of 2015, coinciding with

the start of the Class Period.[64]

227.    These events afford Defendants' top executives and other employees

frequent opportunities to discuss pricing, production, and other proprietary information in

an informal setting and monitor compliance with their conspiracy.

**F.    Defendants exacerbated their supply restraints by continuing to reduce their imports**

228.    Defendants did not offset their slaughter reductions by importing more cattle

into the United States. Rather, imports continued decreasing in 2015 and throughout the

Class Period. Figure 15 captures this trend:

---

61    *Tyson to sell Mexico, Brazil poultry businesses to JBS*, REUTERS (July 29, 2014, 1:32 PM), https://www.reuters.com/article/us-tyson-foods-results/tyson-to-sell-mexico-brazil-poultry-businesses-to-jbs-idUKKBN0FX0UR20140729.

62    Lawrence Aylward, *Inside the JBS, Cargill deal*, MEAT + POULTRY (July 2, 2015), https://www.meatpoultry.com/articles/13164-inside-the-jbs-cargill-deal.

63    Press Release, Cargill, JBS USA Pork agrees to purchase Cargill Pork business (July 1, 2015), https://www.cargill.com/news/releases/2015/NA31861255.jsp.

64    Luciana Magalhaes, *With Cargill Purchase, Brazil's JBS Poised to Become No. 2 Pork Producer in U.S.*, WALL STREET JOURNAL (July 2, 2015, 3:18 PM), https://www.wsj.com/articles/with-cargill-purchase-brazils-jbs-poised-to-become-no-2-pork-producer-in-u-s-1435864508.

**Figure 15.**



229.   Furthermore, certain Defendants shuttered international plants, thereby decreasing the supply of cattle available to be imported into the United States, which could otherwise have offset Operating Defendants' conspiratorial reductions.

230.   Operating Defendants' reduced domestic slaughtering and reduced cattle imports for slaughter combined to raise above competitive levels beef prices paid by Plaintiffs and other class members.

### G.    Defendants' Market Share Stability is Indicative of a Conspiracy

231.    In a competitive market, market shares fluctuate as producers compete for and gain business from each other. Stable market shares over time can suggest anticompetitive behavior like that engaged in by Operating Defendants'.

232.    Although market-share stability in a commodity market does not itself prove collusion, it strongly suggests operation of an effective cartel that has agreed not to compete. A marked decline in market-share volatility over time may suggest a conspiracy in a previously competitive market.

233.    Available data show that Operating Defendants' market shares, measured by wholesale beef sales, became more stable during the Class Period. The same is true for Operating Defendants' market shares as measured by slaughter capacity.

234.    Operating Defendants did not do the things true competitors would do in a competitive market. They did not attempt to capture each other's market share or lower prices as their costs declined. Rather, they shared competitively sensitive confidential information.

235.    As described in Section V.B., Operating Defendants reduced their output and capacity to produce beef for sale to Plaintiffs and class members. In a competitive market, the reduction in output by one producer typically presents an opportunity for competitors to capture market share in the face of constant or increasing demand.

236.    But instead, Operating Defendants reduced their output to limit beef supply, which increased beef prices. By acting together to advance their conspiracy, Operating

Defendants sacrificed potential gains for a few via increased market share for larger gains for all by increased prices and profit at the expense of Plaintiffs and class members. Figure 18 demonstrates Operating Defendants' overwhelming dominance of the market for the purchase of fed cattle.

**Figure 16.**
**Operating Defendants' Share of Annual U.S. Fed Cattle Slaughter Volumes**



### H. The Production Cuts Were Implemented Despite Surging Beef Demand

237. Operating Defendants' joint slaughter management was not a reaction to changes in beef demand. Tyson Fresh's Head of Cattle Procurement, John Gerber, admitted at a November 2018 industry conference:

"[The] [c]onsumer will pay more for beef, and have to pay more for beef because it is worth more. There is value out there in chicken and pork, but unless you have been living under a great big rock the last two years, you

know that **beef demand is off the charts**. We have a lot of supply coming at us, but we have been able to hold the price at a pretty good level, because of beef demand, it's been really good, and I think it will stay good[65]

Yet, no Operating Defendant broke from their collective restraint and bought more cattle in an attempt to capture this "off the charts" demand for beef.

238.    By February 2019, beef demand was "terrific" and, in ordinary times, would encourage packers to compete to secure more cattle and run plants to meet customers' demand.[66]

239.    This strong beef demand trend continued into the fall of 2019, where the "voraciousness of beef demand [surprised] pretty much everyone in the business."[67]

240.    As shown in Figure 17 below, beef demand rebounded from its low in 2013. re.  Beef demand not only remained strong during the Class Period, but actually steadily increased from its prior lows in the immediate pre-collusion period, is also evident from Figure 20 below.

---

65      Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the 2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, November 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.
66      Cassandra Fish, *How About That,* THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific. Even in February, notoriously a slow beef demand month. Packer margins are record wide for February.").
67      Cassandra Fish, *Packers Press and Cash Softens,* THE BEEF (August 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/.

**Figure 17. Monthly Beef Demand Indices, Jan. 1988 – Nov. 2020**



## VIII.  THE BEEF INDUSTRY FACES GOVERNMENTAL INQUIRIES AND INVESTIGATIONS

241.   Price fixing, concerted output restriction, and other anticompetitive conduct, especially in an industry as large, prominent, and vital to national well-being as food production, eventually attract governmental scrutiny. The nation's antitrust enforcers, along with politicians and other government regulators, have an interest in ending such practices—not in leveling false accusations.

242.   Over the past year, Defendants' market power and profiteering, made even more unattractive by the COVID-19 pandemic, has caught the attention of politicians and

regulatory bodies. Investigations confirm the egregiousness of Defendants' conduct and suggest Defendants' culpability for their illegal acts.

243.   In August 2019, the USDA opened an investigation into the beef industry following a fire at Tyson's Holcomb, Kansas plant. The USDA took notice after the reduction in available supply simultaneously caused cattle prices to fall while elevating beef prices.

244.   On March 19, 2020, U.S. Senators Mike Rounds of South Dakota, Kevin Cramer and John Hoeven of North Dakota, and Steve Daines of Montana sent a letter to the DOJ urging the department to launch an investigation into price-fixing in the cattle market. The authors highlighted Defendants' harm to upstream producers and downstream consumers.

245.   On a conference call reported in the press, Senator Rounds stated the request was for the DOJ "to definitively answer whether a packer oligarchy exists within the cattle market and inherently creates an anti-competitive marketplace that unfairly disadvantages the cattle producer and the consumer." Senator Rounds further commented, "These margins just don't make any sense. The reality is there is an inverse correlation between the producer's price and the consumer's price."

246.   On April 8, 2020, Reuters reported that the USDA had extended its existing investigation to include a pricing dynamic like what was observed after the Holcomb fire— reduced prices paid to ranchers for cattle accompanied by a surge in retail beef prices—in

the wake of announced production shortages associated with the nationwide COVID-19 outbreak.

247.   On April 17, 2020, state-level cattle production trade associations from 23 states signed a letter to Attorney General William Barr requesting the DOJ coordinate with the USDA and launch its own investigation into "fraudulent business practices within the meatpacking industry." Signatories included the Minnesota State Cattlemen's Association.

248.   The letter described the two extraordinary pricing episodes, identified by the USDA, following the Holcomb fire and during the COVID-19 outbreak. The state trade associations not only reported their own plight but also observed that: "The nature of previous and current concern in both situations is extreme market degradation to the producer segment quickly followed by sharp increases and unseasonable profitability to the packing segment through boxed beef prices."

249.   With respect to the most recent manipulations, the letter explained that: "We are now seeing that same type of price action [observed after the Holcomb fire] repeated— only in a more extreme manner and during a time of crisis that includes logistical stressors on the nation's food production and distribution system." Indeed, in the last analysis, Defendants' conduct portends more than mere profiteering. If left unchecked, it will remain a direct and gathering threat to the country's food security during the current crisis.

250.   On May 5, 2020, 11 state attorneys general representing agricultural heartland states, including the Minnesota attorney general, signed a joint letter to Attorney General Barr urging the DOJ to open a coordinated federal antitrust investigation into

"anticompetitive practices by the meat packers in the cattle industry." This letter reiterated the two-way value extraction made possible by Defendants' market power: "Cattle ranchers . . . often struggle to survive. Consumers, moreover, do not realize the benefits from a competitive market."

251.    On June 4, 2020, Bloomberg reported that the DOJ had served civil investigative demands on Tyson Foods, JBS S.A., Cargill, Inc., and National Beef in connection with an investigation into antitrust violations consistent with the earlier requests by the producer trade associations and state attorneys general.

## IX.    ANTITRUST INJURY

252.    The cattle market is an oligopsony consisting of the Operating Defendants, which purchase most of the cattle for slaughter and produce most of the beef sold in the wholesale market. When Operating Defendants colluded to restrict supply, the market effectively became a monopsony that left Plaintiffs with no choice but to accept whatever price Operating Defendants offered.

253.    In a competitive market, the volume of cattle purchased by beef producers (such as Defendants) would equal the volume where supply matches the demand/marginal revenue product curve, and the price for that cattle would be the additional revenue that the producers would receive for cattle.

254.    When Operating Defendants collaborated to restrict supply, they exercised their monopsony power to compel Plaintiffs to accept the price Operating Defendants offered, thus driving down the market price. In this manner, Operating Defendants'

monopsony power enabled them to maximize their profit by purchasing fewer cattle at a lower price.

255.   Further, because imported beef was not offsetting the shortages that Operating Defendants created, the restricted supply of cattle caused a restricted supply of beef in the downstream market to direct purchasers like Plaintiffs.

256.   From the standpoint of direct purchasers of commodity beef, such as Plaintiffs, Operating Defendants function as an oligopoly in control of most of the industry supply. When Operating Defendants colluded to restrict supply, the market for beef became a monopoly in which direct purchasers were forced to buy at prices dictated by Operating Defendants who acted in concert.

257.   Because no other source was offsetting the shortages, Operating Defendants created the restricted supply of fed cattle, which in turn restricted the supply of beef in the downstream market to direct purchasers. Operating Defendants exacerbated this restriction through their concerted manipulation of slaughter capacity and processing volume.

258.   Because Operating Defendants had and have accompanying downstream market power, they were able to maximize their profits by colluding to produce volumes based on their marginal revenue curve instead of the market demand curve, which increased wholesale prices that Plaintiffs and class members paid.

259.   Because Operating Defendants did not fear competition from other meatpackers, Operating Defendants' collusion had the dual effect of (a) artificially

decreasing the price that Operating Defendants paid for cattle; and (b) artificially increasing the price they charged for their beef products.

260.    Operating Defendants' monopsony power and anticompetitive conduct had the following effects, among others:

- Price competition in the beef market was restrained or eliminated;

- Prices for beef sold by Operating Defendants, their divisions, subsidiaries, and affiliates, and co-conspirators, and, in turn, other beef producers, were raised, maintained, and fixed at artificially high, noncompetitive levels throughout the United States;

- Direct purchasers of beef were deprived of free and open competition; and

- Direct purchasers paid artificially inflated prices.

261.    The purpose of Operating Defendants' and their co-conspirators' conduct was to raise, fix, or maintain the price of beef above a competitive level. As a direct and foreseeable result, Plaintiffs and class members paid supra-competitive prices for beef during the Class Period.

262.    Defendants' violations of the Sherman Act caused Plaintiffs and class members to suffer injury to their businesses or property.

263.    This harm is an antitrust injury of the type that the antitrust laws were designed to punish and prevent.

## X.    DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY

264.   To invoke fraudulent concealment, Plaintiffs must allege facts showing: (a) Defendants' concealment of Plaintiffs' cause of action, (b) failure by Plaintiffs to discover the existence of their cause of action, and (c) due diligence by Plaintiffs in attempting to discover the claim. The statute of limitations is then tolled with respect to Plaintiffs' and class members' claims arising from Defendants' illegal conduct.

### A.    Defendants' concealment of Plaintiffs' cause of action

265.   Defendants took affirmative actions to fraudulently conceal their antitrust violation.

266.   Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed the conspiracy from Plaintiffs and class members.

267.   Defendants used various means and methods to fraudulently conceal their conspiracy, including but not limited to secret meetings, surreptitious communications between Defendants by telephone or in person meetings to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply-restraint communications on documents, and communicating competitively sensitive data to each other.

268.   The facts alleged in Section V.B of this complaint describe Defendants' secret behaviors intended to advance their conspiracy. These sections allege the who, what, when, where, and how of Defendants' conspiracy—based on behaviors known only to

Defendants to be illegal at the time they performed them—that plausibly suggest Defendants engaged in a fraudulent-concealment campaign.

269.   JBS and Tyson often falsely attributed their historically high profits to their ability to accurately foresee the volume of cattle that would enter the beef supply chain in the upcoming years, yet their high profits had nothing to do with foresight and instead were the result of collusion as described in Section VI.B. of this complaint.

270.   Accordingly, Defendants concealed their illegal behavior from Plaintiffs and class members by the following means:

- communicating privately by telephone about their purchases and slaughter volumes so they would not create written evidence of sharing this information, as well as relying on nonpublic forms of communication;

- offering false or pretextual rationales for the low fed cattle prices;

- providing pretextual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade;

- explicitly and implicitly representing that the fed cattle bids and contract terms offered to Plaintiffs and class members were the product of honest competition and not a conspiracy;

- misrepresenting that Defendants complied with applicable laws and regulations, including antitrust laws; and

- misrepresenting the nature of Defendants' agreements (and purported adherence to competitive safeguards) to government officials and the public.

271. During the Class Period, Defendants also lied about their compliance with antitrust laws whose compliance lies at the heart of Plaintiffs' antitrust case:

- Tyson's Code of Conduct touts that "[w]e compete in the market with integrity and comply with competition laws [and w]e comply with the letter and spirit of competition laws (also referred to as "antitrust" laws) wherever we do business."

- JBS's 2014 Annual Report asserts that the company has clear policies "[t]o ensure ethical conduct and integrity in the management of its business," including a Manual of Ethical Conduct "that addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices, and other sensitive topics."

- Cargill stressed in its 2015 Corporate Responsibility report that "[w]e obey the law. Obeying the law is the foundation on which our reputation and Guiding Principles are built We conduct our business with integrity We compete vigorously, but do so fairly and ethically. We ... comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill reaffirmed this commitment in subsequent Corporate Responsibility reports.

- National Beef's former majority shareholder, Jefferies Financial Group acknowledged in its 2014 Annual Report that National Beef was "subject to extensive government regulation," including the USDA's.

272. As it concerns Cargill, Inc.'s, JBS S.A.'s, and Tyson Foods's false or pretextual statements or issued false or pretextual data, Cargill, Inc. did so for the benefit

of CMS, JBS S.A. did so for the benefit of JBS USA, Swift, and Packerland, and Tyson Foods did so for the benefit of Tyson Fresh because, had these parent Defendants not continually cloaked Operating Defendants' conspiracy, the entire conspiracy would have been unable to operate. Indeed, these parent Defendants told and perpetuated many of the lies that fueled Operating Defendants' conspiracy and allowed it to operate.

273.   In addition to Defendants having affirmatively concealed their conspiracy, Defendants' conspiracy was inherently self-concealing because it depended on secrecy for its successful operation. Had the public learned Defendants were conspiring to limit supply and fix prices, their conspiracy could not have survived.

274.   Defendants also lied about their plant closures, slaughter reductions, and withdrawal from the cash cattle trade as follows:

### 1.    The Cargill Defendants

275.   As discussed above, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance their conspiracy.

276.   To facilitate Defendants' conspiracy, Cargill, Inc. made public statements offering pretextual explanations to cloak Defendants' unlawful activity. For example, Cargill, Inc. used its 2017 Annual Report to explain that "[r]enewed consumer demand for beef [produced] favorable market conditions in North America."

277.   The following year, Cargill, Inc. proclaimed that its Animal and Nutrition & Protein segment's "strong performance" in 2018 was "fueled by rising domestic and export

demand for North American beef" rather than through its price-fixing scheme, which reference Cargill, Inc. understandably avoided.

278.    Cargill, Inc. made these false public statements to obscure its role and participation in the conspiracy. Instead of disclosing that its "strong performance" stemmed from the illegal behavior and profits, Cargill, Inc. concocted fabricated business justifications such as "favorable market conditions" and "rising domestic and export demand."

### 2.    The JBS Defendants

279.    As discussed above, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance the conspiracy.

280.    To facilitate the conspiracy, JBS USA made public statements to conceal Defendants' unlawful activity. For example, in November 2015, JBS USA CEO Andre Nogueira declared that "[c]attle price will go down" in the United States because "we are going to see more cattle available."

281.    Similarly, in March 2016, JBS S.A.'s CEO Wesley Mendonca Batista, stated that JBS would see "better margin[s]" due to an "increase in the herd in the U.S."

282.    JBS executives made similar statements throughout 2016 and 2017 and into 2018, regularly claiming that JBS's strong financial performance in the United States was a result of "more cattle available in the U.S.," "cattle price[s being] back to the normal level," and "strong demand for beef."

283.    Instead of disclosing that the "improvement in EBITDA margin" was the result of illegal profits from the conspiracy, JBS offered false business justifications such as "more cattle available in the U.S." and cattle prices returning "back to the normal level." JBS made all these false public statements to disguise its role and participation in the conspiracy.

### 3.    National Beef

284.    To facilitate the conspiracy, National Beef, through its majority shareholders Jefferies Financial Group Inc. and later Marfrig Global Foods S.A., used public statements to conceal Defendants' unlawful activity.

285.    For example, in October 2015, Jefferies stated that the anticipated expansion of the cowherd "bodes well for [meatpacking industry] margins as it will lead to an increase in the number of fed cattle available for slaughter."

286.    In October 2016, Jefferies explained that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when justifying how, "[f]rom June 27, 2015 to June 25, 2016, the average market price per pound of fed cattle ha[d] fallen from $1.48 to $1.16."

287.    Jefferies offered similar justifications throughout 2017 and 2018, such as "National Beef generated record results for [the last 12 months] on the back of a more balanced supply of cattle and robust end market demand," "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016," "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef

104

continued to support strong margins," and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins."

288.   These statements were made during Jefferies Financial Group Investor Day presentations in 2015, 2016, and 2017, at which National Beef's CEO and President, Tim Klein, was scheduled to speak on topics related to National Beef's performance.

289.   Marfrig similarly offered false justifications for the low prices caused by the conspiracy after Marfrig acquired a controlling stake in National Beef.

290.   For example, Marfrig reported in November 2018 that, "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins."

291.   In 2018, during a third-quarter company earnings call, Marfrig executives reiterated the preceding paragraph's point by claiming that "the U.S. beef industry has delivered record results" because of "an ample supply of cattle" and "strong demand in both the domestic and international markets." Although Marfrig declared that it had attained record results and better margins while reducing cattle slaughter volumes, it misrepresented that these results were due to "fewer weeks in the third quarter 2018 compared to the third quarter 2017."

292.   National Beef CEO, Timothy M. Klein—referred to by Marfrig CEO, Eduardo de Oliveira Miron, as "CEO of [Marfrig's] North American Operations"— participated in the 2018 call.

293.    Marfrig announced in the fourth quarter of 2018 that it attained a "[s]olid result from North America Operation, sustained by strong demand for beef protein and the higher cattle availability."

294.    Jefferies and Marfrig made these pretextual public statements on behalf of National Beef—which, as alleged above, was the original source of the pretextual public statements—to obscure their role and participation in the conspiracy. Instead of disclosing that their record results and better margins stemmed from the illegal prices implemented by the conspiracy, Jefferies and Marfrig claimed these results were due to ample supply of cattle, higher cattle availability, and strong demand.

### 4.    The Tyson Defendants

295.    As discussed above, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance the conspiracy.

296.    To facilitate the conspiracy, Tyson Foods made public statements to conceal Defendants' unlawful activity. For example, Tyson Foods used its SEC filings from 2015 to 2018 to declare that it had "limited or no control" over the pricing and production of cattle because prices were "determined by constantly changing market forces of supply and demand."

297.    As for the factors that influence the cost of cattle, Tyson identified "weather patterns throughout the world, outbreaks of disease, the global level of supply inventories and demand for grains and other feed ingredients, as well as agricultural and energy policies of domestic and foreign governments."

106

298.    Tyson further stated that it "ceased operations at our Denison, Iowa plant" to "better align our overall production capacity with current cattle supplies." Tyson claimed that "[t]he beef segment earnings improved . . . due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."

299.    Rather than truthfully disclosing that the conspiracy improved its earnings, Tyson Foods issued false business justifications such as lower fed cattle costs and favorable market conditions. Tyson Foods made these misrepresentations to cover up its role and participation in the conspiracy.

300.    There was no truth to Defendants' foregoing statements. Rather, Defendants made them to mislead Plaintiffs into believing they were acting legally as keeping Plaintiffs and class members in the dark would allow Defendants' price-fixing conspiracy to operate and for Defendants to profit from it.

**B.      Plaintiffs were unable to discover the existence of Operating Defendants' conspiracy**

301.    Plaintiffs only recently learned about Witness 1, as early as April 25, 2019, upon the filing of cattle ranchers' complaint. Witness 1 offers direct evidence that the beef industry has been colluding to fix prices.

302.    Plaintiffs also only recently learned about the USDA and DOJ investigations into price fixing in the beef industry, as early as March 12, 2020.

303.    Before Witness 1's account and the revelation of the government's investigations, no facts existed that could have or should have reasonably suggested or disclosed to Plaintiffs or class members the possibility of price fixing in the beef industry.

304.    The discovery of Witness 1 and the government's investigations put Plaintiffs and class members on inquiry notice of Operating Defendants' price fixing in the beef industry.

305.    Operating Defendants' conspiracy, by its very nature, was self-concealing. Beef is not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Operating Defendants' beef prices before these recent events.

### C.    Plaintiffs exercised due diligence in attempting to discover their claim[68]

306.    Plaintiffs and class members could not have learned of Operating Defendants' anticompetitive conduct until recently through disclosures by Witness 1 and the existence of governmental investigations. Market conditions that Operating Defendants—and, accordingly, Plaintiffs—ascribed to legal behavior did not put Plaintiffs on inquiry notice.

307.    Operating Defendants' concealment was successful—that is, because of their concealment, Plaintiffs were unable to discover the existence of their antitrust claim.

---

[68]    Since due diligence is an affirmative defense, Plaintiffs need not necessarily plead it here but do.

308.   Because of Operating Defendants' fraudulent concealment, Plaintiffs and class members had insufficient information concerning Operating Defendants' misconduct on which to base a complaint and could not have discovered, until their recent exercise of due diligence, Operating Defendants' conspiracy.

309.   Because of Defendants' affirmatively made public statements giving pretextual reasons for their record profits, Plaintiffs' attention was not raised sufficiently to require them to take affirmative steps to uncover Operating Defendants' conspiracy. Relatedly, DOJ's investigation into the seafood and broilers industries did not—and could not have been expected to—attract Plaintiffs' attention because these investigations did not involve the beef industry and because though the broilers and pork industries utilize Agri Stats the beef industry does not.

310.   Because of Defendants' misrepresentations, the lack of the involvement of Agri Stats in the beef industry, and Defendants' success and precision in cloaking their illegal behavior, Plaintiffs lacked reasonable awareness of suspicious circumstances or storm warnings sufficient to trigger the duty to investigate.

311.   A reasonable person would not have discovered the conspiracy through any of Defendants' statements. As such, the most reasonable time for Plaintiffs' duty to inquire to arise was following Witness 1's revelations and indication of the government's investigations.

312.   An April 2018 General Accounting Office ("GAO") report did not reveal Defendants' anticompetitive conduct. The GAO had limited investigative authority and

"did not obtain and review internal packer documents." This report did not consider whether Defendants engaged in anticompetitive behavior of the type alleged here. Plaintiffs and class members have neither obtained nor reviewed internal packer documents.

## XI.   DEFENDANTS ENGAGED IN CONTINUING ANTITRUST VIOLATIONS

313.   A continuing violation restarts the statute of limitations period each time Defendants commit an overt act.

### A.   Defendants Renewed their Conspiracy with New and Independent Acts

314.   During the Class Period, Operating Defendants continued to make sales to Plaintiffs and class members of beef whose prices were fixed as the result of Operating Defendants' continually renewed and adjusted price-fixing agreement. Operating Defendants needed to continually renew and adjust their price-fixing agreement to account for ever-fluctuating economic and market conditions.

315.   Defendants' meetings and misrepresentations were overt acts that began a new statute of limitations because these events advanced the objectives of Defendants' conspiracy. Indeed, every statement involved different facts and suggestions but sprang from the same seed—Defendants' conspiracy.

316.   Defendants' overt acts, which were new acts beyond the initial price fixing that were necessary to perpetuate Defendants' agreement, continued throughout the Class Period. Each sale of beef by an Operating Defendant at a supracompetitive price was a new

overt act that was part of Defendants' antitrust violation that injured Plaintiffs and class members and started the statutory period running again.

317.   Defendants' overt acts were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiffs and class members.

318.   This reality is most easily recognized when considering the Holcomb fire and onset of COVID-19. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████

## B.   Defendants Inflicted New and Accumulating Injury on Plaintiffs

319.   Each purchase by Plaintiffs and class members through the Class Period of Operating Defendants' beef, the price of which resulted from Operating Defendants' continually renewed and adjusted price-fixing agreement, necessarily caused new and accumulating injury to Plaintiffs and class members.

320.   As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale

to Plaintiffs starts the statutory period running again regardless of the Plaintiffs' knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of beef to Plaintiffs and class members constituted a new cause of action for purposes of the statute of limitations.

321.    To adequately allege that a continuing violation has occurred, Plaintiffs must plead: (a) a price-fixing conspiracy; (b) that brings about a series of unlawfully high-priced sales during the Class Period; and (c) sales to them during the Class Period.

322.    This complaint alleges, via direct and indirect evidence, the existence of Operating Defendants' price-fixing conspiracy.

323.    Operating Defendants' conspiracy continued into the non-time-barred Class Period—that is, four years before Plaintiff Central Grocers filed its complaint.

324.    As alleged throughout this complaint, Operating Defendants' price fixing began in at least 2015 (slightly more than four years ago), and many of Plaintiffs' factual assertions alleged regard Operating Defendants' 2015 (or earlier) misconduct. But Plaintiffs also allege that Operating Defendants' misconduct continued throughout the Class Period, alleging facts that would not have occurred had the conspiracy disbanded.

325.    Many of Operating Defendants' illegal acts occurred in at least 2015 and continued throughout the Class Period. See supra Section V.B. and Figures 1–3, 7-13 (describing Defendants' overt illegal acts beginning in at least 2015 and extending into the four-year period before former-named plaintiff Pacific Agri-Products filed its first complaint, followed by the filing Plaintiff Central Grocers' complaint).

326.    Plaintiffs allege that Operating Defendants constantly coordinated and communicated with each other beginning in at least 2015 and throughout the Class Period. The fact that they maintained such communications makes plausible the allegation that their conspiracy continued from at least 2015 through present. *See* supra Sections V.B. and VI.B. (describing coordination and communications among Operating Defendants at least as early as 2015 and continuing throughout the Class Period). In this manner, Operating Defendants' conspiracy continued when their sales to Plaintiffs during the four years preceding the filing of former-named plaintiff Pacific Agri-Products filed its first complaint, followed by the filing Plaintiff Central Grocers' complaint.

327.    Each of the beef industry's plus factors were present at least as early as 2015: high market concentration, commodity product, inelastic demand, high barriers to entry, and trade association meetings that occurred each year and provided the Operating Defendants the continual opportunity to conspire.

328.    Finally, this complaint alleges that Operating Defendants sold beef directly to Plaintiffs during the Class Period.

## XII.    CLASS ACTION ALLEGATIONS

329.    Plaintiffs invoke Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following class:

> All persons and entities who purchased beef directly from any of the Defendants, or their respective subsidiaries or affiliates, for use or delivery in the United States from January 1, 2015 to present.

Excluded from this Class are Defendants; their officers, directors or employees; any entity in which a Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of a Defendant. Also excluded from this Class are any federal, state, or local governmental entities; any judicial officer presiding over this action; the members of the judicial officer's immediate family and staff; and any juror assigned to this action.

330. **Class membership**. During the Class Period, Plaintiffs purchased beef directly from one or more Defendants.

331. **Ascertainability**. The class is readily identifiable and one for which adequate electronic records exist.

332. **Numerosity**. Due to the nature of the trade and commerce involved, Plaintiffs believe thousands of class members exist. Defendants know the exact number of class members and their identities.

333. **Typicality**. Plaintiffs' claims are typical of class members' claims because they purchased beef directly from one or more Defendants during the Class Period and Defendants injured them in same way as they injured class members—to wit, Plaintiffs paid more for beef than they would have paid absent Defendants' conspiracy. Plaintiffs' claims arise from the same common course of conduct, give rise to the same claims of injury, and seek the same relief as other class members.

334. **Predominance of common legal and factual questions**. Common legal and factual questions predominate over individual questions. These predominating common legal and factual questions, which generate common answers, include the following:

A.   Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of beef sold in interstate commerce in the United States;

B.   The identity of the conspiracy's participants;

C.   The conspiracy's duration;

D.   The acts performed by Defendants and their co-conspirators in furtherance of their conspiracy;

E.   Whether Defendants' conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

F.   The effect of the conspiracy on the price of beef sold in the United States during the Class Period;

G.   Whether Plaintiffs and class members suffered antitrust injury as a result of Defendants' conspiracy;

H.   The appropriate measure of damages for injury suffered by Plaintiffs and class members; and

I.   Whether Plaintiffs and class members are entitled to injunctive relief and the nature and extent of injunctive relief.

335.   **Adequacy**. Plaintiffs will fairly and adequately protect class members' interests because Plaintiffs' interests are aligned with, and not antagonistic to, class

members' interests. Plaintiffs have retained counsel competent and experienced in prosecuting class actions and antitrust litigation.

336.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons: (a) individual joinder of all class members is impractical; (b) prosecution as a class action will eliminate the possibility of duplicative litigation; (c) prosecution of separate actions by individual class members would create the risk of inconsistent or varying decisions and adjudications, creating uncertain and potentially incompatible standards for adjudicating the claims and defenses asserted in this action; (d) the relatively small amount of damages suffered by individual class members, when compared to the expense and burden of individual prosecution of their individual claims, preclude feasible and practical individual actions to seek redress for the violations alleged; and (e) individual litigation would greatly magnify the delay and expense to all parties and to the court system. For these reasons, a class action will reduce case management difficulties and provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

337.    Defendants have also acted on grounds generally applicable to the class, making final injunctive relief appropriate for the class as a whole.

### XIII.  VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

338.    Plaintiffs incorporate and reallege all preceding paragraphs.

339.   Beginning at least as early as 2015 and continuing through the present, the exact dates presently unknown to Plaintiffs, Defendants and their co-conspirators entered and engaged in a continuing agreement, understanding, and conspiracy in unreasonable restraint of trade to artificially fix, raise, and stabilize the wholesale price for beef in the United States, thus creating anticompetitive effects in violation of Section 1 of the Sherman Act.

340.   Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

341.   Defendants and their co-conspirators conspired to conceive and further their objects of the conspiracy, including but not limited to the following acts, practices, and course of conduct:

- Fixing, raising, and stabilizing the wholesale price of beef; and

- Allocating among themselves and collusively reducing the production of beef.

342.   The combination and conspiracy alleged had these effects, among others:

- Price competition in the sale of beef has been restrained, suppressed, and eliminated in the United States;

- Prices for beef sold by Defendants, their divisions, subsidiaries, and affiliates, and all their co-conspirators have been fixed, raised,

stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

- Plaintiffs and class members who directly purchased beef from Defendants, their divisions, subsidiaries, and affiliates, and co-conspirators, were deprived of the benefits of free and open competition in the purchase of beef.

343. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing beef prices throughout the United States because Defendants sell their beef in every state.

344. The conspiratorial acts and combinations have caused unreasonable restraints in the beef market.

345. Plaintiffs and class members have been injured and will continue to be injured in their businesses and property by paying more for beef purchased directly from Defendants and their co-conspirators than they would have paid and will pay absent the conspiracy.

346. The alleged contract, combination, understanding, agreement, or conspiracy is a per se violation of the federal antitrust laws.

347. Plaintiffs and class members are entitled to an injunction against Defendants to prevent and restrain the violations alleged.

## XIV.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on their behalf and on behalf of class members, request that the Court grant the following relief:

A.    Determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as class representatives and their counsel of record as class counsel, and direct that notice of this action as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure be given to the Class, once certified;

B.    Adjudge that the conspiracy and the acts done by Defendants and their co-conspirators in furtherance thereof violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Enter judgment for Plaintiffs and class members against Defendants for three times the damages sustained by Plaintiffs and class members as a result of Defendants' violations of Section 1 of the Sherman Act and costs of this action, including reasonable attorneys' fees, as permitted Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

D.    Award Plaintiffs and class members prejudgment and post-judgment interest at the highest legal rate from commencement of this proceeding, to the extent allowed by law;

E.   Permanently enjoin Defendants and their co-conspirators, affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing, maintaining or renewing the conduct, conspiracy, or combination and from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect caused by any further violation of the antitrust laws; and

F.   Such other and further relief as the Court may deem just and proper under the circumstances.

## XV.   JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury according to Rule 38(b) of the Federal Rules of Civil Procedure of all issues so triable.

Dated:   January 18, 2022              Respectfully submitted,

                                       */s/ Michelle J. Looby*
                                       Daniel E. Gustafson (#202241)
                                       Daniel C. Hedlund (#258337)
                                       Michelle J. Looby (#0388166)
                                       Joshua J. Rissman (#0391500)
                                       Brittany Resch (#397656)
                                       **GUSTAFSON GLUEK PLLC**
                                       Canadian Pacific Plaza
                                       120 So. Sixth Street, Suite 2600

120

Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

Dennis J. Stewart (*admitted pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dstewart@gustafsongluek.com

Adam J. Zapala (*admitted pro hac vice*)
Elizabeth T. Castillo (*admitted pro hac vice*)
James G. Dallal (*admitted pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com

Alexander E. Barnett (*admitted pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
40 Worth Street, Suite 602
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

Jason S. Hartley (*admitted pro hac vice*)
**HARTLEY LLP**
101 W. Broadway, Suite 820

121

San Diego, CA 92101
Tel: (619) 400-5822
hartley@hartleyllp.com

Megan E. Jones (*admitted pro hac vice*)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
mjones@hausfeld.com

***Interim Co-Lead Counsel for the Proposed
Direct Purchaser Plaintiffs***

Dianne M. Nast (*admitted pro hac vice*)
Daniel N. Gallucci (*admitted pro hac vice*)
Michele Burkholder (*admitted pro hac vice*)
Joanne E. Matusko (*admitted pro hac vice*)
Michael S. Tarringer (*admitted pro hac vice*)
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
dnast@nastlaw.com
dgallucci@nastlaw.com
mburkholder@nastlaw.com
jmatusko@nastlaw.com
mtarringer@nastlaw.com

Doulas A. Millen (*admitted pro hac vice*)
Steven A. Kanner (*admitted pro hac vice*)
Brian M. Hogan
**FREED KANNER LONDON & MILLEN
LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
dmillen@fklmlaw.com
skanner@fklmlaw.com
bhogan@fklmlaw.com

122

Kenneth A. Wexler (*admitted pro hac vice*)
Melinda J. Morales (#0249981)
**WEXLER BOLEY & ELGERSMA LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel:(312) 346-2222
kaw@wbe-llp.com
mjm@wbe-llp.com


Daniel R. Karon (*admitted pro hac vice*)
**KARON LLC**
700 W. St. Clair Ave., Ste. 200
Cleveland, OH 44113
Tel: (216) 622-1851
dkaron@karonllc.com

***Plaintiffs' Steering Committee and
Counsel for Direct Purchaser Plaintiffs***

Arthur N. Bailey (*admitted pro hac vice*)
**RUPP, BAASE, PFALZGRAF
CUNNINGHAM LLC**
111 West 2nd Street #1100
Jamestown, New York 14701
T: (716) 664-2967
bailey@ruppbaase.com

Marco Cercone, Esq. (*admitted pro hac vice*)
**RUPP, BAASE, PFALZGRAF
CUNNINGHAM LLC**
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
Tel: (716) 854-3400
cercone@ruppbaase.com


Kevin Landau (*pro hac vice forthcoming*)
Evan Rosin (*pro hac vice forthcoming*)
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204

123

New York, NY 10038
Tel: (646) 873-7654
Fax: (212) 931-0703
klandau@tcllaw.com
erosin@tcllaw.com

R. Alexander Saveri (*admitted pro hac vice*)
Cadio Zirpoli (*admitted pro hac vice*)
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813
rick@saveri.com
cadio@saveri.com

Simon B. Paris (*admitted pro hac vice*)
Patrick Howard (*admitted pro hac vice*)
**SALTZ, MONGELUZZI,**
**& BENDESKY, P.C**.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: (215) 496-8282
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com

Brian D. Penny (*admitted pro hac vice*)
**GOLDMAN SCARLATO & PENNY, P.C.**
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Tel.: (484) 342-0700
Fax: (484) 580-8747
penny@lawgsp.com

J. Gordon Rudd, Jr. (#222082)
David M. Cialkowski (#306526)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street

124

Minneapolis, MN 55402
Tel: (612) 341-0400
gordon.rudd@zimmreed.com
david.cialkowski@zimmreed.com

Joseph Goldberg (*admitted pro hac vice*)
Vince Ward (*admitted pro hac vice*)
**FREEDMAN BOYD HOLLANDER**
**GOLDBERG URIAS & WARD P.A.**
20 First Plaza, Suite 700
Albuquerque, NM  87102
Tel : 1.505.244.7520
jg@fbdlaw.com
vjw@fbdlaw.com

Richard M. Hagstrom (#0039445)
Michael R. Cashman (#0206945)
Nathan D. Prosser (#0329745)
Anne T. Regan (#0333852)
**HELLMUTH & JOHNSON, PLLC**
8050 West 78th Street
Edina MN 55439
Telephone: (952) 941-4005
rhagstrom@hjlawfirm.com
mcashman@hjlawfirm.com
nprosser@hjlawfirm.com
aregan@hjlawfirm.com

Warren T. Burns (*admitted pro hac vice*)
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel: (469) 904-4550
wburns@burnscharest.com

Christopher J. Cormier (*admitted pro hac vice*)
**BURNS CHAREST LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Tel: (202) 577-3977
ccormier@burnscharest.com

125

Bryan L. Bleichner (#0326689)
Jeffrey D. Bores (#227699)
Christopher P. Renz (#0313415)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Tel: (612) 339-7300
bbleichner@chestnutcambronne.com
jbores@chestnutcambronne.com
crenz@chestnutcambronne.com

Daniel J. Mogin (*admitted pro hac vice*)
Jennifer M. Oliver (*admitted pro hac vice*)
Timothy Z. LaComb (*admitted pro hac vice*)
**MOGIN RUBIN LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 687-6611
dmogin@moginrubin.com
joliver@moginrubin.com
tlacomb@moginrubin.com

Erica C. Lai (*admitted pro hac vice*)
Melissa H. Maxman (*admitted pro hac vice*)
**COHEN & GRESSER LLP**
2001 Pennsylvania Ave. NW, Suite 300
Washington, DC 20006
Tel: (202) 851-2073
elai@cohengresser.com
mmaxman@cohengresser.com

Ariana J. Tadler (*admitted pro hac vice*)
Brian Morrison (*admitted pro hac vice*)
**TADLER LAW LLP**
One Penn Plaza, 36th Floor
New York, NY 10119
Tel: (212) 946-9300
atadler@tadlerlaw.com
bmorrison@tadlerlaw.com

Daniel Walker (*pro hac vice forthcoming*)
**BERGER MONTAGUE**
2001 Pennsylvania Avenue NW, Suite 300
Washington, DC 20006
Tel: (202) 559-9745
dwalker@bm.net

Katrina Carroll (*admitted pro hac vice*)
**CARLSON LYNCH**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Tel: (312) 750-1265
kcarroll@carlsonlynch.com

Kelly Iverson (*admitted pro hac vice*)
**CARLSON LYNCH**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
kiverson@carlsonlynch.com

Andrew J. McGuinness (*admitted pro hac vice*)
**ANDREW J. MCGUINNESS, ESQ.**
111 S. Main St., 3rd Floor
Ann Arbor, MI 48107
Tel: (734) 274-9374
drewmcg@topclasslaw.com

Michael Gratz (*pro hac vice forthcoming*)
**GRATZ & GRATZ, P.A.**
312 North Green St.
Tupelo, MS 38804
Tel (662) 844-5531
Fax (662) 844-8747
michael@gratzandgratz.com

Joshua H. Grabar, Esq. (*pro hac vice forthcoming*)
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600

127

Philadelphia, PA 19103
Tel: 267-507-6085
Fax: 267-507-6048
Email: jgrabar@grabarlaw.com

Marc H. Edelson (*pro hac vice forthcoming*)
**EDELSON LECHTZIN LLP**
3 Terry Drive
Suite 205
Newtown, PA 18940
215-867-2399 (work)
215-272-0517 (cell)
Medelson@edelson-law.com

***Additional Counsel for the Putative Direct Purchaser Class***

128

Exhibit B

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE CATTLE AND BEEF ANTITRUST LITIGATION*<br><br>This Document Relates To: ALL CASES | Case No. 22-md-03031 (JRT/JFD) |

## ORDER TO MODIFY SCHEDULING ORDER

Pursuant to the Joint Stipulation to Modify Scheduling Order, filed by the Parties

[Dkt. 67], **IT IS HEREBY ORDERED THAT**:

1.     The case schedule is modified as follows:

| **Event** | **Prior Deadline** | **New Deadline** |
|---|---|---|
| Conclude meet and confers and file motion practice over search terms, if any | November 7, 2022 | November 23, 2022 |
| Direct Action Plaintiffs to file specific, narrowly tailored requests for modifications to the Initial Pretrial Scheduling Order (if any) | November 8, 2022 | November 23, 2022 |
| November Case Management Conference (by Zoom) | November 17, 2022 at 11:30 a.m. | No change |
| Opposition brief to motion practice over search terms, if any | N/A | December 13, 2022 |
| Defendants and Class Plaintiffs file responses to any requests that are filed pursuant to this Order seeking | November 22, 2022 | December 16, 2022 |

| | | |
|---|---|---|
| modification to the Initial Pretrial Scheduling Order | | |
| December Case Management Conference (by Zoom) | N/A | December 19-22 (at Court's convenience) |

**IT IS SO ORDERED.**

Dated: November 8, 2022

*s/ John F. Docherty*
JOHN F. DOCHERTY
United States Magistrate Judge

Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

## STATUS CONFERENCE

In Re: Cattle and Beef Antitrust Litigation

**COURT MINUTES**
BEFORE: John R. Tunheim
U.S. District Judge

John F. Docherty
Magistrate Judge

| | |
|---|---|
| Case No: | 22-3031 JRT/JFD |
| Date: | December 20, 2022 |
| Deputy: | Heather Arent |
| Court Reporter: | Kristine Mousseau |
| Time Commenced: | 11:16 a.m. |
| Time Concluded: | 11:39 a.m. |
| Time in Court: | 23 Minutes |

Hearing on:  Status Conference

### I.   MODIFICATIONS TO INITIAL PRETRIAL SCHEDULING ORDER

The parties discussed the proposed modifications to the scheduling order that were submitted on December 19, 2022.  The Court appreciates the parties' cooperation on this matter and asked the parties to submit the modifications as a joint stipulation and proposed order after the parties meet and confer to finalize some remaining details.

### II.   PROCEDURE FOR AFFIRMING PROTECTIVE ORDER

The parties discussed the procedure for affirming that the protective order (Docket No. 123 in Case No. 20-1319), as well as all other orders in this case, applies to new Direct Action Plaintiff actions that are consolidated in this MDL.  The Court asked the parties to include language to this extent in any joint stipulation and proposed order that they file regarding modifications to the pretrial scheduling order.

### III.   Next Status Conference

The Court has scheduled the next status conference for January 24, 2022 at 4PM via video conference.

**APPEARANCES:**

Plaintiffs: Daniel Herrera, Jennifer Sprengel, Michael Srodoski, Richard Paul, Mikal Watts, Stacy Slaughter, Alexander Barnett, Jack Stern, Mark Singer, Jeff Bergman, Amanda Jesteadt, Emil Rice, Anthony Maneiro, Jason Hartley, Joshua Rissman, Megan Jones, Michelle Looby, Blaine Finley, Abby Wolf, Brian Clark, Shana Scarlett, Joseph Bruckner, Philip Iovieno, Patrick Ahern, Kristin Gore, Elana Katcher, Sarah Jones, William Blechman, Samuel Randall, Michael Ponzoli

Defendants: Holley Horrell, Kevin Zhao, Moira Penza, Jessica Nelson, Patrick Brookhouser, Sami Rashid, Benjamin Ellison, Tiffany Lipscomb-Jackson, Susan Foster,

s/Heather Arent
Courtroom Deputy Clerk

Exhibit D

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE CATTLE AND BEEF ANTITRUST LITIGATION | Case No. 0:20-cv-01319 JRT-HB |
| This Document Relates To:<br>IN RE DPP BEEF LITIGATION | |

## DIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT BETWEEN DIRECT PURCHASER PLAINTIFFS AND JBS DEFENDANTS

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................. 2

III.   SUMMARY OF SETTLEMENT NEGOTIATIONS AND AGREEMENT ............... 4

IV.    THE SETTLEMENT IS WITHIN THE RANGE OF POSSIBLE APPROVAL ....... 6

       A.  The Settlement is Fair, Reasonable, and Adequate ................................. 7

           1.  The Eighth Circuit Factors Support a Finding That the Settlement is Fair, Reasonable, and Adequate ................................................................. 11

       B.  The Proposed Settlement Class Satisfies the Requirements for Class Certification at the Settlement Stage .............................................. 12

           1.  Numerosity is Easily Satisfied ................................................ 13

           2.  There are Common Questions of Law and Fact ....................... 14

           3.  Plaintiffs' Claims are Typical of the Class ............................... 14

           4.  Plaintiffs Have Adequately Represented the Class .................. 15

           5.  The Proposed Settlement Class Satisfies Rule 23(b)(3) ......... 16

           6.  A Class Action is the Superior Method for Resolving These Claims ............ 17

V.     NOTICE PLAN ................................................................................................ 18

       C.  The Court Should Direct Settlement Class Notice to the Class ............ 18

           1.  The Proposed Notice Plan Is Robust and Multilayered for Providing the Best Notice Practicable .......................................... 19

           2.  The Form of Plaintiffs' Proposed Notice Satisfies Rule 23 and Due Process 22

       D.  Proposed Notice Schedule ..................................................................... 25

VI.    CONCLUSION ................................................................................................. 26

i

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Alberts v. Nash Finch Co.*,
    245 F.R.D. 399 (D. Minn. 2007) ................................................................... 13

*Capsolas v. Pasta Res. Inc.*,
    No. 10-CV-5595 RLE, 2012 WL 1656920 (S.D.N.Y. May 9, 2012) ........................... 10

*Dirks v. Clayton Brokerage Co. of St. Louis, Inc.*,
    105 F.R.D. 125 (D. Minn. 1985) .................................................................. 14

*Dryer v. Nat'l Football League*,
    No. 09-cv-2182-PAM-AJB, 2013 WL 5888231 (D. Minn. 2013) ............................. 11

*Grier v. Chase Manhattan Auto Fin. Co.*,
    No. 99-cv-180, 2000 WL 175126 (E.D. Pa. Feb. 16, 2000)................................... 8

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ....................................................................... 8

*In re Centurylink Sales Pracs. & Sec. Litig.*,
    No. CV 18-296 (MJD/KMM), 2021 WL 3080960, (D. Minn. July 21, 2021)............... 7

*In re Control Data Corp. Sec. Litig.*,
    116 F.R.D. 216 (D. Minn. 1986) .................................................................. 15

*In re Employee Benefit Plans Sec. Litig.*,
    Civ. No. 3-92-708, 1993 WL 330595 (D. Minn. June 2, 1993) .......................... 8, 9

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ......................................................................... 6

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003)............................................................. 10

*In re Michael Milken and Assocs. Sec. Litig.*,
    150 F.R.D. 57 (S.D.N.Y. 1993) ................................................................... 10

*In re Monosodium Glutamate Antitrust Litig.*,
    205 F.R.D. at .................................................................................................... 16

*In re Packaged Seafood Antitrust Litigation*, No.,
    15-MD-2670 (S.D. Cal.) ..................................................................................... 9

*In re Select Comfort Corp. Sec. Litig.*,
    202 F.R.D. 598 (D. Minn. 2001) ................................................................ 13, 15, 16

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
    11-MD-2247- ADM-JJK, 2012 WL 2512750 (D. Minn. June 29, 2012) ..................... 7

*In re Uponor, Inc. F1807 Plumbing Fittings Prods. Liab. Litig.*,
    716 F.3d 1057 (8th Cir. 2013)........................................................................ 11

*Katun Corp. v. Clarke*,
    484 F.3d 972 (8th Cir. 2007) ............................................................................ 6

*Khoday v. Symantec Corp.*,
    No. 11-180, 2014 WL 1281600 (D. Minn. Mar. 13, 2014).......................................... 14

*Liddell v. Board of Educ. of the City of St. Louis*,
    126 F.3d 1049 (8th Cir. 1997) ........................................................................... 6

*Lockwood Motors, Inc. v. General Motors Corp.*,
    162 F.R.D. 569 (D. Minn. 1995) .............................................................. 14, 16

*Marshall v. Nat'l Football League*,
    787 F.3d 502 (8th Cir.2015) ......................................................................... 11

*Paxton v. Union Nat. Bank*,
    688 F.2d 552, 561-62 (8th Cir. 1982)............................................................. 14

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ......................................................................... 7

*Ponce v. Lenovo (United States) Inc.*,
    No. 16-CV-1000 (JNE/JSM), 2017 WL 1093186 (D. Minn. Mar. 23, 2017) .............. 10

*Rasberry v. Columbia Cty., Arkansas*,
    No. 16-cv-1074, 2017 WL 3259447 (W.D. Ark. July 31, 2017) ................................. 13

*Smith v. United Health Care Servs., Inc.*,
    No. 00-1163, 2002 WL 192565 (D. Minn. 2002).......................................................... 15

*Van Horn v. Trickey*,
    840 F.2d 604 (8th Cir. 1988) ..................................................................................... 11

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)................................................................................................... 14

*Welsch v. Gardenbring*,
    667 F. Supp. 1284 (D. Minn. 1987)............................................................................. 8

*White v. Nat'l Football League*,
    822 F. Supp. 1389 (D. Minn. 1993)............................................................................. 7

*White v. Nat'l Football League*,
    836 F. Supp. 1458 (D. Minn. 1993)............................................................................. 8

**<u>Rules</u>**

Fed. R. Civ. P. 23(a)(1) ..................................................................................................... 11

Fed. R. Civ. P. 23(e)(1) and (e)(2) .................................................................................... 6

Federal Rule of Civil Procedure 23(a)............................................................................... 11

Rule 23(a) and (b)(3) ........................................................................................................ 16

Rule 23(a)(2)..................................................................................................................... 12

Rule 23(a)(4)..................................................................................................................... 14

Rule 23(b) ......................................................................................................................... 11

Rule 23(b)(3) ............................................................................................................. 11, 14, 15

**<u>Other Authorities</u>**

*Class Certification in the Age of Aggregate Proof*,
    84 N.Y.U. L. REV. 97 (2009).................................................................................... 12

## I.   INTRODUCTION

Direct Purchaser Plaintiffs ("DPPs")[1] respectfully move for preliminary approval of a settlement (the "Settlement") with Defendants JBS S.A., JBS USA Food Company, Swift Beef Company, and JBS Packerland, Inc. (collectively, "JBS"). This is the first settlement for the DPP class and the first public settlement overall in any of the coordinated, complex beef antitrust cases. This icebreaker settlement represents an excellent recovery for the class, both in terms of financial relief to class members and benefit to those class members in pursuing their claims against other Defendants.

The Settlement provides $52.5 million in monetary relief and extensive cooperation to the DPP class. This settlement was negotiated at arm's length with the assistance of a nationally recognized, highly experienced mediator and extended over several months.  Because the Settlement provides significant relief to the class, it falls well within the range of reasonableness necessary to establish preliminary approval under Rule 23(e).

Based on the motion and supporting papers, the DPPs request that this Court grant preliminary approval of this Settlement; appoint Interim Co-Lead Counsel as Settlement Class Counsel; certify the proposed settlement class; approve the form of notice (including directing non-settling Defendants to timely provide notice data); direct that

---

[1]      As used herein, "DPPs" means Howard B. Samuels solely in his capacity as Chapter 7 trustee for the bankruptcy estate of Central Grocers, Inc., R&D Marketing, LLC, and Redner's Markets, Inc.

individual notice of this settlement be distributed to potential members of the settlement class to the extent reasonably practicable; and set the date for the final approval hearing.

## II.    BACKGROUND

DPPs filed their underlying complaints in June and July of 2020, after extensive investigation. *See* Case No. 20-cv-1319, Doc. No. 1; Case No. 20-cv-1602, Doc. No. 1.[2] DPPs filed their consolidated amended class action complaint on December 28, 2020. Doc. No. 142 ("Complaint"). The investigation included significant research into the allegations of an alleged agreement and Defendants[3] participation in trade associations, vetting of the then-confidential witness information, and extensive work with economic experts.

The DPPs allege that "Defendants conspired to . . . drive up the price of beef in order to realize sky-high margins" in violation of Section 1 of the Sherman Act. Doc. No. 331 ("MTD Order") at 3. DPPs allege Defendants engaged in price-fixing, in part, by constraining the supply of beef in the United States through various means and by engaging in other collusive conduct. *See, e.g.*, Complaint, ¶ 3. Plaintiffs allege that each Defendant, from 2015 on, unlawfully acted in concert to moderate and suppress slaughter volumes in order to drive up the price of beef. MTD Order at 21.

---

[2]     On September 4, 2020, the Court appointed Gustafson Gluek PLLC, Cotchett, Pitre & McCarthy, LLP, Hartley LLP, and Hausfeld LLP as Interim Co-Lead Counsel for the putative class of direct purchasers. Doc. No. 71.

[3]     DPPs' Complaint names JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., Cargill, Inc., Cargill Meat Solutions Corporation (a/k/a Cargill Protein), National Beef Packing Company, Tyson Foods, Inc., and Tyson Fresh Meats, Inc. as Defendants.

After complaints making similar allegations were dismissed on September 29, 2020, DPPs further researched, investigated, and analyzed their claims to file an amended complaint, including with substantial expert analysis. *See* Doc. No. 127. Defendants moved to dismiss the DPPs' Amended Complaint on February 11, 2021, which DPPs opposed on March 29, 2021. After a lengthy hearing on the motions on July 12, 2021, this Court denied the motions as to the DPPs' Complaint on September 14, 2021.[4] Doc. No. 331.

Since filing the initial complaints, the parties exchanged discovery requests and objections and responses on September 9, 2020, and October 9, 2020, respectively. *See* Declaration of Daniel E. Gustafson ¶ 5. After the motions to dismiss were denied, discovery disclosures and requests, and related discussions, resumed in earnest. On October 15, 2021, DPPs served further requests for production on Defendants, including JBS; on December 3, 2021, Defendants served their objections and responses on DPPs. *Id*. ¶ 10.

The parties have now spent many hours negotiating and substantively meeting and conferring regarding discovery requests, deposition limits, custodians, structured data, date ranges, search methodology, the scope of third-party subpoenas, and for the entry of a protective order. *Id*. These tasks have been large but made even more complicated by the extensive coordination between DPPs and the other classes and the Direct Action Plaintiff ("DAP"). The parties have also extensively negotiated and submitted competing

---

[4]     This Court granted Defendants' Motions as to nine state law claims brought by the indirect purchasers. *See* Doc. No. 331.

scheduling proposals and worked to submit a Case Management Issues Order. *Id*. The

DPPs have added additional class representatives to bolster the DPP class's

representation throughout the case and have worked to respond to discovery requests

from Defendants for these new representatives.  *Id*. ¶ 11.

## III.    SUMMARY OF SETTLEMENT NEGOTIATIONS AND AGREEMENT

DPPs and JBS reached this settlement through protracted, confidential arm's-

length negotiations. *Id*. ¶¶ 12-15. This settlement includes both monetary relief for the

class and JBS's extensive cooperation in DPPs' prosecution of the ongoing litigation

against the non-settling Defendants.

After the denial of Defendants' motion to dismiss, the parties discussed the

possibility of settlement and agreed to mediate with Professor Eric Green. *Id*. ¶ 13. Prior

to the mediation, the parties submitted extensive papers regarding their respective

settlement positions and after an extended, hard-fought mediation on October 28, 2021,

made substantial progress but did not reach a final agreement on all material terms.

Following months of further difficult negotiations, the Parties have agreed on the full

Settlement. *See* Gustafson Declaration Ex. A.

The Settlement provides that DPPs shall seek appointment of Interim Co-Lead

Counsel as Settlement Class Counsel for purposes of the Settlement and certification of

the following "Settlement Class" for settlement purposes only:

> All persons and entities who, from January 1, 2015, through February
> 10, 2022, purchased for use or delivery in the United States, directly
> from any of the Defendants or their respective subsidiaries and
> affiliates, boxed or case-ready beef processed from Fed Cattle,
> excluding ground beef made from culled cows.  Excluded from the

4

> Settlement Class are Defendants; their officers, directors or
> employees; any entity in which a Defendant has a controlling interest;
> and any affiliate, legal representative, heir or assign of a Defendant.
> Also excluded from this Settlement Class are any federal, state, or
> local governmental entities, any judicial officer presiding over this
> action; the members of the judicial officer's immediate family and
> staff, and any juror assigned to this action.

*Id*. ¶ 5. The Settlement provides that JBS will pay $52.5 million into a settlement fund

that will be used to compensate the direct purchaser class, pay for notice and

administration of the settlement and pay litigation fees and expenses. *Id*. ¶¶ 1(u), 9.

Interim Co-Lead Counsel believe this remarkable recovery is fair and reasonable

in any event, but particularly given the early stage of the litigation, JBS's market share

regarding the products at issue, and the significant cooperation JBS has agreed to

provide. The fairness and reasonableness of the settlement is further amplified by the fact

that the Settlement is an "icebreaker" settlement in a multi-defendant case, assisting

Plaintiffs in the litigation against the non-settling Defendants. The promised cooperation

by JBS's U.S. Operations and sales divisions includes: (a) an eight (8) hour attorney

proffer where JBS's counsel is required to summarize the principal facts known to it that

are relevant to the alleged conduct, market, and industry participants at issue in the

Actions, including any facts previously provided to the DOJ or any other U.S.

government investigative authority in response to subpoenas or otherwise related to the

allegations in the Complaint; (b) production of JBS's structured data; (c) data,

documents, and contact information necessary for facilitating class notice and settlement

administration; (d) witness interviews with up to six (6) JBS employees; (e) depositions

of up to six (6) JBS employees; (f) the production of up to three (3) current employee

witnesses at trial; and (g) assistance with authentication and laying a foundation for admissibility at trial of JBS documents, among other cooperation provisions. *Id.* ¶ 10. The settlement includes a typical "opt out provision," set forth in a confidential side letter available to the Court for *in camera* review, that permits JBS to withdraw from the settlement if class members representing a specified percentage of total sales of Beef sold by JBS in the United States opt out of the settlement. *See, e.g.,* Manual for Complex Litigation, 4th Edition, § 22.922 (discussing such provisions and noting that it is common in Rule 23(b)(3) class settlements).

Upon final judgment, and in exchange for the monetary relief and extensive cooperation, DPPs will release claims, as defined in the Settlement, against JBS. *See Id.* at 21-22.

## IV.   THE SETTLEMENT IS WITHIN THE RANGE OF POSSIBLE APPROVAL

"The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation. The parties may also gain significantly from avoiding the costs and risks of a lengthy and complex trial. These economic gains multiply when settlement also avoids the costs of litigating class status—often a complex litigation within itself." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (internal citations omitted). "Minnesota courts recognize a 'strong public policy favoring the settlement of disputed claims without litigation.'" *Katun Corp. v. Clarke*, 484 F.3d 972, 975 (8th Cir. 2007) (internal citations omitted); *Liddell v. Board of Educ. of the City of St.*

*Louis*, 126 F.3d 1049, 1056 (8th Cir. 1997). "The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context." *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 11-MD-2247- ADM-JJK, 2012 WL 2512750, at *7 (D. Minn. June 29, 2012) (quoting *White v. Nat'l Football League*, 822 F. Supp. 1389, 1416 (D. Minn. 1993)). As the Eighth Circuit has directed, in considering settlements, "strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999).

In reviewing class action settlements, courts must ensure that they are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In assessing whether a settlement should receive preliminary approval, the fairness, reasonableness, and adequacy "standard is lowered, with emphasis only on whether the settlement is within the range of possible approval due to an absence of any glaring substantive or procedural deficiencies." *In re Centurylink Sales Pracs. & Sec. Litig.*, No. CV 18-296 (MJD/KMM), 2021 WL 3080960, at *5 (D. Minn. July 21, 2021). A court properly grants preliminary approval and approves class notice if the parties "will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1).

### A.    The Settlement is Fair, Reasonable, and Adequate

Rule 23(e)(2) directs courts to approve a settlement "only on finding that it is fair, reasonable, and adequate" after considering several factors, namely: that the class was adequately represented by counsel and the class representatives; that the proposed

settlement was negotiated at arm's length; that the settlement provides adequate relief to the class; and that the settlement treats class members equitably relative to each other.

Courts attach "[a]n initial presumption of fairness . . . to a class settlement reached in arm's-length negotiations between experienced and capable counsel after meaningful discovery." *Grier v. Chase Manhattan Auto Fin. Co.*, No. 99-cv-180, 2000 WL 175126, at *5 (E.D. Pa. Feb. 16, 2000); *see also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *White v. Nat'l Football League*, 836 F. Supp. 1458, 1476-77 (D. Minn. 1993). "The court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." *In re Employee Benefit Plans Sec. Litig.*, Civ. No. 3-92-708, 1993 WL 330595, *5 (D. Minn. June 2, 1993) (citation omitted); *see also Welsch v. Gardenbring*, 667 F. Supp. 1284, 1295 (D. Minn. 1987) (affording "great weight" to opinions of experienced counsel).

This proposed settlement satisfies all of the foregoing factors. First, the Settlement was reached in arm's length negotiations by counsel experienced in settling class actions. Sufficient investigation and initial data analysis were conducted in drafting the exhaustive complaints and counsel for both parties have had the opportunity to properly evaluate the strengths and weaknesses of their respective claims and defenses, and the propriety of settlement at this juncture. Both parties' counsel are experienced in antitrust matters. Indeed, lead counsel for the DPPs have substantial experience in litigating protein antitrust cases throughout the country. For example, Gustafson Gluek PLLC ("Gustafson") and Cotchett, Pitre & McCarthy, LLP ("CPM") are the court-appointed lead class counsel for a class of commercial food preparers in the *In re Broiler Chicken*

*Antitrust Litigation* currently pending in the Northern District of Illinois. *See* 16-cv-08637 (N.D. Ill.), Doc. No. 144 (order appointing lead counsel). That case similarly alleges collusive supply restraints and price-fixing. Gustafson is also serving as co-lead counsel for the indirect consumer class in the *In re Pork Antitrust Litigation* pending in this District and also involving some of the same defendant groups as this case. *See* 18-cv-1776 (D. Minn.), Doc. No. 151 (order appointing lead counsel). Moreover, Hausfeld LLP ("Hausfeld") is the court-appointed lead counsel for a class of direct purchasers in the *In re Packaged Seafood Antitrust Litigation*, No. 3:15-MD-2670 (S.D. Cal.) that is currently pending before both the Ninth Circuit and in the Southern District of California; Jason Hartley, now of Hartley LLP ("Hartley"), serves on Plaintiffs' steering committee in that matter. Doc. No. 119, at 3 (appointing Hausfeld LLP as co-lead counsel, appointing Jason Hartley to Plaintiffs' steering committee) (S.D. Cal. March 24, 2016). Finally, Gustafson, CPM, and Hausfeld are all serving in leadership or high-level roles in either the *In re Atlantic Farm-Raised Salmon Antitrust Litigation* or the related indirect purchaser matter, *Wood Mountain Fish LLC v. Mowi ASA*, 19-CV-22128, both pending in the Southern District of Florida. *In re Atlantic Farm-Raised Salmon Antitrust Litig.*, 19-cv-21551, Doc. No. 97, at 3 (S.D. Fla. June 3, 2019) (appointing Hausfeld LLP co-lead counsel). All of the foregoing experiences have provided class counsel with valuable insight into these protein markets, the associated volume of commerce, and the risks inherent in the litigation, which further support approval of the settlement.

      Moreover, the negotiations over this settlement were conducted before a highly respected, nationally-renowned mediator, who has extensive experience in resolving

complex litigation and who ensured the negotiations were conducted at arm's length and were non-collusive. This further demonstrates the procedural fairness associated with the settlement. *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993); *Capsolas v. Pasta Res. Inc.*, No. 10-CV-5595 RLE, 2012 WL 1656920, at *1 (S.D.N.Y. May 9, 2012) ("The assistance of an experienced mediator . . . reinforces that the Settlement Agreement is noncollusive."); *cf. Ponce v. Lenovo (United States) Inc.*, No. 16-CV-1000 (JNE/JSM), 2017 WL 1093186, at *2 (D. Minn. Mar. 23, 2017) ("The assistance of a retired United States Magistrate Judge as a mediator in the settlement process supports a conclusion that the Settlement is non-collusive and was fairly negotiated at arm's length."). These factors weigh heavily in favor of preliminary approval.

Further, the relief provided to the class in this Settlement is substantial. As a threshold measure, in a multi-defendant case like this one, the existence of an "icebreaker" settlement is itself valuable to the class, because such settlements often bring remaining defendants to settlement negotiations. *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) ("An early settlement with one of many defendants can 'break the ice' and bring other defendants to the point of serious negotiations."). But even were this not the first such settlement, by any measure, $52.5 million dollars is a substantial settlement sum.  By comparison, JBS settled with the direct purchaser class in the *Pork* case for $24.5 million and that settlement was preliminarily approved by this Court.  In addition to the financial component of this

Settlement, JBS's required cooperation will bolster DPPs' claims against the remaining Defendants.

Finally, the Settlement treats class members equitably relative to each other: funds will be awarded to class members on a *pro rata* basis, taking into account the amount of class products they purchased, and the number of claims submitted. There will be a simplified online claims process for class members once it is time for the funds to be distributed.

### 1.     The Eighth Circuit Factors Support a Finding That the Settlement is Fair, Reasonable, and Adequate

The Eighth Circuit has established four factors for determining whether a proposed settlement is fair, reasonable and adequate: (1) the merits of plaintiffs' case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) (citing *In re Uponor, Inc. F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013)); *Dryer v. Nat'l Football League*, No. 09-cv-2182-PAM-AJB, 2013 WL 5888231, at *2 (D. Minn. 2013). At the preliminary approval stage, only the first three factors are considered, *In re Wireless Tel.*, 396 F.3d at 932, and the first is the most important, *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988).

All three factors favor preliminary approval of the Settlement. First, without the Settlement, the outcome of the litigation as to JBS would be far from certain. Although DPPs defeated Defendants' a motion to dismiss, the future stages of class certification,

summary judgment motions, and trial will be strenuously contested. Furthermore, any decisions on class certification or at trial are not only uncertain, but would likely face an appeal, which compounds the uncertainty, not to mention the delay associated with any recovery for the class. In lieu of the vicissitudes and delay that inhere in continued litigation, the Settlement provides for substantial, direct, and certain benefits to the class. This is a highly favorable result in the face of uncertain continued litigation. This factor favors approval of the Settlement.

Second, there is no indication that JBS's financial condition is not secure. After carefully reviewing the financial information JBS furnished, counsel concluded that JBS is capable of fulfilling its voluntary financial settlement obligations or of funding a vigorous defense to the litigation.

Third, this case will be complex and expensive, and will place an enormous burden upon the parties and the Court. Counsel for all parties have vigorously represented their clients and will continue to do so. This case will only get more expensive and complex as depositions and expert analyses begin to take place. This factor easily supports approval of the Settlement.

### B.     The Proposed Settlement Class Satisfies the Requirements for Class Certification at the Settlement Stage

To qualify for settlement-class certification, an action must satisfy all provisions of Federal Rule of Civil Procedure 23(a), plus one of the subdivisions of Rule 23(b). *See* Fed. R. Civ. P. 23(a) & 23(b). Rule 23(a) requires the proponents of certification to establish each of the following: (1) that the members of the proposed class are so

12

numerous that joinder of the individual claims would be impracticable; (2) that there are questions of law or fact common to the class; (3) that the claims of the proposed class representatives are typical of the claims of the Class members; and (4) that the proposed class representatives will adequately represent the interests of the class. Fed. R. Civ. P. 23(a). In this case, Rule 23(b)(3) requires that the common questions of law and fact must predominate over individual questions, and the class must be superior to other available methods for fairly and efficiently adjudicating the controversy. *See In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 611 (D. Minn. 2001). The proposed Settlement Class here satisfies each of the requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy of representation) and of Rule 23(b)(3) (predominance and superiority).

### 1.     Numerosity is Easily Satisfied

For a class action to be appropriate, the proposed class must be so numerous that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). "In general, a putative class exceeding 40 members is sufficiently large to make joinder impracticable." *Rasberry v. Columbia Cty., Arkansas*, No. 16-cv-1074, 2017 WL 3259447, at *2 (W.D. Ark. July 31, 2017) (citing *Alberts v. Nash Finch Co.*, 245 F.R.D. 399, 409 (D. Minn. 2007) ("[A] putative class exceeding 40 members is sufficiently large to make joinder impracticable.")). Here, the proposed class includes thousands of direct purchasers of beef. Gustafson Decl., ¶ 5. The Defendants unquestionably sell their products directly to a number of direct purchasers that are geographically dispersed throughout the United States.

13

### 2.    There are Common Questions of Law and Fact

A common question, for purposes of Rule 23(a)(2), is a "common contention" that is "of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). What matters is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). The existence of a single, common question will satisfy Rule 23(a)(2). *Dukes*, 564 U.S. at 359; *see also Khoday v. Symantec Corp.*, No. 11-180, 2014 WL 1281600, at *15 (D. Minn. Mar. 13, 2014) (noting that a "single common contention" could satisfy commonality).

The Complaint sets forth nine common questions relating to the scope of JBS's conduct to suppress the supply of beef and artificially inflate its price. *See* Compl. ¶ 333. These common questions will yield common answers and readily satisfy the commonality requirement.

### 3.    Plaintiffs' Claims are Typical of the Class

The typicality prerequisite is satisfied "when the claims of the named plaintiffs arise from the same event or are based on the same legal theory as the claims of the class members." *Lockwood Motors, Inc. v. General Motors Corp.*, 162 F.R.D. 569, 575 (D. Minn. 1995); *Dirks v. Clayton Brokerage Co. of St. Louis, Inc.*, 105 F.R.D. 125, 133 (D. Minn. 1985); *Paxton v. Union Nat. Bank*, 688 F.2d 552, 561-62 (8th Cir. 1982).

"When the claims or defenses of the representative and the class are based on the same course of conduct or legal theory, it is thought that the representatives will advance the interest of the class members by advancing his or her own interests." *In re Control Data Corp. Sec. Litig.*, 116 F.R.D. 216, 220 (D. Minn. 1986) (internal citations omitted); *see also Smith v. United Health Care Servs., Inc.*, No. 00-cv-1163, 2002 WL 192565, at *3-4 (D. Minn. 2002) (plaintiffs typical of class despite varying degree of damages due to "strong similarity of legal theories").

Here, the named Plaintiffs' and the putative Settlement Class's legal claims arise out of the same alleged conduct. Namely, that class members purchased beef directly from one or more Defendants during the Relevant Time Period and suffered economic injury as a result of paying Beef prices that were artificially inflated by Defendants' conspiracy. *See, generally,* Complaint. In short, Plaintiffs' claims arise out of the same course of conduct and the same injury, and they seek the same relief. *See In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 604 (D. Minn. 2001) ("Typicality is closely related to commonality as a finding of one generally compels a finding of the other.") (cleaned up). Because Plaintiffs' claims are typical of the Settlement Class's claims, this requirement is similarly met.

### 4.      Plaintiffs Have Adequately Represented the Class

Under Rule 23(a)(4), a class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In order to meet this requirement, the Court must find that (1) the representatives and their counsel are able and willing to prosecute the action competently and vigorously; and (2) each representative's interests

15

are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge. *See In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 233 (D. Minn. 2001); *Lockwood*, 162 F.R.D. at 576.

Since the Court's appointment of Interim Co-Lead Counsel, they have vigorously prosecuted this action on behalf of the class representatives and the entire proposed Settlement Class. Co-Lead Counsel—in addition to their extensive experience with protein related price-fixing cases cited above—have decades of experience leading and litigating some of the largest antitrust cases in the country. *See* Doc. No. 71 (firm resumes of Co-Lead Counsel previously submitted with DPPs' Motion to Appoint Lead Counsel). Further, the class representatives have come forward to litigate against their Beef suppliers on behalf of the Class and have actively participated in this action and fully cooperated with Interim Co-Lead Counsel. This requirement is satisfied.

### 5.   The Proposed Settlement Class Satisfies Rule 23(b)(3)

A proposed class meets the predominance requirement of Rule 23(b)(3) when "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). District courts in Minnesota have recognized that "[a]s with commonality and typicality requirements, the predominance inquiry is directed toward the issue of liability." *In re Select Comfort*, 202 F.R.D. at 610. When determining whether common questions predominate, courts "focus on the liability issue . . . and if the liability issue is common to the class, common questions are held to predominate over individual questions." *Id.* (internal citations omitted).

16

Here, multiple common questions lie at the heart of all Settlement Class members' claims, including whether Defendants conspired to decrease the supply of beef and raise the price of beef and whether Defendants' conspiracy caused market-wide supracompetitive beef prices. Because the question of liability is common to the class, predominance is satisfied here.

### 6. A Class Action is the Superior Method for Resolving These Claims

Rule 23(b)(3) instructs that the matters pertinent to this inquiry include: (a) class members' interests in individually controlling the prosecution of separate actions; (b) whether other litigation exists concerning this controversy; (c) the desirability of concentrating the litigation in this forum; and (d) any difficulties in managing a class action. Each of these factors favor certification in this case. Requiring each direct purchaser of beef to come forward with individual—and identical—claims would deplete the judiciary's resources, likely create inconsistent results, establish incompatible standards of conduct for the Defendant, and lead to repetitious, complex trials. This litigation provides an efficient and economic method for individual direct purchasers to participate in this litigation and recover their damages, while aggregating costs. Finally, while there are similar cases being brought by other groups of purchaser plaintiffs, this is the only case seeking recovery for a class of direct purchasers. Despite the large number of putative Settlement Class members and the complex issues at stake, there are no insurmountable difficulties in managing this case as a class action. The Settlement itself

will obviate the need for management of further litigation and a possible trial and appeal involving one of the larger Defendants.

It should also be noted that the proposed Settlement Class is easily ascertainable in two ways: first, a class member may self-identify simply by reviewing the class definition, and second, Defendants, including JBS, possess complete lists of clients and customers who purchased beef directly from them.

Because DPPs have satisfied Rule 23(a) and (b)(3) for purposes of the proposed Settlement, the Court should provisionally certify the proposed Settlement Class.

## V.    NOTICE PLAN

### A.    The Court Should Direct Settlement Class Notice to the Class

Under generally recognized standards, class notice must afford potential class members the ability to "make an informed decision about their participation [in the litigation]." MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.311, at 289. For class action cases where the class is certified under Rule 23(b)(3) or for settlement purposes, the Court must direct notice to class members that is the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Settlement class notice generally requires individual notice where possible, and "alternative means such as notice through third parties, paid advertising, and/or posting in places frequented by class members" where individual notice is not possible. *Mullins v. Direct Digital*, 795 F.3d 654, 665 (7th Cir. 2015); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1149 (8th Cir. 1999); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995). This standard

does not require that every conceivable class member receive actual notice. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974). Notice need not provide "a complete source of information" or an exact amount of recovery for each class member. *Petrovic*, 200 F.3d at 1153 (citing *DeBoer*, 64 F.3d at 1176). Furthermore, in addition to United States mail, notice may be by electronic means or other appropriate means. Fed. R. Civ. P. 23(c)(2)(B). Other putative settlement class members may be notified by publication notice. *See City of Greenville v. Syngenta Crop Prot.*, No. 3:10-CV-188, 2012 WL 1948153, *4 (S.D. Ill. May 30, 2012).

> 1.     **The Robust, Multilayered Proposed Notice Plan Will
>           Provide the Best Notice Practicable**

***DPPs' Notice Provider***. DPPs have retained an experienced and well-regarded notice and claims administrator, A.B. Data, to serve as the notice provider for this Settlement. *See* Declaration of Eric Schachter ¶¶ 3-5, Ex. A (listing many prior engagements on complex settlement administration projects). A.B. Data has extensive experience providing notice and claims administration in antitrust cases, such as this one. *Id*. For example, this Court appointed A.B. Data as notice provider and claims administrator in connection with the direct purchasers' settlements in *In re Pork Antitrust Litigation. See* 18-cv-1776 (D. Minn.), Doc. Nos. 631, 832. This Court also appointed A.B. Data as notice and claims administrator with respect to the consumer indirect purchaser class in *Pork*. *See* 18-cv-1776, Doc. No. 811.

Similarly, A.B. Data has also been appointed by the court as notice and claims administrator in the *In re Broiler Chicken Antitrust Litigation*, currently pending in the

Northern District of Illinois. Notably, A.B. Data has been appointed as notice provider for *each of the three classes* litigating *Broilers* claims there: the Direct Purchaser Plaintiffs, the Commercial and Institutional Indirect Purchaser Plaintiffs, *and* the End-User Consumer Plaintiffs. *See, e.g.,* 16-cv-08637 (N.D. Ill.), Doc. No. 5234.

A.B. Data is also the court-appointed notice provider and claims administrator for direct purchasers in the antitrust litigation pending against the Turkey producers. *See Olean Wholesale Grocery Cooperative Inc. et al. v. Agri-Stats, Inc.*, *et al.*, 19-cv-08318 (N.D. Ill.), Doc. Nos. 265, 295. The extensive experience A.B. Data has gained from the other protein antitrust cases involving chicken, pork, and turkey will be invaluable in this case.

***Direct Notice***. Proposed forms of the notice materials to the putative Settlement Class are included herewith as exhibits attached to the Schacter Declaration, and include the Long-Form Notice at Exhibit B. The foregoing materials provide plain, easily understood information about, among other things, that this is a class action; the amount of the settlement; the Settlement Class definition in plain and engaging language; that the Action alleges antitrust violations and price-fixing claims; that a member of the Settlement Class may appear through an attorney if the member wants; that members of the Settlement Class can be excluded from the Settlement Class or object to the Settlement if they so choose; the amount of the litigation fund that Plaintiffs seek; the maximum amount of fees and expenses to be sought; the time and manner for requesting exclusion or submitting an objection; the binding effect of a judgment on the Settlement

Class; and that, if the Court grants final approval, the case will be dismissed as against the Settling Defendants. Schachter Decl. ¶ 9.

Under DPPs' plan, the notice provider will send by mail (and email where available) the Long Form Notice to settlement class members whose contact information has been provided by the settling and non-settling Defendants.[5] The Long-Form Notice provides significant information and transparency regarding the proposed settlement and contains all information required by the Rules and case law. The Long-Form Notice also provides the URL for the website where class members may review the more fulsome information about the lawsuit and the proposed settlement. In addition to a physical mailing, the Notice will also be emailed directly to settlement class members where email information is available. *See* Schachter Decl. ¶¶ 7-10.

***Supplemental Publication Notice***. In addition to the robust direct-notice plan outlined above, DPPs will supplement the notice plan with other forms of notice reasonably tailored to reach a maximum number of additional potential class members as efficiently as possible. These measures include:

- **Paid Media**. A.B. Data has devised a well-tailored paid media program that will include publishing the Short-Form Notice one time in *Supermarket News and Nation's Restaurant News*, trade journals targeting supply chain executives and food industry professionals and implementing a thirty-day digital media banner ad campaign on www.supermarketnews.com and www.nrn.com. Schachter Decl. ¶ 11. The subscriber base for the trade journals and websites encompasses many businesses responsible for procurement of beef and other

---

[5]     Class Counsel for DPPs estimates that there are approximately 30,000 class members. An exact number cannot be provided at this time because Defendants have not produced their granular data yet in this litigation. Gustafson Decl. ¶ 16. The 30,000-class member estimate is based on Class Counsel and A.B. Data's experience in similar antitrust protein cases, including *Broilers*, *Pork*, and *Turkey*. *Id.*

businesses that fall within the settlement class definition. A proposed sample banner ad is included with the Notice Plan and attached as Exhibit D to the Schachter Declaration.

- **News Release**. A.B. Data will disseminate a news release via the *PR Newswire* distribution service. Schachter Decl. ¶ 12. This news release will be distributed to more than 10,000 newsrooms, including print, broadcast, and digital media, across the United States. It will also be distributed to food-industry trade publications.

*Settlement Website and Toll-Free Number*. A.B. Data will further assist potential class members in understanding their rights under the settlement by establishing a case-specific toll-free number and website. Schachter Decl. ¶¶ 13-15. The toll-free telephone number will be equipped with an automated interactive voice response system in both English and Spanish. The automated interactive voice response system will present callers with a series of choices to hear prerecorded information concerning the Settlement Agreement. If callers need further help, they will have an option to speak with a live operator during business hours. *Id*. The website will present relevant information and documentation, including a case summary, copies of the settlement agreement and related Orders, other important documents, and a schedule showing important dates. *Id*.

Courts have regularly approved class notice plans that include multilayered approaches, such as the foregoing. *See Petrovic*, 200 F.3d at 1153; *DeBoer*, 64 F.3d at 1176.

### 2.    The Form of Plaintiffs' Proposed Notice Satisfies Rule 23 and Due Process

Under Rule 23(c)(2)(B), the proposed class notice:

> must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may

> enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who
> requests exclusion; (vi) the time and manner for requesting exclusion;
> and (vii) the binding effect of a class judgment on members under
> Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).  As demonstrated in Exhibits B-D to the Schachter

Declaration, DPPs' Class Notice Plan addresses each of Rule 23's requirements in a clear

and easily understood manner. DPPs' notice expert has opined that the notice plan meets

the requirements of Rule 23. Accordingly, the Notice Plan and accompanying forms are

reasonable and adequate under the circumstances and are fairly calculated to apprise class

members of their rights under the settlement. *See id*. DPPs respectfully submit that this

multifaceted, comprehensive Notice Plan provides the best notice practicable under the

circumstances of this case and fully satisfies Rule 23 and due process requirements. *See*

*Petrovic*, 200 F.3d at 1153; *DeBoer*, 64 F.3d at 1176; Schachter Decl. ¶ 17. Interim Co-

Lead Class Counsel requests that the Court approve the proposed form and manner of

notice to the Settlement Class as set forth in the Notice Plan.

    **B**.    **To Provide for Adequate Notice, the Court Should Require the Non-
Settling Defendants to Produce Their Available Customer Contact
Information**

    The foregoing plan requires providing direct notice to the DPP class in accord

with Rule 23. DPPs have thus far received no customer contact information from the non-

settling Defendants in this litigation. Through this filing, DPPs seek an order from the

Court requiring that all non-settling Defendants produce their customer names, addresses,

and email addresses for the settlement class period.  Courts regularly require non-settling

defendants to produce this information for purposes of effectuating notice of class

settlements and facilitating claims administration in antitrust and complex cases. *See, e.g., In re Pork Antitrust Litigation*, Case No. 18-cv-1776-JRT-HB (D. Minn. January 13, 2021), ECF No. 631, ¶ 7 ("So that the proposed notice plan may be carried out, each Defendant in this Action is directed to provide a customer list to the Settlement Administrator, including any reasonably available names, email addresses, and mailing addresses, pursuant to the schedule below."); *Precision Associates Inc. et al. v. Panalpina World Transport (Holding) Ltd.,* Case No. 08-cv-000042-BMC-PK (E.D.N.Y. Sept. 29, 2011, Oct. 17, 2011 & Dec. 02, 2011), (ECF Nos. 536 (ordering production from non-settling defendants); 546 (denying limitation that class lists be sent directly to claims administrator without access by class counsel); 561 (ordering further production from those defendants only providing subsets of customer contact information)); *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, No. 09-ML-2007 (C.D. Cal. Aug. 29, 2011) (Doc. No. 315-3) (Finegan declaration) (defendants produced class member records); *Encinas v. J.J. Drywall Corp.,* 265 F.R.D. 3, 11 (D.D.C. 2010); *In re Processed Egg Prod. Antitrust Litig.*, No. 08-MD-2002, ¶ 3 (E.D. Pa. July 15, 2010) (ordering "each Defendant who has not already done so" to produce customer lists); *In re Air Cargo Shipping Serv. Antitrust Litig.*, No. 06-MD-01775 (E.D.N.Y. Oct. 31, 2007) (Doc. No. 646) (ordering production from non-settling defendants). There are myriad other decisions holding similarly.[6] DPPs respectfully request that such information be

---

[6]     *See, e.g., In re Visa Check/MasterMoney Antitrust Litigation*, 2002 WL 31528478, at *3 (E.D.N.Y. June 21, 2002) (Gleeson, J.) (non-settling defendants required to produce customer information for purposes of notice); *In re Urethane Antitrust Litig.*, No. 04-MD-01616, ECF No. 291 at 3 (D. Kan. April 6, 2006) (requiring production of records

provided to DPPs within 30 days of this Court's order directing notice to the class and preliminarily approving this settlement.

**B.      Proposed Notice Schedule**

Set forth below is the proposed schedule for purposes of the notice plan, objections and opt-out deadlines, deadlines for filing any attorneys' fees and reimbursement of litigation fund expenses, and a schedule for final approval. The relevant dates are not yet affixed in the proposed notices but will be once the Court sets dates certain for the following litigation events.

| EVENT | DEADLINE |
|---|---|
| JBS to issue CAFA notice | Within 10 days after the Preliminary Approval Motion is filed |
| Order approving Plaintiffs' proposed Notice Program ("Order") | N/A |
| All Defendants to produce reasonably available customer names, mailing addresses and email addresses | 30 days after the Court's Order |
| Direct mail; Mailed and Email notice to potential Settlement Class Members; establish the settlement website; and issue a press release over PR Newswire | 60 days after the Court's Order |

from non-settling defendants' records); *Lazy Oil Co. v. Witco Corp.*, 95 F.Supp.2d 290, 297 (W.D. Pa. 1997) (mailed notice based on non-settling defendants' customer lists); *In re Packaged Ice Antitrust Litig.,* No. 08-MD-1952, 2010 WL 5638219, *2 (E.D. Mich. Sept. 2, 2010) (directing non-settling defendants to provide customer data); *In re Citric Acid Antitrust Litig.,* No. 1092, C-95-2963, 1997 WL 446239, *1 (N.D. Cal. July 24, 1997); *In re Art Materials Antitrust Litig.*, MDL No. 436, 1983 WL 1815, *2 (N.D. Ohio May 2, 1983) (ordering defendants to identify purchasers).

| EVENT | DEADLINE |
|---|---|
| Publication notice begins | 60 days after the Court's Order or as soon as practicable thereafter due to publication schedules |
| Plaintiffs to file motion for final approval of $5 million Litigation Fund | 75 days after the Court's Order |
| Deadline for class members to object | 105 days after the Court's Order (objections must be received by this deadline) |
| Deadline for class members to request to opt out of the settlement | 105 days after the Court's Order (requests must be postmarked by this deadline) |
| Plaintiffs to file affidavits or declarations of the person(s) under whose general direction notice was issued | At least 10 days before the Final Approval Hearing |
| Plaintiffs to file final approval brief, response to objections, if any, and a proposed final approval order with a complete list of all Settlement Class Members that have opted out of the Settlement | At least 10 days before the Final Approval Hearing or by a date to be set by the Court |
| Final Approval Hearing | At least 135 days after the Court's Order, as the Court's schedule permits |

## VI.    CONCLUSION

Based on the foregoing, Interim Co-Lead Counsel respectfully asks the Court to

enter an Order:

- Preliminarily approving the settlement between DPPs and JBS;

- Certifying the Settlement Class for purposes of Settlement, and appointing Howard B. Samuels solely in his capacity as Chapter 7 trustee for the

bankruptcy estate of Central Grocers, Inc.; R&D Marketing, LLC; and Redner's Markets, Inc. as representatives of the Class; appointing DPP Interim Co-Lead Counsel as Settlement Class Counsel, and granting preliminary approval of the proposed Settlement;

- Ordering the non-settling Defendants to produce customer names, addresses, and email addresses for the settlement class period;

- Approving the proposed form and manner of notice to the Settlement Class, and directing that the notice to the Settlement Class be disseminated by Claims Administrator A.B. Data in the manner described, establishing a deadline for Settlement Class Members to request exclusion from the Class or file objections to the Settlement; and

- Setting the proposed schedule for completion of further Settlement proceedings, including scheduling the Final Approval Hearing.

Dated:   January 31, 2022                    Respectfully Submitted,

                                            */s/ Daniel E. Gustafson*
                                            Daniel E. Gustafson (#202241)
                                            Daniel C. Hedlund (#258337)
                                            Michelle J. Looby (#0388166)
                                            Joshua J. Rissman (#0391500)
                                            Brittany Resch (#397656)
                                            **GUSTAFSON GLUEK PLLC**
                                            Canadian Pacific Plaza
                                            120 South Sixth Street, Suite 2600
                                            Minneapolis, MN 55402
                                            Telephone: (612) 333-8844
                                            Facsimile: (612) 339-6622
                                            dgustafson@gustafsongluek.com
                                            dhedlund@gustafsongluek.com
                                            mlooby@gustafsongluek.com
                                            jrissman@gustafsongluek.com
                                            bresch@gustafsongluek.com

                                            Dennis J. Stewart (*admitted pro hac vice*)
                                            **GUSTAFSON GLUEK PLLC**
                                            600 B Street
                                            17th Floor
                                            San Diego, CA 92101

27

Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dstewart@gustafsongluek.com

Adam J. Zapala (*admitted pro hac vice*)
Elizabeth T. Castillo (*admitted pro hac vice*)
Reid W. Gaa (*admitted pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
rgaa@cpmlegal.com

Alexander E. Barnett (*admitted pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
40 Worth Street, Suite 602
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

Jason S. Hartley (*admitted pro hac vice*)
**HARTLEY LLP**
101 W. Broadway, Suite 820
San Diego, CA 92101
Tel: (619) 400-5822
hartley@hartleyllp.com

Megan E. Jones (*admitted pro hac vice*)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
mjones@hausfeld.com

Timothy S. Kearns (*admitted pro hac vice*)
Hausfeld LLP
888 16th St. NW, Suite 300
Washington, DC 20006
Tel: (202) 540-7200

tkearns@hausfeld.com

***Interim Co-Lead Counsel for the Proposed
Direct Purchaser Plaintiffs***

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE CATTLE AND BEEF ANTITRUST LITIGATION | Case No. 0:20-cv-01319 JRT-HB |
| This Document Relates To: IN RE DPP BEEF LITIGATION | **DIRECT PURCHASER PLAINTIFFS' RULE 7.1(f) COMPLIANCE CERTIFICATE** |

The undersigned hereby certifies that, pursuant to Local Rule 7.1(f), Direct Purchaser Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Settlement with JBS Defendants, contains 7,104 words, as determined through the word count feature of the Microsoft Office Word 2016 word processing software used to prepare the memorandum. The word processing program has been applied specifically to include all text, including headings, footnotes, and quotations. The memorandum was prepared in 13-point font in accordance with the type size limitation of Local Rule 7.1(h).

Dated:   January 31, 2022

Respectfully Submitted,

*/s/ Daniel E. Gustafson*
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#0388166)
Joshua J. Rissman (#0391500)
Brittany Resch (#397656)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622

1

dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

Dennis J. Stewart (*admitted pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dstewart@gustafsongluek.com

Adam J. Zapala (*admitted pro hac vice*)
Elizabeth T. Castillo (*admitted pro hac vice*)
Reid W. Gaa (*admitted pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
rgaa@cpmlegal.com

Alexander E. Barnett (*admitted pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
40 Worth Street, Suite 602
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

Jason S. Hartley (*admitted pro hac vice*)
**HARTLEY LLP**
101 W. Broadway, Suite 820
San Diego, CA 92101
Tel: (619) 400-5822
hartley@hartleyllp.com

Megan E. Jones (*admitted pro hac vice*)

2

**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
mjones@hausfeld.com

*Interim Co-Lead Counsel for the Proposed*
*Direct Purchaser Plaintiffs*

Exhibit E

Colorado
Secretary of State
Jena Griswold

About Secretary Griswold | Español

**For this Record...**
Filing history and documents
Trade names
Get a certificate of good standing
File a form
Subscribe to email notification
Unsubscribe from email notification
Subscribe to text notification
Unsubscribe from text notification

Business Home
Business Information
Business Search

FAQs, Glossary and Information

# Summary

| Details | |
|---|---|
| **Name** | Five Rivers Cattle Feeding, LLC |
| **Status** Good Standing | **Formation date** 04/25/2005 |
| **ID number** 20051146390 | **Form** Foreign Limited Liability Company |
| **Periodic report month** April | **Jurisdiction** Delaware |
| **Principal office street address** | 4848 Thompson Parkway, Suite 410, Johnstown, CO 80534, United States |
| **Principal office mailing address** | 4848 Thompson Parkway, Suite 410, Johnstown, CO 80534, United States |

| Registered Agent | |
|---|---|
| **Name** | Corporation Service Company |
| **Street address** | 1900 W. Littleton Boulevard, Littleton, CO 80120, United States |
| **Mailing address** | 1900 W. Littleton Boulevard, Littleton, CO 80120, United States |

Filing history and documents

Trade names

Get a certificate of good standing

Get certified copies of documents

File a form

Set up secure business filing

Subscribe to email notification

Unsubscribe from email notification

Subscribe to text notification

Unsubscribe from text notification

| Back |
|---|

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Minnesota

| IN RE CATTLE AND BEEF ANTITRUST LITIGATION | ) | |
|---|---|---|
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  0:20-cv-1319 (JRT/HB) |
| | ) | |
| _____ | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          FIVE RIVERS CATTLE FEEDING LLC
             4848 Thompson Parkway, #410, Johnstown, CO 80534

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
          SEE SCHEDULE A ATTACHED HERETO

| Place: Shelley Thompson, c/o Burns, Figa & Will P.C., 6400 S. Fiddler's Cir., #1000, Greenwood Village, CO 80111 | Date and Time:  11/04/2022 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____09/28/2022_____

|  *CLERK OF COURT* | OR | |
|---|---|---|
| | | s/Jason S. Hartley |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Direct Purchaser Plaintiffs _____ , who issues or requests this subpoena, are:

Jason S. Hartley, Hartley LLP, 101 W. Broadway, Ste. 820, San Diego, CA 92101 (619) 400-5822

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  0:20-cv-1319 (JRT/HB)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____    on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                          *Server's signature*

                                                     _____
                                                          *Printed name and title*

                                                     _____
                                                          *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

   **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

   **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

   **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

   **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

   **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

   **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

   **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**

**DIRECT PURCHASER PLAINTIFFS' REQUESTS FOR PRODUCTION OF
DOCUMENTS TO NON-PARTY FIVE RIVERS CATTLE FEEDING, LLC**

Pursuant to the foregoing subpoena a duces tecum, Five Rivers Cattle Feeding, LLC, is required

to produce the documents requested herein.

**DEFINITIONS**

1.      "And" and "or" are to be read interchangeably to give the broadest possible

meaning to a particular request in which either or both is used.

2.      "Beef" means boxed and case-ready meat that has been processed from fed cattle

by Defendants (defined below) and other smaller, non-defendant producers.

3.      "Communication" means, without limitation, any exchange of thoughts,

messages, or information, as by speech, signals, writing, or behavior, including, but not limited

to, any advice, advisement, announcement, articulation, assertion, contact, conversation, written

or electronic correspondence, declaration, discussion, dissemination, elucidation, expression,

interchange, memoranda, notes, publication, reception, revelation, talk, transfer, transmission, or

utterance. The phrase "communication between" is defined to include instances where one party

addresses the other party, but the other party does not necessarily respond.

4.      "Competitive  Conditions," in addition to its ordinary meaning and usage,

includes actual or forecasted, projected or estimated conditions or trends relating to pricing, the

supply and availability of cattle (including cow and heifer slaughter), Beef Supply Factors,

number of fed cattle slaughtered, Beef available for purchase by customers, production

(including output, capacity, capacity utilization, operating rates, facility closures, rationalization,

supply or capacity discipline, production or downtime, and/or production scheduling),

inventories, demand, sales, profitability or margins, market share (including mergers, acquisitions, joint ventures, divestitures, sales or transfers of assets, spin- offs, or any other form of change of ownership or control or consolidation), competitors, fixed or variable costs, and imports or exports in the market for Beef.

5.      "Complaint" means Direct Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint (ECF Nos. 256 (sealed), 257 (redacted)).

6.      "Defendant" means any company, organization, entity, or person presently or subsequently named as a Defendant in this litigation, including its predecessors, wholly-owned or controlled subsidiaries or affiliates, successors, parents, other subsidiaries, departments, divisions, joint ventures, other affiliates, and any organization or entity managed or controlled by a named Defendant, including those merged with or acquired, together with all present and former directors, officers, employees, agents, attorneys, representatives or any persons acting or purporting to act on behalf of a Defendant.  The entities presently named as a Defendant in this litigation include:

- Cargill Meat Solutions Corporations (a/k/a Cargill Protein)
- JBS S.A.
- JBS USA Food Company
- Swift Beef Company
- JBS Packerland, Inc.
- National Beef Packing Company
- Tyson Foods, Inc.
- Tyson Fresh Meats, Inc.

7.      "Document" shall have the same meaning as used in Rule 34, and shall be construed in its broadest sense to include, without limitation, the final form and all drafts and revisions of any paper or other substance or thing, original or reproduced, and all copies thereof that are different in any way from the original, on which any words, letters, numbers, symbols, pictures, graphics, or any other form of information is written, typed, printed, inscribed, or

otherwise visibly shown, and also every other form of stored or recorded information, whether

on film, tape, disks, cards, computer memories, or any other medium and/or device whereby

stored information can, by any means whatsoever, be printed or otherwise recovered, generated

or displayed in the form of visible, audible, or otherwise perceptible words, letters, numbers,

symbols, pictures, or graphics. To illustrate (and not to limit) the breadth of this definition,

"document" in this sense includes papers or objects bearing handwritten notes, material written

in Braille, contracts, letters, bills, telegrams, notes, e-mail, voice mail, books, desk calendars,

memoranda, envelopes, drafts or partial copies of anything, signs, photographic negatives and

prints, video and audio recordings of all kinds and the contents of storage media used in data-

processing systems. Each and every draft of a document is a separate document for purposes of

these document requests.

      8.     "Electronically stored information" or "ESI" means and refers to computer

generated information or data of any kind, stored in or on any storage media located on

computers, file servers, disks, the cloud, tape, or other real or virtualized devices or media. Non-

limiting examples of ESI include:

- Digital communications (*e.g.*, e-mail, phone calls and logs of phone calls, voice mail, text messaging, instant messaging, and ephemeral messaging (Snapchat, Confide, Signal, etc.));
- E-mail server stores (*e.g.*, Lotus Domino NSF or Microsoft Exchange .EDB);
- Word processed documents (e.g., MS Word or WordPerfect files and drafts);
- Spreadsheets and tables (*e.g.*, Excel or Lotus 123 worksheets);
- Accounting application data (*e.g.*, QuickBooks, Money, Peachtree data);
- Image and facsimile files (*e.g.*, .PDF, .TIFF, .JPG, .GIF images);
- Sound recordings (*e.g.*, .WAV and .MP3 files);
- Video and animation (*e.g.*, .AVI and .MOV files);
- Unstructured Data;
- Structured Databases (*e.g.*, Excel, Access, Oracle, SQL Server data, SAP);
- Contact and relationship management data (*e.g.*, Outlook, ACT!);
- Calendar and diary application data (*e.g.*, Outlook PST, blog entries);
- Online access data (*e.g.,* Temporary Internet Files, History, Cookies);
- Presentations (*e.g.*, PowerPoint, Corel Presentations);

- Network access and server activity logs;
- Project management application data; and
- Cloud-based or other virtualized ESI (including application, infrastructure and data) and backup and archival files (*e.g.*, Cloud based backups/archives of devices or data, such as iCloud, Dropbox, OneDrive, and Google Drive, Veritas, Zip, external storage devices and GHO).

9.     "Including" is used to emphasize certain types of Documents requested and should not be construed as limiting the request in any way. Including therefore means "including, but not limited to," or "including without limitation."

10.     "Person" means, without limitation, any individual, corporation, partnership, or any variation thereof (e.g., limited partnership, limited liability partnership), limited liability company, proprietorship, joint venture, association, group or other form of legal entity or business existing under the laws of the United States, any state, or any foreign country.

11.     "Relating to," "referring to," "regarding," "with respect to," and "concerning" mean, without limitation, the following concepts: concerning, constituting, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part, directly or indirectly. Documents are considered relating to the subject matter whether they are viewed alone or in combination with other Documents.

12.     "Representative" shall mean any and all agents, employees, servants, independent contractors, consultants, officers, directors, associates, or other persons acting or purporting to act on Your behalf or on behalf of the person in question.

13.     "Structured Data" or "Structured Database" refers to any data that resides in a fixed field within a record or file, such as data stored in Oracle, SQL, or files that are in Columns/Rows or a fixed field with a predefined format.

14.     "Studies" or "Analyses" include all reports, memoranda, statistical compilations, reviews, audits, and other types of written, printed, or electronic submissions of information.

15.     "United States" means each of the 50 states, the District of Columbia, and the commonwealths, territories, and possessions of the United States.

16.     "Unstructured Data" is data that does not conform to a specific, pre- defined data model and may be human generated and in various formats that fit into structured database tables and columns. Common examples include, but are not limited to, word processing documents, emails, blogs, social media extracts, tweets, picture captions, GPS data, and others of similar variable formats.

17.     "You," "Your" or "Your Company" mean the responding entity, including its predecessors, wholly-owned or controlled subsidiaries or affiliates, successors, parents, other subsidiaries, departments, divisions, joint ventures, other affiliates and any organization or entity that the responding entity manages or controls, including those merged with or acquired, together with all present and former directors, officers, employees, agents, attorneys, representatives or any persons acting or purporting to act on their behalf.

## INSTRUCTIONS

1.     These requests call for the production of all responsive Documents that are within Your possession, custody, or control.

2.     Unless otherwise noted, the presumptive date ranges for the Document Requests below are: (a) for Documents and Unstructured Data, January 1, 2012 to June 30, 2020; and (b) for Structured Data, January 1, 2009 to June 30, 2020.

3.     With respect to any Document maintained or stored electronically, please harvest it in a manner that maintains the integrity and readability of all data, including all metadata.

4.      Please produce all Documents maintained or stored electronically in native, electronic format with all relevant metadata intact. Encrypted or password-protected documents should be produced in a form permitting them to be reviewed.

5.      All information and/or Documents called for by, or related to, these Document Requests for which you claim a privilege or statutory authority as a ground for nonproduction shall be listed chronologically as follows:

    a.  The place, date, manner or recording or otherwise preparing the Documents;

    b.  The name and title of the Documents (e.g., letter, memorandum, drawing, etc.);

    c.  An identification of the author(s), addressee(s), recipient(s), their titles and employers at the time of creation and transmittal, and, where not apparent from the identification alone, the relationship of such persons to each other;

    d.  An identification of the persons that possess or control the information;

    e.  The number of pages;

    f.  Factual and legal basis for claim, privilege or specific statutory or regulatory authority which provides the claimed ground for nonproduction.

6.      All Documents produced in response to these Document Requests shall be produced in total notwithstanding the fact that portions thereof may contain information not requested.

7.      If any Documents requested herein have been lost or destroyed, please identify—by author, date, and subject matter—the Documents so lost or destroyed.

8.      Where exact information cannot be furnished, estimated information is to be supplied to the extent possible. Where estimate is used, it should be so indicated, and an

explanation should be given as to the basis on which the estimate was made and the reason the exact information cannot be furnished.

## DOCUMENT REQUESTS

1.      All Documents regarding the acquisition by Pinnacle Asset Management, L.P., of Your company from JBS USA (the "Pinnacle Acquisition), including, but not limited to, the following:

      a.   Contracts (including drafts) relating to the Pinnacle Acquisition;

      b.   Communications regarding the Pinnacle Acquisition between You and any Defendant, governmental agency, cattle supplier, or fed cattle purchaser; and

      c.   Studies or Analyses regarding the Pinnacle Acquisition, the business rationale behind it, and its anticipated effect on Your business or the industry.

2.      All Documents regarding the acquisition by JBS USA of Your company from Smithfield Foods and Continental Grain Company (the "JBS USA Acquisition"), including, but not limited to, the following:

      a.   Contracts (including drafts) relating to the JBS USA Acquisition;

      b.   Communications regarding the JBS USA Acquisition between You and any Defendant, governmental agency, cattle supplier, or fed cattle purchaser; and

      c.   Studies or Analyses regarding the JBS USA Acquisition, the business rationale behind it, and its anticipated effect on Your business or the industry.

3.      All Structured Data showing the individual transactions You made acquiring and selling cattle domestically, as well as the shipments or movements of cattle into or out of Your possession. For each transaction, this includes, but is not limited to:

      a.   Structured Data identifying the cattle producer/supplier or buyer;

  b. The geographic location of the feedlot;

  c. Type of procurement transaction (*e.g.*, whether cash or spot, negotiated grid, negotiated formula, forward contract, other formula marketing agreement);

  d. Date of purchase;

  e. Date of delivery;

  f. Payment and delivery terms;

  g. The specific pricing terms and determinants of pricing (*e.g.*, formula, grade, grid, adjustments);

  h. Supply commitments; and

  i. Total sales amount.

  4. All Documents reflecting Communications between You and two or more Defendants.

  5. All Documents relating to any studies, reports, analyses, or presentations regarding Competitive Conditions in the cattle feedlot industry or the Beef industry, generally.

  6. All Documents related to the effect of drought on any Competitive Conditions for cattle, including the quality or quantity of cattle.

Exhibit F

## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MINNESOTA

|                                         |   |                                       |
|-----------------------------------------|---|---------------------------------------|
|                                         | : |                                       |
|                                         | : |                                       |
|                                         | : |                                       |
| **IN RE CATTLE AND BEEF**               | : | **Civil Action No. 0:20-cv-1319 (JRT/HB)** |
| **ANTITRUST LITIGATION**                | : |                                       |
|                                         | : |                                       |
|                                         | : |                                       |
|                                         | : |                                       |
|                                         | : |                                       |
|                                         | : |                                       |

### FIVE RIVERS CATTLE FEEDING, LLC'S RESPONSES AND OBJECTIONS TO DIRECT PURCHASER PLAINTIFFS' NON-PARTY SUBPOENA

Pursuant to Fed. R. Civ. P. 45(d)(2)(B), Five Rivers Cattle Feeding, LLC ("Five Rivers"), a non-party to the above-captioned action (the "Litigation"), serves its objections to the non-party subpoena (the "Subpoena") served by Direct Purchaser Plaintiffs on October 11, 2022.

### GENERAL OBJECTIONS

Five Rivers asserts the following general objections ("General Objections") and Objections to Definitions and Instructions to each and every one of the Requests contained in the Subpoena where applicable. The General Objections and Objections to Definitions and Instructions may or may not be reasserted after each Request. The assertion of the same, similar, or additional objections to each specific Request, or the failure to assert additional objections to each specific Request does not waive or alter the General Objections or Objections to Definitions and Instructions set forth below. Five Rivers' General and Specific Objections are not admissions that Five Rivers otherwise possesses information responsive to the Requests.

1.      Five Rivers objects to the Subpoena because it seeks information that is not relevant to any of the claims or defenses in this Litigation.

1

2.      Five Rivers objects to the Subpoena because it "[imposes] undue burden or expense" on Five Rivers, a non-party with no relation to this Litigation. Fed. R. Civ. P. 45(d)(1). The Subpoena subjects Five Rivers to an undue burden by demanding the production of broad and poorly defined categories of information. The vagueness and overbreadth of these Requests makes compliance extraordinarily expensive and burdensome. Five Rivers further objects to the Subpoena as violating the proportionality requirements of the Federal Rules of Civil Procedure. Direct Purchaser Plaintiffs have made no offer to reimburse Five Rivers for the cost of compliance.

3.      Five Rivers objects to the Subpoena to the extent that it requests competitively sensitive, confidential, and/or proprietary information of Five Rivers, the disclosure of which would cause irreparable business harm.

4.      Five Rivers objects to the Subpoena to the extent that it requires Five Rivers to produce Documents, Communications, or other information in violation of any legal or contractual obligations of nondisclosure or confidentiality to any individual or entity.

5.      Five Rivers objects to the Subpoena to the extent that it seeks information that is already within the parties' or third parties' possession, custody, or control, or is equally accessible and available to the requesting party from other sources (including themselves, the public record, and other non-parties).

6.      Five Rivers objects to the Subpoena to the extent that it seeks information that is not in Five Rivers' possession, custody, or control, that is not known or reasonably available to Five Rivers, that is not ascertainable by means of a reasonably diligent search, that is not maintained by Five Rivers in the ordinary course of business, or that is no longer maintained by Five Rivers.

7.      Five Rivers objects to the Subpoena to the extent that it demands the production of information or Documents covered by the attorney-client privilege, the attorney work product doctrine, the common interest privilege, the joint defense privilege, and/or any other legal, statutory, or evidentiary protection.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Five Rivers objects to Definition No. 3, "Communication," to the extent that it seeks to impose obligations upon Five Rivers greater than or different from those obligations imposed by the Federal Rules of Civil Procedure or the Local Rules. For purposes of responding to the Subpoena, Five Rivers will construe the term "Communication" in accordance with the definition permitted by Rules 26 and 45 of the Federal Rules of Civil Procedure or the Local Rules.

2.      Five Rivers objects to Definition No. 4, "Competitive Conditions," as unintelligible, vague, ambiguous, and overbroad.

3.      Five Rivers objects to Definition No. 11, "relating to," "referring to," "regarding," "with respect to," or "concerning" to the extent that it seeks to impose obligations greater than or different from those obligations imposed by the Federal Rules of Civil Procedure or Local Rules. For purposes of responding to the Subpoena, Five Rivers will construe the terms "relating to," "referring to," "regarding," "with respect to," and "concerning" in accordance with the definitions permitted by Rules 26 and 45 of the Federal Rules of Civil Procedure or the Local Rules.

4.      Five Rivers objects to Definition No. 17, "You," "Your," or "Your Company" to the extent that it includes entities other than Five Rivers Cattle Feeding, LLC. For purposes of responding to the Subpoena, Five Rivers will construe the incorrectly defined terms as meaning

and referencing only and solely Five Rivers Cattle Feeding, LLC and not any other individual or entity.

5.      Five Rivers objects to Instruction No. 2 because the date ranges are overbroad, unduly burdensome, and neither relevant nor necessary to the claims and defenses in the Litigation. Five Rivers further objects to Instruction No. 2 because it imposes burdens that are not proportional to the needs of the case.

6.      Five Rivers objects to Instruction Nos. 2-12, inclusive, to the extent that they individually and collectively seek to impose obligations on Five Rivers greater than or different from those obligations imposed by the Federal Rules of Civil Procedure, the Local Rules and/or the scope of discovery by the parties to the Litigation as previously limited by order(s) of the court and/or by the agreement(s) of the parties.

## RESPONSES TO REQUESTS FOR PRODUCTION

**Request No. 1**: All Documents regarding the acquisition by Pinnacle Asset Management, L.P., of Your company from JBS USA (the "Pinnacle Acquisition").

**Response to Request No. 1**: Five Rivers restates and incorporates by reference all of its foregoing General Objections and Objections to Definitions and Instructions. Five Rivers further and specifically objects to this Request as overbroad, unduly burdensome, vague, and ambiguous. The Request seeks information that is not relevant nor proportional to the needs of the case. Five Rivers further objects to this Request because it seeks Documents and Communications covered by the attorney-client privilege, the attorney work product doctrine, the common interest privilege, the joint defense privilege, and/or any other legal, statutory, or evidentiary protection.

In addition, Five Rivers objects to the Request as unduly burdensome because it seeks information and/or Documents that would be more readily available from JBS USA, which is a

party to this Litigation. Even if relevant (which it is not) the requested information is unreasonably cumulative of publicly available information and information produced or that will be produced in this Litigation by the parties and other non-parties.

Based on its objections, Five Rivers states that it is not obligated to, and does not intend to, produce any materials in response to this Request.

**Request No. 2:** All Documents regarding the acquisition by JBS USA of Your company from Smithfield Foods and Continental Grain Company (the "JBS USA Acquisition").

**Response to Request No. 2:** Five Rivers restates and incorporates by reference all of its foregoing General Objections and Objections to Definitions and Instructions. Five Rivers further and specifically objects to this Request as overbroad, unduly burdensome, vague, and ambiguous. The Request seeks information that is not relevant nor proportional to the needs of the case. Five Rivers further objects to this Request because it seeks Documents and Communications covered by the attorney-client privilege, the attorney work product doctrine, the common interest privilege, the joint defense privilege, and/or any other legal, statutory, or evidentiary protection.

Moreover, the JBS USA Acquisition took place in 2008, seven years before the purported class period commenced. As such, any information related to the JBS USA Acquisition is irrelevant to the Litigation.

In addition, Five Rivers objects to the Request as unduly burdensome because it seeks information and/or Documents that would be more readily available from JBS USA, which is a party to this Litigation. Even if relevant (which it is not) the requested information is unreasonably cumulative of publicly available information and information produced or that will be produced in this Litigation by the parties and other non-parties.

Based on its objections, Five Rivers states that it is not obligated to, and does not intend to, produce any materials in response to this Request.

**Request No. 3:** All Structured Data showing the individual transactions You made acquiring and selling cattle domestically, as well as the shipments or movements of cattle into or out of Your possession.

**Response to Request No. 3:** Five Rivers restates and incorporates by reference all of its foregoing General Objections and Objections to Definitions and Instructions. Five Rivers further and specifically objects to this Request as overbroad, unduly burdensome, vague, and ambiguous. The Request seeks information that is not relevant nor proportional to the needs of the case. Five Rivers further objects to this Request to the extent that it requests competitively sensitive, confidential, and/or proprietary information of Five Rivers, the disclosure of which would cause irreparable business harm.

In addition, Five Rivers objects to the Request as unduly burdensome because it seeks information that would be more readily available from other sources. Even if relevant (which it is not) the requested information is unreasonably cumulative of publicly available information and information produced or that will be produced in this Litigation by the parties and other non-parties.

Based on its objections, Five Rivers states that it is not obligated to, and does not intend to, produce any materials in response to this Request.

**Request No. 4:** All Documents reflecting Communications between You and two or more Defendants.

**Response to Request No. 4:** Five Rivers restates and incorporates by reference all of its foregoing General Objections and Objections to Definitions and Instructions. Five Rivers further and specifically objects to this Request as overbroad, unduly burdensome, vague, and

ambiguous. The Request seeks information that is not relevant nor proportional to the needs of the case.

In addition, Five Rivers objects to the Request as unduly burdensome because it seeks information that would be more readily available from other sources. Even if relevant (which it is not) the requested information is unreasonably cumulative of publicly available information and information produced or that will be produced in this Litigation by the parties and other non-parties.

Based on its objections, Five Rivers states that it is not obligated to, and does not intend to, produce any materials in response to this Request.

**Request No. 5:** All Documents relating to any Studies, Reports, Analyses, or presentations regarding Competitive Conditions in the cattle feedlot industry or the Beef industry, generally.

**Response to Request No. 5:** Five Rivers restates and incorporates by reference all of its foregoing General Objections and Objections to Definitions and Instructions. Five Rivers further and specifically objects to this Request as overbroad, unduly burdensome, vague, and ambiguous. Five Rivers objects to this Request because it is vague and unclear in its use of the term "Competitive Conditions." The Request seeks information that is not relevant nor proportional to the needs of the case. Five Rivers further objects to this Request because it seeks information protected by the attorney-client privilege, the attorney work product doctrine, the common interest privilege, the joint defense privilege, and/or any other legal, statutory, or evidentiary privilege. Five Rivers further objects to this Request to the extent that it requests competitively sensitive, confidential, and/or proprietary information of Five Rivers, the disclosure of which would cause irreparable business harm.

In addition, Five Rivers objects to the Request as unduly burdensome because it seeks information that would be more readily available from other sources. Even if relevant (which it is not) the requested information is unreasonably cumulative of publicly available information and information produced or that will be produced in this Litigation by the parties and other non-parties.

Based on its objections, Five Rivers states that it is not obligated to, and does not intend to, produce any materials in response to this Request.

**Request No. 6**: All Documents related to the effect of drought on any Competitive Conditions for cattle, including the quality or quantity of cattle.

**Response to Request No. 6**: Five Rivers restates and incorporates by reference all of its foregoing General Objections and Objections to Definitions and Instructions. Five Rivers further and specifically objects to this Request as overbroad, unduly burdensome, vague, and ambiguous. Five Rivers objects to this Request because it is vague and unclear in its use of the term "Competitive Conditions." The Request seeks information that is not relevant nor proportional to the needs of the case. Five Rivers further objects to this Request because it seeks information protected by the attorney-client privilege, the attorney work product doctrine, the common interest privilege, the joint defense privilege, and/or any other legal, statutory, or evidentiary privilege. Five Rivers further objects to this Request to the extent that it requests competitively sensitive, confidential, and/or proprietary information of Five Rivers, the disclosure of which would cause irreparable business harm.

In addition, Five Rivers objects to the Request as unduly burdensome because it seeks information that would be more readily available from other sources. Even if relevant (which it is not) the requested information is unreasonably cumulative of publicly available information and

information produced or that will be produced in this Litigation by the parties and other non-

parties.

Based on its objections, Five Rivers states that it is not obligated to, and does not intend

to, produce any materials in response to this Request.

DATED:  October 25, 2022

s/

Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, D.C.  20006
Tel.: 202-737-0500
cyook@kslaw.com
*Counsel for Five Rivers Cattle Feeding, LLC*

9

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2022, I caused a copy of the foregoing document to

be served on:

Jason S. Hartley
Hartley LLP
101 W. Broadway Street, Suite 820
San Diego, CA 92101
hartley@hartleyllp.com
*Counsel for Direct Purchaser Plaintiffs*

s/

Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, D.C. 20006
Tel.: 202-737-0500
cyook@kslaw.com
*Counsel for Five Rivers Cattle Feeding, LLC*

Exhibit G



Jason Hartley
hartley@hartleyllp.com

101 West Broadway, Suite 820
San Diego, CA 92101
Phone: (619) 400-5822
Fax: (619) 400-5832

November 10, 2022

Christopher Yook
King & Spalding, LLP
1700 Pennsylvania Ave, Suite 200
Washington, DC 20006
cyook@kslaw.com

Re:     *In re Cattle and Beef Antitrust Litigation*, Case No. 20-cv-1319 (D.Minn.)
        Five Rivers Subpoena

Dear Counsel:

We received Five Rivers Cattle Feeding LLC's ("Five Rivers") objections and responses to the October 11, 2022 subpoena served by Direct Purchaser Plaintiffs ("DPPS"). We were surprised at the flat refusal of Five Rivers to produce any documents in response to any Request despite our meet and confer call on October 14, 2022, where we explained to you the relevance and importance of the material requested.

There are some requests we are willing to hold in abeyance for a period of time and some requests we require responses and documents from Five Rivers. We take each of the six requests in order.

**Request 1** seeks documents related to the acquisition of Five Rivers from JBS by Pinnacle. As I noted on our call, we considered staying Five Rivers' compliance with this request pending production by JBS. After further investigation, however, we do not expect these documents to be produced by JBS as they are not explicitly the subject of any request from JBS. Because we settled with JBS we cannot pursue additional discovery from them. Consequently, we must insist on this production from Five Rivers.

**Request 2** seeks documents related to the acquisition of Five Rivers from Smithfield by JBS. Although DPPs continue to believe these documents are relevant to the litigation, given the time period at issue and the purported burden claimed by Five Rivers, DPPs hereby withdraw this request.



November 10, 2022
Page 2

**Request 3** seeks two categories of structured data: one regarding Five Rivers' acquisition of cattle and the other regarding Fiver Rivers' sale of cattle. With respect to Five Rivers' sale of cattle, we understand that JBS was the primary, if not sole, purchaser of cattle from Five Rivers during most or all of the relevant period (January 1, 2009-June 30, 2020). For the transactions where JBS or another Defendant was the purchaser of cattle from Five Rivers, we would be willing to hold this Request in abeyance on one condition: that Five Rivers produce summary documents reflecting its annual total sales of cattle to JBS (or other Defendant) in both dollars and volume for each year of the relevant period. That way we can confirm the completeness of structured data we expect to receive from JBS and the other Defendants. In addition, we still request the production of any structured data concerning the sale of cattle to any other entity besides a Defendant within that period.

With respect to structured data concerning Five Rivers' purchases of cattle, this data is not available from any Defendant. Only Five Rivers has this data, which obviously has relevance to the market for the sale of cattle. We request that Five Rivers reconsider its refusal to produce this data. If Five Rivers intends to stand on its objection and refuses to produce this data, please provide us with authority supporting its position and a more complete description of the purported burden associated with producing this data.

**Request 4** seeks any communications between Five Rivers and two or more Defendants. As we explained on our call, this information is directly relevant in a conspiracy case like this. Plaintiffs are permitted to discover whether Five Rivers facilitated anticompetitive communications between the Defendants. This is particularly relevant with respect to Five Rivers given its prior vertical integration with Defendant JBS. This Request is limited to communications that involved more than one Defendant. If Five Rivers sold cattle only to JBS for most or all of the relevant period, then there would be little occasion to also communicate with other Defendants. Plaintiffs therefore do not consider this a burdensome request.

Moreover, while it is possible that some of these communications may be produced by Defendants, we cannot be sure they kept all such documents, inasmuch as their preservation obligations would not have been triggered until the earlier of government investigations or the first Cattle/Beef antitrust complaint. In addition, as noted by one court:

> [T]here is no absolute rule prohibiting a party from seeking to obtain the same documents from a non-party as can be obtained from a party, nor is there an absolute rule providing that the party must first seek those documents from an opposing party before seeking them from a non-party. In many cases, it is important to obtain what should be the same documents from two different sources because tell-tale differences may appear between them; and in many cases when a party obtains what should be the same set of documents from two different sources a critical fact in the litigation turns out to be that one set omitted a document that was in the other set.

*Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, No. 4:08MC00017 JLH, 2008 WL 4853620, at *2 (E.D. Ark. Nov. 6, 2008); *see also Pearson v. Univ. of Chicago*, No. 3:20-



November 10, 2022
Page  3

MC-00092-CSH, 2021 WL 194725, at *6 (D. Conn. Jan. 20, 2021) ("Using discovery from a non-party to vet the fulsomeness of a party's discovery is permissible under the Federal Rules.") (collecting cases).

For these reasons, we ask Five Rivers to reconsider its refusal to produce these documents or provide contrary authority plus a more complete description of the burden associated with producing such documents in support of its position withholding them.

**Request 5** seeks documents related to studies, reports, or analyses Five Rivers possesses that concern competitive conditions in the feedlot or Beef industries. We are entitled to know which reports the largest feedlot in the country considers reputable enough to collect. While some of the requested information may conceivably be available from other sources, we want to know which such documents are found at Five Rivers. These documents could refute or confirm some of the Defendants' representations about the relevant markets. We ask Five Rivers to reconsider its refusal to produce these documents or provide authority supporting its position to withhold them.

Finally, **Request 6** seeks documents related to drought conditions for cattle. Defendants have represented that drought conditions affected feedlots around the country and impacted the cattle market at issue in this case. Plaintiffs are entitled to any documents concerning such conditions and the steps Five Rivers took (and that Five Rivers knew others to have taken) to address or mitigate such conditions in order to test and confirm Defendants' representations. We ask Five Rivers to reconsider its refusal to produce these documents or provide relevant authority plus a more complete description of the burden associated with producing such documents in support of its position withholding them.

Please let us know your availability next week for a further meet and confer to assess whether the parties can reach a compromise or are impasse concerning any of these Requests.

Very truly yours,

Jason S. Hartley

Exhibit H

# KING & SPALDING

King & Spalding LLP
1700 Pennsylvania Ave, NW
Suite 900
Washington, D.C. 20006-4707
Tel:  +1 202 737 0500
Fax:  +1 202 626 3737
www.kslaw.com

Christopher C. Yook
Direct Dial:  +1 202 626 3747
cyook@kslaw.com

November 23, 2022

**VIA EMAIL**

Jason Hartley
Hartley LLP
101 West Broadway, Suite 820
San Diego, CA 92101
hartley@hartleyllp.com

                      Re: *In re Cattle and Beef Antitrust Litigation*, Case No. 20-cv-1319 (D. Minn.)
                      Five Rivers Subpoena

Jason:

       I appreciate your time yesterday to discuss the non-party subpoena served by Direct Purchaser Plaintiffs ("DPPs") on Five Rivers Cattle Feeding LLC ("Five Rivers").  I write to memorialize our discussion, the agreements regarding certain aspects of the subpoena, and the remaining follow-ups.

**Request No. 1 (2018 Merger Documents)**

       Five Rivers reiterated that Defendant JBS—who sold Five Rivers in 2018—is the proper source of information regarding that merger.  This is especially true in light of JBS's ongoing, extensive discovery obligations as part of its settlement with DPPs.  Even putting that aside, however, the relevance of the merger to the underlying antitrust claims remains unclear.

       When asked about the relevance, DPPs explained they want the merger documents to explore (1) why JBS would sell Five Rivers if vertical integration were so important, and (2) whether there was some conspiratorial motive on the part of JBS behind the sale of Five Rivers.  On the former rationale, we remain unconvinced that this justifies the obvious burdens of producing all drafts, communications, and the like related to the merger.  On the latter rationale,

November 23, 2022
Page 2

the DPPs' theory of some nefarious motive behind the merger is entirely speculative and DPPs were unable to provide any concrete support for it, despite our requests.

Consequently, Five Rivers continues to stand on its objections to this Request but remains willing to consider a proposal from DPPs narrowing the information related to the merger. In addition, we said on the call that we would be willing to discuss with Five Rivers the prospect of producing certain final merger documents, although we reiterated our objections to the production of drafts, communications, etc. You said that DPPs would also consider the issue further and respond.

### Request No. 3 (Sales and Purchase Data)

In exchange for holding this Request in abeyance,[1] Five Rivers offered to produce data for downstream sales from Five Rivers, broken out by purchaser, for the time period of 2009 through 2020. The monthly data will include sales volumes in both pounds and dollars. We noted that the proposed data aggregates company- and customer-owned cattle, and we said we would ask Five Rivers whether the sales data could be reasonably distinguished between the two categories. DPPs agreed to this proposal.

With regard to upstream purchases of cattle by Five Rivers, we continue to stand on our objections. We further explained that, for the period that Five Rivers was owned by JBS, a separate JBS affiliate purchased the cattle for which Five Rivers provided feed services, i.e., Five Rivers did not purchase or own the cattle. As such, the JBS affiliate is the proper source of purchase data. You said that DPPs would consider the issue further and respond, and also that DPPs will seek the requested information from the affiliate, if possible.

### Request No. 4 (Communications Involving Two or More Defendants)

Five Rivers explained that the Request is not reasonable where DPPs have two party sources for the requested documents. Five Rivers asked about the status of party discovery, and DPPs explained that the parties have been involved in extended negotiations related to Defendants' search terms and technology assisted review, and thus the Defendants have not yet made any significant document productions.

Because the parties are apparently in the early stages of fact discovery, Five Rivers proposed that the Request be held in abeyance unless and until party discovery reveals the need for the requested documents from Five Rivers. You said that DPPs would consider this proposal and respond.

---

[1] For any Request held in abeyance, Five Rivers and DPPs will discuss in good faith renewed Requests following DPPs' further efforts to obtain responsive information from other discovery sources. Five Rivers does not waive its objections to the Subpoena and reserves the right to reassert the objections if DPPs subsequently renew the Requests held in abeyance.

November 23, 2022
Page 3

### Request No. 5 (Competitive Conditions in the Feedlot Industry)

In satisfaction of this request, Five Rivers offered to provide a list of third-party studies, reports, and analyses related to Competitive Conditions in the feedlot industry and to which Five Rivers subscribes. DPPs agreed that the production of such a list would satisfy the Request as to third-party materials.

DPPs continue to seek any proprietary materials prepared by Five Rivers related to Competitive Conditions in the feedlot industry. Five Rivers expressed concerns that any internal reports, studies, and analyses, if they exist, would contain highly sensitive information, and that the Request is not proportional to the needs of the case, especially in light of the ample availability of responsive information from public and sources. Five Rivers continues to stand on its objections as to this aspect of the Request.

### Request No. 6 (Effect of Drought on Competitive Conditions)

Five Rivers asked for clarification about the types of materials at issue in the Request. DPPs agreed to search for examples of responsive documents, if any, in JBS's document productions.

Five Rivers further suggested that the requested information is publicly available and that the Request could be held in abeyance while DPPs further examine the third-party publications that Five Rivers identifies in response to Request No. 5. You said that DPPs would consider this proposal and respond.

*     *     *

Please let us know immediately if any of this summary is incorrect. Assuming we are aligned, Five Rivers will work to produce materials responsive to Request Nos. 3 and 5 in accordance with the above-referenced agreements.

Note that we expect to designate certain Five Rivers materials as either Confidential or Highly Confidential under the applicable Protective Order (Doc. 123). Please confirm that this is the operative Protective Order in the underlying case. Also, because Five Rivers is a non-party, to the extent any party plans to use Highly Confidential information produced by Five Rivers at a deposition, hearing, or trial in reliance on Section 6(b)(ii)(7) of the Protective Order, that party should provide written notice to counsel for Five Rivers in advance of the deposition, hearing, or trial so that counsel for Five Rivers has sufficient time to respond.

Sincerely,

Christopher C. Yook

cc: John F. Massouh

Exhibit I



Jason Hartley
hartley@hartleyllp.com

101 West Broadway, Suite 820
San Diego, CA 92101
Phone: (619) 400-5822
Fax: (619) 400-5832

December 28, 2022

Christopher Yook
King & Spalding, LLP
1700 Pennsylvania Ave, Suite 200
Washington, DC 20006
cyook@kslaw.com

      Re:    *In re Cattle and Beef Antitrust Litigation*, Case No. 20-cv-1319 (D.Minn.)
              Five Rivers Subpoena

Dear Chris:

Thank you for your response following our November 22, 2022 meet and confer. We appreciate your patience as the case became extremely busy in the month of December finalizing several discovery and schedule disputes with the Defendants and coordinating with seven groups of plaintiffs. We respond below to your stated positions regarding each of the subpoena requests at issue and indicate where the parties seem to be at impasse.

**RFP 1 (Documents re 2018 sale of Five Rivers)**

You expressed concern about the burden and relevance of gathering and producing all drafts of and communications about the sale of Five Rivers by JBS in 2018 and offered to produce final merger documents only. While we do not agree with your representations about burden and relevance, DPPs may be inclined to accept your offer to produce the final sale and sale-related documents. You suggested Five Rivers would be willing to produce "certain final merger documents." Please advise specifically what documents Five Rivers is willing to produce so that we can fully evaluate Five Rivers' proposed compromise.

**RFP 3 (Sales and Purchase Data)**

With respect to Five Rivers' sales data, DPPs accept your offer to produce a summary of Beef sales data for the period 2009-2020, in a monthly or quarterly fashion, by packer, in both volume and dollars sold. With respect to cattle procurement, you advised that for the period before 2018, Five Rivers did not purchase or own cattle. Instead, during the period JBS owned



December 28, 2022
Page 2

Five Rivers, those transactions were performed by another JBS -owned affiliate named J&F Oklahoma. DPPs will accept your proposal to hold this request in abeyance pending production of data from Defendants and/or J&F Oklahoma. If DPPs deem it necessary at a later date to retrieve sales data for 2018 on, please be advised that in this litigation a district court in Tennessee already ordered a third-party beef producer, Nebraska Beef, to produce - among other voluminous documents - its sales data for the period from January 1, 2010 through December 31, 2020 in response to a subpoena. *In Re Cattle and Beef Antitrust Litig.*, No. 8:22CV204, 2022 WL 17718553, at *8-9 (D. Neb. Dec. 15, 2022).

**RFP 4 (Communications involving two or more Defendants)**

It appears the parties are at impasse here. DPPs are not willing to hold this request in abeyance pending production by the Defendants. Even if Defendants produced some communications involving Five Rivers and another Defendant, DPPs cannot be sure of the completeness of such production and we are entitled to the documents Five Rivers has. This request is narrowly tailored and does not present an unreasonable burden to Five Rivers. As you know, Rule 26 is construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *In re Milk Prod. Antitrust Litig.*, 84 F.Supp.2d 1016, 1027 (D. Minn. 1997) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)); *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). Once the party seeking the discovery has made a threshold showing of relevance, the party resisting discovery based on a claim of undue burden must adduce specific facts demonstrating undue burden. *Inline Packaging, LLC v. Graphic Packaging Int'., Inc.*, No. 15-cv-3183 (ADM/LIB), 2016 WL 6997113, at *7 (D. Minn. Sept. 6, 2016). "Boilerplate objections, without more specific explanations for any refusal to provide information," are inadequate. *Lubrication Techs., Inc. v. Lee's Oil Serv., LLC,* Case No. 11-cv-2226 (DSD/LIB), 2012 WL 1633259, at *5 n.5 (D. Minn. Apr. 10, 2012)).

The relevance of communications between defendants as direct evidence of a conspiracy to control supply and fix prices was discussed during our call and is, in any case, self-evident. Their relevance as indirect proof to infer a conspiracy from consciously parallel behavior is also well-settled. This is so for communications between Defendants or through a third party intermediary.

Given the central probity of the communications DPPs seek, Five Rivers cannot articulate an excessive burden to produce them. *See, e.g., Inline Packaging,* 2016 WL 6997113, at *8-9 (compelling production of "[a]ll documents relating to or consisting of communications between competitors"); *In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09–MD–2090 ADM/AJB, 2011 WL 1304610, at *2-3 (D. Minn. Apr. 6, 2011) (ordering defendants to produce "documents related to communications between themselves relating to the plaintiffs' cause of action).

Please let us know if Five Rivers is willing to reconsider its position.



December 28, 2022
Page 3

**RFP 5 (Competitive Conditions)**

Thank you for your offer to produce a list of the third-party publications to which Five Rivers subscribes. That would be sufficient for our purposes with respect to third party publications. With respect to any internal documents, it appears the parties are at impasse. DPPs are entitled to any internal studies, reports, analyses and the like concerning competitive conditions in the cattle procurement or beef sales markets. As you know there is a robust Protective Order in the case that addresses any proprietary and confidentiality concerns Five Rivers has. You indicated during our call skepticism that such internal documents even exist. If that is the case, then please state so in a verified response. *See, e.g., Baker v. Cenlar FSB*, No. 20-cv-0967 (JRT/HB), 2021 WL 2493767, at *5 (D. Minn. June 18, 2021) (Mag. J. Bowbeer) (holding that representations made during meet-and-confer process that no responsive documents exist was insufficient and ordering formal written response following diligent search).

**RFP 6 (Effect of Drought)**

DPPs are not willing to hold this request in abeyance. Third party publications will not tell us how any drought conditions affected Five Rivers' procurement of cattle or sales of beef. The relevance of drought conditions to *Five Rivers'* (versus industry-wide) purchases of cattle or sales of beef is equally obvious given Defendants' argument that the drought affected market supply and prices. This request is much narrower than several in a subpoena served on Nebraska Beef in this litigation that sought information about market factors and conditions. In *In Re Cattle and Beef Antitrust Litig.*, No. 8:22CV204, 2022 WL 17718553 (D. Neb. Dec. 15, 2022), the court ordered Nebraska Beef to produce, among other information, all documents discussing or analyzing (1) the effects of the Tyson Holcomb Plant fire (another factor Defendants analogously rely on); (2) non-Defendant meat packers' ability to compete with the Defendants in the cattle purchase and beef sales markets; (3) fed cattle procurement practices; (4) fed cattle slaughter levels; (5) beef production and sales; (6) impacts on fed cattle and beef prices; (7) and utilization of its slaughter plants. *Id*. at **8-16.

Please let us know if this authority causes Five Rivers to reconsider its position or if the parties are at impasse. If you would like to discuss any of these Requests, please let us know your availability for another meet and confer.

Very truly yours,

Jason S. Hartley

Exhibit J

| | |
|---|---|
| **From:** | Christopher Yook |
| **Sent:** | Thursday, December 29, 2022 12:10 PM |
| **To:** | Jason Hartley |
| **Cc:** | John Massouh; Jeffrey Spigel; Matthew Ruan; Doug Millen; beefdppcoleads |
| **Subject:** | RE: In re Cattle Antitrust Litig - Five Rivers Subpoena |

Jason,

Thank you for the letter.  Please see Five Rivers' replies below:

**Request 1 (2018 Merger Documents):** Following our November 22nd meet-and-confer, I discussed with Five Rivers the prospect of producing final merger documents, but we remain unconvinced that the information is at all relevant to the case.  To correct a statement in your letter, Five Rivers did not offer to produce final merger documents.  As stated in our November 23rd letter, "Five Rivers continues to stand on its objections to this Request but remains willing to consider a proposal from DPPs narrowing the information related to the merger."  Plaintiffs have not presented a proposal so we are at an impasse on this request.

**Request 3 (Sales and Purchase Data):** Five Rivers will produce the aggregated downstream sales data, as discussed.  With regard to post-2018 upstream purchase data, note that it is our understanding that purchases of cattle are generally made on a feedlot-by-feedlot basis and thus generating the requested transactional data will be extremely burdensome.

**Request 4 (Communications Involving Two or More Defendants):** Confirming that we are at an impasse on this request.

**Request 5 (Competitive Conditions in the Feedlot Industry):** As previously stated, Five Rivers will produce a list of third-party studies, reports, and analyses.  With regard to Five Rivers' internal documents, confirming that we are at an impasse on this request.

**Request 6 (Effective of Drought on Competitive Conditions):** Confirming that we are at an impasse on this request.

Best,
Chris

**From:** Jason Hartley <hartley@hartleyllp.com>
**Sent:** Wednesday, December 28, 2022 2:41 PM
**To:** Christopher Yook <CYook@KSLAW.com>
**Cc:** John Massouh <john.massouh@sprouselaw.com>; Jeffrey Spigel <JSpigel@KSLAW.com>; Matthew Ruan <mruan@fklmlaw.com>; Doug Millen <dmillen@fklmlaw.com>; beefdppcoleads <beefdppcoleads@gustafsongluek.com>
**Subject:** Re: In re Cattle Antitrust Litig - Five Rivers Subpoena

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Dear Chris

Please see the attached letter concerning the Five Rivers subpoena.

1

**Jason S. Hartley**

101 W. Broadway, Suite 820
San Diego, CA 92101
(619) 400-5822 **TEL**
(619) 400-5832 **FAX**
hartley@hartleyllp.com
hartleyllp.com

The information contained in this message from Hartley LLP, any attachments thereto, and any information contained in messages replying to this message is privileged and confidential.  This message is intended only for the use of the named recipient(s) and the attorney-client and attorney work-product privileges are not waived by virtue of this having been sent by e-mail.  If you receive this message in error, you are strictly prohibited from, and it may be illegal to, copy, distribute or use the information. If you have received the foregoing email in error, please contact the sender immediately by return email and delete the original message.

**From:** Christopher Yook <CYook@KSLAW.com>
**Date:** Monday, December 26, 2022 at 9:43 AM
**To:** Jason Hartley <hartley@hartleyllp.com>
**Cc:** John Massouh <john.massouh@sprouselaw.com>, Jeffrey Spigel <JSpigel@KSLAW.com>, Matthew Ruan <mruan@fklmlaw.com>, Doug Millen <dmillen@fklmlaw.com>
**Subject:** RE: In re Cattle Antitrust Litig - Five Rivers Subpoena

Counsel,

It's been over a month since Five Rivers' letter memorializing the November 21st meet-and-confer regarding Plaintiffs' subpoena.  Plaintiffs have still yet to respond.  I also sent a follow-up email on December 2, which also went unacknowledged.

Based on the agreement reached during the meet-and-confer, Five Rivers has started collecting materials responsive to the narrowed scope of Requests 3 and 5, and expects to produce those materials by the end of next week.  As requested by Plaintiffs, the sales data for Request 3 will be further organized by company- and customer-owned cattle.

Given the lack of Plaintiffs' response to our correspondence, we are at an impasse on all other subpoena requests.  Please also note that JBS retained possession of Five Rivers' emails before the sale of Five Rivers in 2018 and Five Rivers thus does not have access to the pre-2018 email systems.

If Plaintiffs intend to withdraw their subpoena in its entirety (other than the narrowed scope of Requests 3 and 5 and the previously withdrawn Request 2), let us know no later than 5 pm ET on Wednesday, December 28.

Thanks,
Chris

**From:** Christopher Yook
**Sent:** Friday, December 2, 2022 4:06 PM
**To:** Jason Hartley <hartley@hartleyllp.com>
**Cc:** John Massouh <john.massouh@sprouselaw.com>; Jeffrey Spigel <JSpigel@KSLAW.com>; Matthew Ruan

2

<mruan@fklmlaw.com>; Doug Millen <dmillen@fklmlaw.com>
**Subject:** RE: In re Cattle Antitrust Litig - Five Rivers Subpoena

Jason, please let us know Plaintiffs positions regarding the few remaining items identified in our November 23rd letter.  Once we get your confirmation we'll work produce materials responsive to the narrowed Requests 3 and 5.  Thank you.

Chris

---

**From:** Christopher Yook
**Sent:** Wednesday, November 23, 2022 9:00 AM
**To:** 'Jason Hartley' <hartley@hartleyllp.com>
**Cc:** 'John Massouh' <john.massouh@sprouselaw.com>; Jeffrey Spigel <JSpigel@KSLAW.com>; 'Matthew Ruan' <mruan@fklmlaw.com>; 'Doug Millen' <dmillen@fklmlaw.com>
**Subject:** RE: In re Cattle Antitrust Litig - Five Rivers Subpoena

Jason, see attached correspondence.

---

**From:** Christopher Yook
**Sent:** Tuesday, November 22, 2022 10:00 AM
**To:** Jason Hartley <hartley@hartleyllp.com>
**Cc:** John Massouh <john.massouh@sprouselaw.com>; Jeffrey Spigel <JSpigel@KSLAW.com>; Matthew Ruan <mruan@fklmlaw.com>; Doug Millen <dmillen@fklmlaw.com>
**Subject:** RE: In re Cattle Antitrust Litig - Five Rivers Subpoena

That's fine with us, thanks.

---

**From:** Jason Hartley <hartley@hartleyllp.com>
**Sent:** Tuesday, November 22, 2022 9:34 AM
**To:** Christopher Yook <CYook@KSLAW.com>
**Cc:** John Massouh <john.massouh@sprouselaw.com>; Jeffrey Spigel <JSpigel@KSLAW.com>; Matthew Ruan <mruan@fklmlaw.com>; Doug Millen <dmillen@fklmlaw.com>
**Subject:** Re: In re Cattle Antitrust Litig - Five Rivers Subpoena

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Chris

Given some last minute schedule changes unrelated to work would you still be able to conduct this call an hour earlier, at 1pm Eastern? If that works we can use the same dial in below. Please let us know.

Jason

---

**From:** Christopher Yook <CYook@KSLAW.com>
**Date:** Monday, November 21, 2022 at 9:25 AM
**To:** Jason Hartley <hartley@hartleyllp.com>
**Cc:** John Massouh <john.massouh@sprouselaw.com>, Jeffrey Spigel <JSpigel@KSLAW.com>, Matthew Ruan <mruan@fklmlaw.com>, Doug Millen <dmillen@fklmlaw.com>
**Subject:** RE: In re Cattle Antitrust Litig - Five Rivers Subpoena

+1-408-826-0372

Meeting number (access code): 2433 168 7209

---

**From:** Jason Hartley <hartley@hartleyllp.com>
**Sent:** Monday, November 21, 2022 12:05 PM
**To:** Christopher Yook <CYook@KSLAW.com>
**Cc:** John Massouh <john.massouh@sprouselaw.com>; Jeffrey Spigel <JSpigel@KSLAW.com>; Matthew Ruan <mruan@fklmlaw.com>; Doug Millen <dmillen@fklmlaw.com>
**Subject:** Re: In re Cattle Antitrust Litig - Five Rivers Subpoena

> **CAUTION: MAIL FROM OUTSIDE THE FIRM**

Hi Chris

Assuming you meant tomorrow (11-22) we can do 2pm ET. Would you circulate a dial in to the folks on this email?  Thanks

Jason

On Nov 18, 2022, at 9:04 AM, Christopher Yook <CYook@kslaw.com> wrote:


Jason, we're available next Tuesday 11-1 and 2-4 ET for a follow-up to discuss your letter.  Let us know a time that works and I'll send a dial-in.

Thanks,
Chris

---

**From:** Christopher Yook <CYook@KSLAW.com>
**Sent:** Friday, November 11, 2022 6:26 PM
**To:** Jason Hartley <hartley@hartleyllp.com>
**Cc:** John Massouh <john.massouh@sprouselaw.com>; Jeffrey Spigel <JSpigel@KSLAW.com>; beefdppcoleads <beefdppcoleads@gustafsongluek.com>; Matthew Ruan <mruan@fklmlaw.com>; Doug Millen <dmillen@fklmlaw.com>
**Subject:** Re: In re Cattle Antitrust Litig - Five Rivers Subpoena

Jason, confirming receipt.  We're discussing this with Five Rivers and will be back in touch.

Thanks,
Chris

---

**From:** Jason Hartley <hartley@hartleyllp.com>
**Sent:** Thursday, November 10, 2022 12:29:50 PM
**To:** Christopher Yook <CYook@KSLAW.com>
**Cc:** John Massouh <john.massouh@sprouselaw.com>; Jeffrey Spigel <JSpigel@KSLAW.com>; beefdppcoleads <beefdppcoleads@gustafsongluek.com>; Matthew Ruan <mruan@fklmlaw.com>; Doug Millen <dmillen@fklmlaw.com>
**Subject:** Re: In re Cattle Antitrust Litig - Five Rivers Subpoena

> **CAUTION: MAIL FROM OUTSIDE THE FIRM**

Dear Counsel,

Please see the attached correspondence.

Jason S. Hartley

101 W. Broadway, Suite 820
San Diego, CA 92101
(619) 400-5822 **TEL**
(619) 400-5832 **FAX**
hartley@hartleyllp.com
**hartleyllp.com**

The information contained in this message from Hartley LLP, any attachments thereto, and any information contained in messages replying to this message is privileged and confidential.  This message is intended only for the use of the named recipient(s) and the attorney-client and attorney work-product privileges are not waived by virtue of this having been sent by e-mail.  If you receive this message in error, you are strictly prohibited from, and it may be illegal to, copy, distribute or use the information. If you have received the foregoing email in error, please contact the sender immediately by return email and delete the original message.

**From:** Christopher Yook <CYook@KSLAW.com>
**Date:** Tuesday, October 25, 2022 at 1:25 PM
**To:** Jason Hartley <hartley@hartleyllp.com>
**Cc:** John Massouh <john.massouh@sprouselaw.com>, Jeffrey Spigel <JSpigel@KSLAW.com>
**Subject:** RE: In re Cattle Antitrust Litig - Five Rivers Subpoena

Jason,

Please see attached for Five Rivers' objections to the non-party subpoena.

Thanks,
Chris

**From:** Christopher Yook
**Sent:** Thursday, October 13, 2022 1:14 PM
**To:** hartley@hartleyllp.com
**Cc:** John Massouh <john.massouh@sprouselaw.com>; Jeffrey Spigel <JSpigel@KSLAW.com>
**Subject:** In re Cattle Antitrust Litig - Five Rivers Subpoena

Jason,

I hope you're well.  We received a non-party subpoena served on Five Rivers in your litigation.  Could we have a brief call to discuss?

Here are some windows tomorrow: 12-3 or 4-5 ET.  Let us know if you're available then.

Thanks,
Chris

---

**Christopher Yook (Chris)**
*Partner*

T: +1 202 626 3747  |  E: cyook@kslaw.com  |  Bio  |  vCard

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006



kslaw.com

---

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message. Click here to view our Privacy Notice.